Luc A. Despins, Esq.
James T. Grogan, Esq.
PAUL HASTINGS JANOFSKY & WALKER LLP
Park Avenue Tower
75 E. 55th Street, First Floor
New York, NY 10022
Telephone: (212) 318-6000
Facsimile: (212) 319-4090

*Counsel to the Plaintiffs*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------x
                                                          :
**In re:**                                                :   **Chapter 11**
                                                          :
**FAIRPOINT COMMUNICATIONS, INC., *et al.*,** :   **Case No. 09-16335 (BRL)**
                                                          :
        **Reorganized Debtors.**               :   **(Jointly Administered)**
                                                          :
-------------------------------------------------------------x
                                                          :
**FAIRPOINT COMMUNICATIONS, INC.,**       :
**NORTHERN NEW ENGLAND TELEPHONE**        :
**OPERATIONS LLC AND**                     :   **Adv. Proc. No. __**
**TELEPHONE OPERATING COMPANY OF**         :
**VERMONT LLC**                            :
                                                          :
      **Plaintiffs,**                      :
                                                          :
**v.**                                                    :
                                                          :
**SEGTEL, INC. AND**                       :
**SEGNET TECHNOLOGIES, INC.**              :
                                                          :
      **Defendants.**                      :
-------------------------------------------------------------x

## PLAINTIFFS' COMPLAINT AGAINST, AND OBJECTION TO PROOFS OF CLAIM FILED BY, SEGTEL INC. AND SEGNET TECHNOLOGIES INC.

FairPoint Communications, Inc. ("FairPoint Communications"), Northern New England

Telephone Operations LLC ("New England Telco") and Telephone Operating Company of

Vermont LLC ("Vermont Telco", together with FairPoint Communications and New England Telco, the "Plaintiffs") hereby object to proofs of claim nos. 6512, 6513, 6514 and 6515 (together, the "Proofs of Claim", attached as Exhibit A) filed by segNET Technologies, Inc. ("Segnet") and segTEL, Inc. ("Segtel", together with Segnet, the "Defendants"). Plaintiffs also assert counterclaims against Defendants for monetary damages and other affirmative relief as stated herein. For their objection to the Proofs of Claim and counterclaims, Plaintiffs state the following:

## I.     INTRODUCTION

1.     Plaintiffs are engaged in the business of selling wholesale and retail telecommunications services and facilities to Defendants under interconnection agreements, pole attachment agreements, conduit agreements and relevant state and federal tariffs. Pursuant to these agreements and tariffs the Defendants agreed to *purchase* services and facilities from Plaintiffs. Defendants have not paid their debts to Plaintiffs in full.

2.     Instead of paying all of their debts, Defendants make various accusations that Plaintiffs have over-billed for their services, engaged in anti-competitive conduct and failed to adequately account for payments and credits due to Defendants. Further, Defendants have filed Proofs of Claim in the aggregate amount of $5,160,975.25 regarding these accusations. Even more egregiously, the Proofs of Claim themselves amount to a series of "black-box" demands for payment. That is, Defendants have stated their desired output without giving any basis for the damages claimed or evidence supporting such claims.

3.     Plaintiffs have examined the allegations contained the Proofs of Claim and have determined that the Proofs of Claim lack merit for at least the following three reasons. First, Defendants transmogrify their agreement to *pay* Plaintiffs for telecommunications services

into a financial windfall for Defendants by demanding payment for meritless and unsubstantiated disputes over invoices that the Plaintiffs submitted to Defendants for payment.  Even if these billing disputes were valid (and they are not) they are, at most, *defenses* to Plaintiffs' claims against Defendants.  Billing disputes do not give rise to a "right to payment" from Plaintiffs and therefore are not "claims" under section 101(5) of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

4.      Second, Defendants assert that they are due damages for purported "competitive violations" by the Plaintiffs of the Communications Act of 1934, as amended by the Telecommunications Act of 1996 (the "Telecommunications Act")[1] and unidentified state law.  In doing so, Defendants (a) conveniently ignore the terms of tariffs and agreements that *expressly disclaim* the damages now sought by Defendants, (b) presume without basis that Plaintiffs had a duty to provide *whatever* services the Defendants request, and (c) overlook established law that individual claimants cannot assert private claims for damages under the Telecommunications Act.  Further, under the filed-tariff doctrine and applicable law, Defendants are prohibited from challenging the terms of the tariffs and agreements that govern the services Defendants procure from Plaintiffs.

5.      Third, Segtel alleges that it is entitled to billing credits (the "PAP Credits") for Plaintiffs' failure to meet certain performance metrics under the performance assurance plans (the "PAPs") that the Plaintiffs operate under in the States of Maine, New Hampshire, and Vermont (collectively, "Northern New England").  Defendants have grossly exaggerated the amounts of any PAP Credits to which they are entitled by demanding almost $2 million from the Plaintiffs' estates.  In accordance with applicable regulations, Plaintiffs have

---

[1]      47 U.S.C. §§ 151 *et. seq.*

reported that, as of the Petition Date, $140,475 in PAP Credits may be applied to eligible Segtel billing accounts.   Further, at most, PAP Credits would be applied to unpaid charges assessed by Plaintiffs.  Those credits are not payable in cash by the Plaintiffs.

6.      Further, Defendants have each ordered and received, and continue to order and receive, services and facilities from Plaintiffs.  Defendants have failed to pay Plaintiffs amounts due for these services and facilities.  Plaintiffs' books and records indicate that the Defendants have failed to pay at least $698,647, plus penalties and interest, for goods and services that Plaintiffs provided to Defendants (the "Turnover Property").  As a result, Defendants have breached the agreements governing the business relationship between the parties and have disregarded obligations under relevant federal and state law.  Plaintiffs have attempted to resolve this matter by engaging in good faith efforts with Defendants to obtain the payments due to Plaintiffs, to no avail.  Defendants are liable for the Turnover Property under section 542(b) of the Bankruptcy Code.

7.      Unless the Turnover Property is immediately and fully paid to the Plaintiffs, section 502(d) of the Bankruptcy Code requires the disallowance of any claim filed by the Defendants.

8.      Finally, for the reasons described herein, Plaintiffs are entitled to a declaratory judgment stating that (a) Plaintiffs do not owe Defendants any cure amounts to assume any executory contracts that exist between Plaintiffs and Defendants under section 365 of the Bankruptcy Code, and (b) Plaintiffs are entitled to cash deposits from the Defendants in the aggregate amount of $368,250 as adequate assurance of payment under the terms of applicable tariffs and agreements.

## II. THE PARTIES

9.      FairPoint Communications, a Delaware corporation with a principal place of business in Charlotte, North Carolina, is a reorganized debtor in these chapter 11 cases.

10.      New England Telco, a Delaware limited liability company with a principal place of business in Portland, Maine, is a reorganized debtor in these chapter 11 cases.

11.      Vermont Telco, a Delaware limited liability company with a principal place of business in Burlington, VT, is a reorganized debtor in these chapter 11 cases.

12.      On information and belief, Segtel is a New Hampshire corporation with its principal place of business located in Lebanon, New Hampshire.  Segtel has appeared and filed claims in the Plaintiffs' bankruptcy and is subject to personal jurisdiction before this Court.  Segtel can be served with process by and through its President Steve E. Goldsmith, Vice President William Harper and/or Vice President Jeremy L. Katz, or by and through its registered agent, Barry C. Schuster Esq., at 79 Hanover Street, PO Box 388, Lebanon NJ 03766.

13.      On information and belief, Segnet is a Delaware corporation with its principal place of business located in Lebanon, New Hampshire.  Segnet has appeared and filed claims in the Plaintiffs' bankruptcy and is subject to personal jurisdiction before this Court.  Segnet can be served with process by and through its President Steve E. Goldsmith and/or Vice President Jeremy L. Katz, or by and through its registered agents, National Registered Agents, Inc., at 160 Greentree Drive Suite 101, Dover DE 19904 and/or Barry C. Schuster Esq., at 79 Hanover Street, PO Box 388, Lebanon NJ 03766.

## III. JURISDICTION AND VENUE

14.      This Court has jurisdiction over the parties and the subject matter of this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334.

15.     This adversary proceeding is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

16.     This adversary proceeding is commenced pursuant to Rules 3007, 7001, 7008 and 7020 of the Federal Rules of Bankruptcy Procedure.

17.     Venue is proper in this district pursuant to 28 U.S.C. § 1409.

## IV.     GENERAL ALLEGATIONS

### A.     Background

18.     On January 15, 2007, FairPoint Communications entered into an agreement (the "Merger Agreement") with Verizon Communications Inc. ("Verizon") and Northern New England Spinco Inc. ("Spinco"), a subsidiary of Verizon, pursuant to which FairPoint Communications committed to purchase and assume Verizon New England Inc.'s ("Verizon NE") landline operations in Northern New England.

19.     In order to consummate the transaction (i) New England Telco was organized as a wholly-owned subsidiary of Spinco, (ii) Vermont Telco was organized as a wholly-owned subsidiary of New England Telco, (iii) Verizon agreed to contribute, among other things, specified assets of Verizon NE in Maine and New Hampshire to New England Telco, (iv) Verizon agreed to contribute, among other things, specified assets of Verizon NE in Vermont to Vermont Telco, and (v) Spinco subsequently merged with and into FairPoint Communications, with FairPoint Communications remaining as the surviving entity.

20.     On March 31, 2008 (the "Closing Date"), FairPoint Communications completed the merger with Spinco (the "Merger").

21.     As a consequence of the Merger, New England Telco and Vermont Telco became subsidiaries of FairPoint Communications.

22.     On January 15, 2007, and in connection with the execution of the Merger Agreement, Verizon, Verizon NE, Verizon Information Technologies LLC, FairPoint Communications, New England Telco, Vermont Telco, and Enhanced Communications of Northern New England Inc. entered into a certain Transition Services Agreement (the "TSA").

23.     In accordance with the terms of the TSA, Verizon remained responsible for critical functions of New England Telco and Vermont Telco between the Closing Date and January 31, 2009 (the "Cutover"), including internal information technology, customer care, order management, broadband help desk support, E-911 services, network monitoring, billing and collection, and supply chain systems.  At Cutover, FairPoint Communications completed the transition of such functions from Verizon to newly created systems owned by FairPoint Communications.

24.     FairPoint Communications is the ultimate parent of New England Telco and Vermont Telco.

25.     New England Telco is an incumbent local exchange carrier ("ILEC") that provides telecommunications services to Defendants in Maine and New Hampshire including, but not limited to, certain listed unbundled network elements ("UNEs") (as determined by the Federal Communications Commission ("FCC")), access usage, collocation, pole attachment, conduit license, retail interstate and intrastate access facilities and various other regulated and unregulated services.

26.     Vermont Telco is an ILEC that provides telecommunication services to Defendants in Vermont including, but not limited to, UNEs, access usage, collocation, pole attachment, conduit license, retail interstate and intrastate access facilities and various other regulated and unregulated services.

27.     On information and belief, Segtel is a competitive local exchange carrier ("CLEC") that operates in Northern New England.

28.     On information and belief, Segnet is an internet service provider in Northern New England.

**B.      Tariffs and Agreements Governing the Parties' Relationship**

29.     In Maine, Segtel obtains and promised to pay for services from New England Telco under the terms of an interconnection agreement between New England Telco and Segtel, adopted on November 3, 2005 (the "Maine Interconnection Agreement", attached as Exhibit B).

30.     In Maine, Segtel obtains and promised to pay for services from New England Telco under the filed tariff known as *Rates and Charges Effective in the State of Maine PUC ME No. 15 Northern New England Telephone Operations LLC d/b/a FairPoint Communications – NNE* ("Maine Tariff 15").[2]

31.     In Maine, Segtel obtains and promised to pay for services from New England Telco under the filed tariff known as *Rates and Charges Effective in the State of Maine PUC ME No. 17 Northern New England Telephone Operations LLC d/b/a FairPoint Communications – NNE* ("Maine Tariff 17").

32.     In Maine, Segtel obtains and promised to pay for services from New England Telco under the filed tariff known as *Rates and Charges Effective in the State of Maine PUC ME No. 18 Northern New England Telephone Operations LLC d/b/a FairPoint Communications – NNE* ("Maine Tariff 18").

---

[2]     The federal and state tariffs that govern the relationship between Plaintiffs and Defendants are voluminous, and only the relevant portions are hereto.  Complete copies of the federal and state tariffs referenced herein are available at http://www.tariffs.net/fairpoint/tier.asp?cid=1644.

33.     In Maine, Segtel obtains and promised to pay for services from New England Telco under the filed tariff known as *Rates and Charges Effective in the State of Maine PUC ME No. 20 Northern New England Telephone Operations LLC d/b/a FairPoint Communications – NNE* ("Maine Tariff 20").[3]

34.     In Maine, Segtel obtains and promised to pay for services from New England Telco under a pole attachment agreement dated May 17, 2005 (the "May 2005 Pole Attachment Agreement", attached as Exhibit D).

35.     In Maine, Segtel obtains and promised to pay for services from New England Telco under a conduit license agreement dated November 22, 2005 (the "November 2005 Conduit Agreement", attached as Exhibit E).

36.     In New Hampshire, Segtel obtains and promised to pay for services from New England Telco under the filed tariff known as *Northern New England Telephone Operations LLC d/b/a FairPoint Communications – NNE Rates and Charges Effective in the State of New Hampshire NH PUC No. 83, dated April 1, 2008* ( "NH Tariff 83").

37.     In New Hampshire, Segtel obtains and promised to pay for services from New England Telco under the filed tariff known as *Northern New England Telephone Operations LLC d/b/a FairPoint Communications – NNE Rates and Charges Effective in the State of New Hampshire NH PUC No. 84, dated April 1, 2008* ("NH Tariff 84").

38.     In New Hampshire, Segtel obtains and promised to pay for services from New England Telco under the filed tariff known as *Northern New England Telephone*

---

[3]     Maine Tariff 15, Maine Tariff 17, Maine Tariff 18, and Maine Tariff 20 shall be collectively referred herein as the "Maine Tariff").  Relevant portions of the Maine Tariff are attached hereto as Exhibit C.

*Operations LLC d/b/a FairPoint Communications – NNE Rates and Charges Effective in the State of New Hampshire NH PUC No. 85, dated April 1, 2008* ("NH Tariff 85").

39.     In New Hampshire, Segtel obtains and promised to pay for services from New England Telco under the filed tariff known as *Northern New England Telephone Operations LLC d/b/a FairPoint Communications – NNE Rates and Charges Effective in the State of New Hampshire NH PUC No. 86, dated April 1, 2008* ("NH Tariff 86").[4]

40.     In New Hampshire, Segtel obtains and promised to pay for services from New England Telco under a pole attachment agreement dated April 6, 2004 (the "April 2004 Pole Attachment Agreement", attached as Exhibit G).

41.     In New Hampshire, Segtel obtains and promised to pay for services from New England Telco under a pole attachment agreement dated July 30, 2004 (the "July 2004 Pole Attachment Agreement", attached as Exhibit H).[5]

42.     In New Hampshire, Segtel obtains and promised to pay for services from New England Telco under a conduit license agreement dated February 27, 2004 (the "February 2004 Conduit Agreement", attached as Exhibit I).

43.     In Vermont, Segtel obtains and promised to pay for services from Vermont Telco under the filed tariff known as *Statement of Generally Available Terms and Conditions for Interconnection Services, Access to Unbundled Network Elements, Resale Telecommunications Services and Ancillary Telecommunications Service Under Sections 251*

---

[4]     NH Tariff 83, NH Tariff 84, NH Tariff 85 and NH Tariff 86 shall be collectively referred to herein as the "NH Tariff".  Relevant portions of the NH Tariff are attached hereto as Exhibit F.

[5]     The April 2004 Pole Attachment Agreement, July 2004 Pole Attachment Agreement and May 2005 Pole Attachment Agreement shall be collectively referred to herein as the "Pole Attachment Agreements".

*and 252 of the Telecommunications Act of 1996, dated April 1, 2008 by Telephone Operating*

*Company of Vermont LLC d/b/a FairPoint Communications* ("Vermont GATT").

      44.     In Vermont, Segtel obtains and promised to pay for services from Vermont Telco under the filed tariff known as *Telephone Operating Company of Vermont LLC d/b/a FairPoint Communications Rates and Charges Effective in the State of Vermont PSB VT No. 20* ("Vermont Tariff 20").

      45.     In Vermont, Segtel obtains and promised to pay for services from Vermont Telco under the filed tariff known as *Telephone Operating Company of Vermont LLC d/b/a FairPoint Communications Rates and Charges Effective in the State of Vermont PSB VT No. 22* ("Vermont Tariff 22").

      46.     In Vermont, Segtel obtains and promised to pay for services from Vermont Telco under the filed tariff known as *Telephone Operating Company of Vermont LLC d/b/a FairPoint Communications Rates and Charges Effective in the State of Vermont PSB VT No. 23* ("Vermont Tariff 23").

      47.     In Vermont, Segtel obtains and promised to pay for services from Vermont Telco under the filed tariff known as *Telephone Operating Company of Vermont LLC d/b/a FairPoint Communications Rates and Charges Effective in the State of Vermont PSB VT No. 24* ("Vermont Tariff 24").

      48.     In Vermont, Segtel obtains and promised to pay for services from Vermont Telco under the filed tariff known as *Telephone Operating Company of Vermont LLC d/b/a FairPoint Communications Rates and Charges Effective in the State of Vermont PSB VT No. 26* ("Vermont Tariff 26").

49.     In Vermont, Segtel obtains and promised to pay for services from Vermont Telco under the filed tariff known as *Telephone Operating Company of Vermont LLC d/b/a FairPoint Communications Rates and Charges Effective in the State of Vermont PSB VT No. 29* ("Vermont Tariff 29").[6]

50.     In Vermont, Segtel obtains and promised to pay for services from Vermont Telco under a conduit license agreement dated February 1, 2005 (the "February 2005 Conduit Agreement", attached as Exhibit K).[7]

51.     In Vermont, Segtel obtains and promised to pay for services from Vermont Telco under the filed tariff known as *Tariff F.C.C. No. 1* ("FCC Tariff 1").

52.     In Vermont, Segtel purchases services from Vermont Telco under the filed tariff known as *Tariff F.C.C. No. 2* ("FCC Tariff 2").[8]

53.     In Maine, Segnet obtains and promised to pay for services from New England Telco under Maine Tariff 15.

54.     In Maine, Segnet obtains and promised to pay for services from New England Telco under Maine Tariff 17.

55.     In Maine, Segnet obtains and promised to pay for services from New England Telco under Maine Tariff 18.

---

[6]     The Vermont GATT, Vermont Tariff 20, Vermont Tariff 22, Vermont Tariff 23, Vermont Tariff 24, Vermont Tariff 26 and Vermont Tariff 29 shall be collectively referred to herein as the "Vermont Tariff". Relevant portions of the Vermont Tariff are attached hereto as Exhibit J.

[7]     The February 2004 Conduit Agreement, November 2005 Conduit Agreement and the February 2005 Conduit Agreement shall be collectively referred to herein as the "Conduit Agreements".

[8]     FCC Tariff 1 and FCC Tariff 2 shall be collectively referred to herein as the "FCC Tariff". Relevant portions of the FCC Tariff are attached hereto as Exhibit L. The NH Tariff, Vermont Tariff, Maine Tariff and FCC Tariff shall collectively be referred to herein as the "FairPoint Tariffs". The FairPoint Tariffs, the Conduit Agreements, the Pole Attachment Agreements, and the Maine Interconnection Agreement shall be collectively referred to herein as the "Agreements."

56.     In New Hampshire, Segnet obtains and promised to pay for services from New England Telco under the terms of NH Tariff 83.

57.     In New Hampshire, Segnet obtains and promised to pay for services from New England Telco under the terms of NH Tariff 85.

58.     In Vermont, Segnet obtains and promised to pay for services from Vermont Telco under the terms of Vermont Tariff 20.

59.     In Vermont, Segnet obtains and promised to pay for services from Vermont Telco under the terms of Vermont Tariff 23.

60.     In Vermont, Segnet obtains and promised to pay for services from Vermont Telco under the terms of Vermont Tariff 24.

61.     In Vermont, Segnet obtains and promised to pay for services from Vermont Telco under the terms of Vermont Tariff 29.

62.     In Vermont, Segnet obtains and promised to pay for services from Vermont Telco under the FCC Tariff 1.

63.     In Vermont, Segnet obtains and promised to pay for services from Vermont Telco under the FCC Tariff 2.

C.     **FairPoint's Plan of Reorganization**

64.     On October 26, 2009 (the "Petition Date"), FairPoint Communications and its debtor affiliates (collectively, "FairPoint") commenced voluntary cases under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York.

65.     By order dated January 13, 2011 [Main Case Docket No. 2113] (the "Confirmation Order"), the Court confirmed the *Debtors' Third Amended Joint Plan Of*

*Reorganization Under Chapter 11 Of The Bankruptcy Code* [Main Case Docket No. 2115] (the

"Plan").

66.    Pursuant to sections 8.12 and 14.3 of the Plan, FairPoint retained the

causes of action brought in this Complaint.

67.    On January 24, 2011, the Plan became effective in accordance with its

own terms.

68.    Section 11.3.3(iii) of the Plan and paragraph 45 of the Confirmation Order

provide that:

> to the extent (A) FairPoint is a party to any contract, lease or other
> agreement providing for the purchase, by a third party, of access to
> FairPoint's facilities or services, (B) any such agreement constitutes an
> executory contract or unexpired lease and (C) such agreement (1) has not
> been assumed or rejected pursuant to a Final Order of the Bankruptcy
> Court, (2) is not subject to a pending motion for reconsideration or appeal
> of an order authorizing the assumption or rejection of such executory
> contract or unexpired lease, (3) is not subject to a motion to assume or
> reject such executory contract or unexpired lease filed on or prior to the
> Effective Date, or (4) is not identified for rejection on Schedules 11.1(A)
> or 11.1(B) of the Plan Supplement, then such agreement will be assumed
> as of the Effective Date by FairPoint, in accordance with the provisions
> and requirements of sections 365 of the Bankruptcy Code. No Cure shall
> be paid and no other form of refund or billing credit shall be given in
> connection with the assumption of such an agreement.

69.    The Agreements provide for the purchase, by Defendants, of access to

FairPoint's facilities or services.

70.    The Agreements are executory contracts for purposes of the Plan.

71.    FairPoint has not filed a motion to assume or reject any executory

contracts that exist between Plaintiffs and Defendants.

72.    On April 30, 2010, Defendants filed the Objection of segTEL Inc., and

segNET Technologies, Inc. to Proposed Cure Amounts, If Any, To be Paid in Accordance with

Section 11.3 of Plan of Reorganization [Main Case Docket No. 1239] (the "Cure Objection").  In

the Cure Objection, Defendants did not mention or object to the provisions of section 11.3.3(iii) of the Plan.  Rather, Defendants objected to payment of cure pursuant to section 11.3.3(i) of the Plan or an earlier version thereof.

## D.    Jurisdiction

73.    Pursuant to section 15 of the Plan and paragraph 66 of the Confirmation Order, the Bankruptcy Court has exclusive jurisdiction of all matters in connection with, arising out of, or related to these chapter 11 cases and the Plan pursuant to, and for the purposes of, sections 105(a) and 1142 of the Bankruptcy Code, including, without limitation, to hear and determine pending applications for the assumption or rejection of executory contracts or unexpired leases and the allowance of cure amounts and claims resulting therefrom, to hear and determine any timely objections to, or requests for estimation of disputed claims, in whole or in part, and to hear and determine any rights, claims or causes of action held by or accruing to Plaintiffs pursuant to the Bankruptcy Code or pursuant to any federal statute or legal theory.

## E.    The Proofs of Claim

74.    On or about March 18, 2010, Segnet filed proof of claim no. 6512 ("Claim 6512") against New England Telco.

75.    On or about March 18, 2010, Segtel filed proof of claim no. 6513 ("Claim 6513") against New England Telco.

76.    On or about March 18, 2010, Segnet filed proof of claim no. 6514 ("Claim 6514") against Vermont Telco.

77.    On or about March 18, 2010, Segtel filed proof of claim no. 6515 ("Claim 6515") against Vermont Telco.

78.    The Proofs of Claim include the following claims and allegations:

### i.  Billing Dispute Claims

79.     Defendants assert claims for $1,816,719.78 (collectively, the "Billing Dispute Claims") attributable to refunds and billing credits purportedly due to the Defendants on account of allegedly incorrect billing by the Plaintiffs.[9]

### ii.  Penalty Interest Claim

80.     Segtel also claims that it is entitled to $17,462.06 in penalty interest (the "Penalty Interest Claim") because Segtel contends that when New England Telco gave Segtel credits for resolved billing disputes it should have included penalty interest with the credits.[10]

### iii.  Unpaid Bills Claim

81.     Segtel also asserts claims (the "Unpaid Bills Claim") for $65,343.14 based upon New England Telco's alleged failure to pay for services rendered by Segtel.[11]

---

[9]     *See* ¶ II.A. of Exhibit A to Claim 6512 (asserting Segnet is entitled to refunds for resolved disputes or overpayments on invoices for New England Telco's services); ¶ II.A. of Exhibit A to Claim 6513 (asserting Segtel is entitled to refunds for resolved disputes or overpayments on invoices for New England Telco's services); ¶ II.A. of Exhibit A to Claim 6514 (asserting Segnet is entitled to refunds for resolved disputes or overpayments on invoices for Vermont Telco's services); ¶ II.A. of Exhibit A to Claim 6515 (asserting Segtel is entitled to refunds for resolved disputes or overpayments on invoices for Vermont Telco's services); ¶ II.B. of Exhibit A to Claim 6512 (asserting Segnet is entitled to billing credits for amounts invoiced by New England Telco during an alleged service outage); ¶ II.B. of Exhibit A to Claim 6514 (asserting Segnet is entitled to billing credits for amounts invoiced by Vermont Telco during an alleged service outage); ¶ II.C. of Exhibit A to Claim 6512 (asserting Segnet is entitled to charges *imposed by New England Telco* for Segnet's "failure to remove cancelled circuits, or other reasons"); ¶ II.C. of Exhibit A to Claim 6514 (asserting Segnet is entitled to charges *imposed by Vermont Telco* for Segnet's "failure to remove cancelled circuits, or other reasons"); ¶ III.A. of Exhibit A to Claim 6513 (asserting New England Telco continues to invoice Segtel for charges that are barred under applicable state and federal statutes of limitations); ¶ III.A. of Exhibit A to Claim 6515 (asserting Vermont Telco continues to invoice Segtel for charges that are barred under applicable state and federal statutes of limitations); ¶ III.B. of Exhibit A to Claim 6513 (asserting New England Telco continues to invoice Segtel for incorrect charges that Segtel disputes on a variety of grounds); ¶ III.B. of Exhibit A to Claim 6515 (asserting Vermont Telco continues to invoice Segtel for incorrect charges that Segtel disputes on a variety of grounds); ¶ III.C. of Exhibit A to Claim 6513 (asserting New England Telco misapplied Segtel payments on certain New England Telco invoices); ¶ III.C. of Exhibit A to Claim 6515 (asserting Vermont Telco misapplied Segtel payments on certain New England Telco invoices); ¶ III.D. of Exhibit A to Claim 6513 (asserting New England Telco continues to invoice Segtel for charges that have been previously disputed by Segtel and resolved by the parties); ¶ III.D. of Exhibit A to Claim 6515 (asserting Vermont Telco continues to invoice Segtel for charges that have been previously disputed by Segtel and resolved by the parties).

[10]     ¶ II.B. of Exhibit A to Claim 6513.

### iv. **Competitive Violation Claims**

82.    Defendants also assert claims (the "Competitive Violation Claims") for $1,060,042.00 on the basis of Plaintiffs' purported failure to (a) provide access to its poles, ducts, conduits and rights-of-way,[12] and (b) provide certain services for resale, or otherwise facilitate such resale of services in violation of sections 224, 251 or 271 of the Telecommunications Act, state and federal tariffs, the Maine Interconnection Agreement, the Pole Attachment Agreements, the Conduit Agreements, and unidentified state law.[13]  Segnet asserts these claims based upon services that it maintains it acquired from Segtel.  Segtel, in turn, maintains that it acquired these services from Plaintiffs.   Defendants assert damages for the Competitive Violation Claims based on lost revenue, costs incurred to obtain alternative services and other forms of incidental and consequential damages as follows:

(a)    Segtel claims that New England Telco has "delayed or failed to provide adequate information for [Segtel] to prepare fiber cables and has further delayed and failed to bring cables into its central offices…. [Segtel] has been damaged in the amount of $135,000 … based upon the costs to purchase alternative services and lost revenue during the period the work

---

(...continued)

[11]    ¶ II.C. of Exhibit A to Claim 6513.

[12]    *See* ¶ II.E.3. of Exhibit A to Claim 6513 (alleging New England Telco failed to provide required survey and make-ready work for Segtel to install facilities in conduit and on poles); ¶ II.E.4. of Exhibit A to Claim 6513 (alleging New England Telco refused to allow Segtel to construct manhole breakouts for access to New England Telco's networks); ¶ II.E.5. of Exhibit A to Claim 6513 (alleging New England Telco delayed processing of Segtel's application for pole attachment licenses).

[13]    *See* ¶ II.D. of Exhibit A to Claim 6512 (alleging New England Telco failed to provide a working platform for conversion of services for resale); ¶ II.E.11. of Exhibit A to Claim 6513 (same); ¶ II.E.12. of Exhibit A to Claim 6513 (same); ¶ II.D.2. of Exhibit A to Claim 6512 (alleging New England Telco failed to convert special access T-1 lines to unbundled network elements or for resale); ¶ II.E.2. of Exhibit A to Claim 6513 (alleging Plaintiffs failed to provide Segtel access to unbundled network elements for resale); ¶ II.C. of Exhibit A to Claim 6515 (same); ¶ II.E.1. of Exhibit A to Claim 6513 (alleging New England Telco failed to bring fiber optic cables into New England Telco's central offices in New Hampshire for resale); ¶ II.E.6. of Exhibit A to Claim 6513 (alleging New England Telco failed to have a working operations support system for processing Segtel orders for resale); ¶ II.E.7. of Exhibit A to Claim 6513 (alleging New England Telco did not qualify its loops as DSL-capable in New Hampshire for resale); ¶ II.E.8. of Exhibit A to Claim 6513 (alleging New England Telco delayed processing of Segtel's applications for collocation); ¶ II.E.13. of Exhibit A to Claim 6513 (alleging New England Telco failed to provide Segtel with a working platform for special access to unbundled network element conversions for resale).

was delayed and not performed, plus additional amounts incurred after the Petition Date."[14]

(b)    Segtel claims that New England Telco has "failed to provide [Segtel] access to certain unbundled network elements …. [Segtel] has been damaged in the amount of $40,000 … based upon the cost to purchase alternative service and lost revenue during the period when these services were not provided or were delayed, plus additional amounts incurred after the Petition Date."[15]

(c)    Segtel claims that New England Telco has "delayed and failed to provide required survey and make-ready work for [Segtel] to install facilities in conduit and on poles owned by [New England Telco] …. [Segtel] has been damaged in the amount of $120,000 … based upon the costs to purchase alternative services and lost revenue during the period the work was delayed and not performed, plus additional amounts incurred after the Petition Date."[16]

(d)    Segtel claims that New England Telco has "delayed and refused to allow [Segtel] to construct manhole breakouts …. [Segtel] has been damaged in the amount of $35,000 … based on the cost to purchase alternative services and lost revenue during the period the work was delayed and not performed, plus additional amounts incurred after the Petition Date."[17]

(e)    Segtel claims that New England Telco has "delayed in processing [Segtel's] applications for pole attachment licenses …. [Segtel] has been damaged in the amount of $24,000 … based on the costs to purchase alternative services during the period the work was delayed and not performed, plus additional amounts incurred after the Petition Date."[18]

(f)    Segtel claims that New England Telco "did not have a working Operations Support System for processing [Segtel's] orders …. [Segtel] has been damaged in the amount of $32,000 … based upon lost revenue during the period ordering services and provisioning services was delayed and not performed, plus additional amounts incurred after the Petition Date."[19]

(g)    Segtel claims that New England Telco has "not had adequate software, tools, or equipment to qualify its loops as DSL-capable …. [Segtel] has

---

[14]    ¶ II.E.1. of Exhibit A to Claim 6513.

[15]    ¶ II.E.2. of Exhibit A to Claim 6513.

[16]    ¶ II.E.3. of Exhibit A to Claim 6513.

[17]    ¶ II.E.4. of Exhibit A to Claim 6513.

[18]    ¶ II.E.5. of Exhibit A to Claim 6513.

[19]    ¶ II.E.6. of Exhibit A to Claim 6513.

been damaged in the amount of $48,000 … based upon lost revenue during the period ordering services and provisioning services was delayed and not performed, plus additional amounts incurred after the Petition Date."[20]

(h)     Segtel claims that New England Telco has "not had adequate procedures, equipment and systems for processing [Segtel's] application for collocation …. [Segtel] has been damaged in the amount of $60,000 … based on the cost to purchase alternative services and lost revenue when these services were not provided or were delayed, plus additional amounts incurred after the Petition Date."[21]

(i)     Segtel claims that New England Telco has "failed to provide a working platform for resale which has impeded [Segtel's] ability to order services for resale to its customers and to provision such service to its customers…. [Segtel] has been damaged in the amount of $22,400 by these breaches and violations, plus additional amounts incurred after the Petition Date."[22]

(j)     Segtel claims that New England Telco has "failed to provide a working platform for DSL resale to its customers which has impeded [Segtel's] ability to order DSL service for resale to its customers and to provision such service to its customers …. [Segtel] has been damaged in the amount of $8,000 …based on lost revenue during the period ordering services and provisions services was delayed and not performed, plus additional amounts after the Petition Date."[23]

(k)     Segtel claims that New England Telco has "failed to provide a working platform for Special Access to Unbundled Network Element Conversions…. [Segtel] has been damaged in the amount of $108,800 by these breaches and violations, plus additional amounts incurred after the Petition Date."[24]

(l)     Segnet claims that New England Telco has "failed to provide a working platform for conversion of services to resale platforms …. [Segnet] has been damaged in the amount of $22,400, based upon lost revenue during the period ordering services and provisioning services was delayed and not performed, plus additional amounts incurred after the Petition Date."[25]

---

[20]     ¶ II.E.7. of Exhibit A to Claim 6513.

[21]     ¶ II.E.8. of Exhibit A to Claim 6513.

[22]     ¶ II.E.11. of Exhibit A to Claim 6513.

[23]     ¶ II.E.12. of Exhibit A to Claim 6513.

[24]     ¶ II.E.13. of Exhibit A to Claim 6513.

[25]     ¶ II.D.1. of Exhibit A to Claim 6512.

(m)    Segnet claims that New England Telco has "been unable or has refused to convert special access T-1 lines leased from [New England Telco] to unbundled network elements or to resale, which [Segtel] tried to order… [a]s a result [Segnet] has been unable to convert from being a [New England Telco] customer to being a [Segtel] customer and has, therefore incurred higher costs for services it purchased.  [Segnet] has been damaged in the amount of $58,880 … based on the additional cost [Segnet] has incurred to purchase these services from [New England Telco] to the extent that exceeds what it would pay to [Segtel] for such services, plus additional amounts incurred after the Petition Date."[26]

### v.    Tort Claims

83.    Segtel also asserts claims (the "Tort Claims") for $261,000 against New England Telco on the basis of alleged "anti-competitive and tortious conduct" in violation of New Hampshire law, sections 222, 251 and 271 of the Telecommunications Act, unspecified FCC regulations, and the unidentified terms of tariffs, and interconnection agreements.  Segtel also alleges that New England Telco (a) misused Segtel's customer information to solicit Segtel customers, and (b) tortiously interfered with Segtel's customer relationships.[27]

### vi.    PAP Credit Claims

84.    Segtel also asserts claims for $1,911,567 in billing credits (the "PAP Credits") due to Plaintiffs' purported failure to meet certain performance criteria or "metrics" set forth in certain PAPs that Plaintiffs have implemented in Northern New England.[28]

---

[26]    ¶ II.D.2. of Exhibit A to Claim 6512.

[27]    ¶ II.F.1.of Exhibit A to Claim 6513; ¶ II.F.2. of Exhibit A to Claim 6513.

[28]    *See* ¶ II.D.1. of Exhibit A to Claim 6513 (alleging New England Telco failed to provide Segtel with PAP reports and as a result failed to provide PAP Credits due to Segtel); ¶ II.D.2. of Exhibit A to Claim 6513. (alleging New England Telco failed to credit Segtel PAP Credits due under unaudited PAP reports); ¶ II.D.3. of Exhibit A to Claim 6513 (alleging New England Telco owes Segtel for misapplied New England Telco PAP Credits); ¶ II.D.4. of Exhibit A to Claim 6513 (alleging Segtel is owed PAP Credits under New England Telco PAP reports *not yet* submitted to the PUCs); ¶ II.B.1. of Exhibit A to Claim 6515 (alleging Vermont Telco failed to provide Segtel with PAP reports and as a result failed to provide PAP Credits due to Segtel); ¶ II.B.2. of Exhibit A to Claim 6515 (alleging Vermont Telco failed to credit Segtel PAP Credits due under unaudited PAP reports); ¶ II.B.3. of Exhibit A to Claim 6515 (alleging Segtel is owed PAP Credits under Vermont Telco PAP reports *not yet* submitted to the PUCs).

### vii.      **Claims Relating to Settlement Agreement**

85.     Segnet also asserts claims for $50,368.00 (the "<u>Settlement Claims</u>") due to Plaintiffs' alleged failure to comply with the terms of a settlement agreement between Segnet, Verizon NE, New England Telco, and Vermont Telco, dated July 16, 2008 (the "<u>Settlement Agreement</u>").[29]

## F.      <u>Rule 2004 Discovery</u>

86.     On September 29, 2010, FairPoint filed its motion for an order authorizing Bankruptcy Rule 2004 discovery from the Defendants in order to investigate the Proofs of Claim [Main Case Docket No. 1789] (the "<u>Rule 2004 Motion</u>").

87.     The Defendants filed an objection [Main Case Docket No. 1803] to the Rule 2004 Motion, but on October 20, 2010, the Court overruled the objection and entered an order authorizing Bankruptcy Rule 2004 discovery [Main Case Docket No. 1833].

88.     On or about November 29, 2010, Defendants served FairPoint with a response to FairPoint's discovery request and produced certain documents (the "<u>Document Production</u>").

89.     The Document Production contains no evidence of the damages asserted by the Defendants in the Proofs of Claim.

## V.      <u>OBJECTION TO PROOFS OF CLAIM AND CAUSES OF ACTION</u>
### <u>COUNT 1</u>
(Objection to Proofs of Claim for Failure to
Contain Sufficient Facts to State a Plausible Claim for Relief)

90.     Plaintiffs incorporate by reference all prior paragraphs of this Complaint.

---

[29]      ¶ III.A. of Exhibit A to Claim 6512; ¶ III.A. of Exhibit A to Claim 6514.

91.     The Proofs of Claim fail to allege sufficient facts to state a plausible claim for relief. [30]

92.     The Proofs of Claim only contain threadbare recitals of the elements of a cause of action and are supported by mere conclusory statements arising from conjecture and speculation.

93.     The Proofs of Claim fail to state sufficient facts relating to the Billing Dispute Claims, including but not limited to, identifying the specific disputes at issue, identifying the resolution of such disputes, identifying any overpayments made by Defendants to Plaintiffs, and identifying incorrect billing by the Plaintiffs.

94.     The Proofs of Claim fail to state sufficient facts relating to the Penalty Interest Claim, including but not limited to, identifying the specific disputes at issue, identifying the resolution of such disputes, identifying the amount of credits allegedly owed, and paid, by Plaintiffs to Defendants, and identifying how the Defendants calculated the penalty interest allegedly due.

95.     The Proofs of Claim fail to state sufficient facts relating to the Competitive Violation Claims, including but not limited to, identifying Defendants' requests for access to poles, ducts, conduits and rights-of-way, and for resale services, identifying the instances when Plaintiffs failed to respond to such requests, identifying how the Defendants engaged in discriminatory pricing and treatment, indentifying how Defendants failed to refund

---

[30]     *See Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (holding that a claim must be dismissed unless it contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face'… [a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged"); *see also In re Lehman Brothers Holdings Inc.*, No. 08-13555, 2010 WL 4818173, *4 (Bankr. S.D.N.Y. Nov. 10, 2010) (relying on *Ashcroft v. Iqbal* and disallowing proofs of claim because claimant's mere belief as to a possible theory of liability did not make such theory plausible and claimant failed to provide any evidence for its claims).

amounts for prepaid work, and identifying how the Defendants calculated the damages allegedly due.

96.     The Proofs of Claim fail to state sufficient facts relating to the Tort Claims, including but not limited to, identifying how Plaintiffs misused Defendants' customer information, identifying how Plaintiffs tortiously interfered with Defendants' customer relationships (including but not limited to stating facts to support each element of a cause of action for tortious interference with a contractual relationship),[31] and identifying how the Defendants calculated the damages allegedly due.

97.     The Proofs of Claim fail to state sufficient facts relating to the PAP Claims, including but not limited to, identifying which specific PAP metrics Plaintiffs failed to meet, and identifying how Plaintiffs failed to meet such PAP metrics.[32]

98.     The Proofs of Claim fail to state sufficient facts relating to the Settlement Claims, including but not limited to, identifying which specific terms of the Settlement Agreement the Plaintiffs violated, identifying how Plaintiffs violated its obligations under the Settlement Agreement, identifying how the Defendants calculated the damages allegedly due.

99.     The Proofs of Claim are replete with mathematical errors and/or internal inconsistencies making it impossible to ascertain the total amounts that Defendants assert that they are owed.[33]

---

[31]     *See infra,* ¶ 198.

[32]     In accordance with applicable regulations, Plaintiffs have reported that, as of the Petition Date, $140,475 in PAP Credits is due to eligible Segtel billing accounts.

[33]     *See e.g.,* ¶ II.G of Exhibit A to Claim 6513 (stating the aggregate amount owed under "Amounts Owed to segTel" is no less than $3,431,169.26, although the total amount of claims in this category adds up to an aggregate of $3,433,995.17); ¶ III.E of Exhibit A to Claim 6513 (stating the aggregate amount owed under "Inappropriate Claims by [New England Telco]" is no less than $1,329,089.60, although the total amount of claims in this category adds up to an aggregate of $1,299,098.60); ¶ III.A. of Claim 6514 (stating the
(continued...)

100.     The Proofs of Claim largely consist of accusations that Plaintiffs have
failed to comply with various provisions of the Telecommunications Act.  But as the Second
Circuit has already held, telephone service customers do not have a cause of action against their
local exchange carrier based on alleged failure to comply with the Telecommunications Act.[34]

101.     For the foregoing reasons, the Proofs of Claim should be disallowed and
expunged in their entirety.

## COUNT 2
(General Objections to the Proofs of Claim)

102.     Plaintiffs incorporate by reference all prior paragraphs of this Complaint.

103.     Pursuant to section 502(b)(1) of the Bankruptcy Code, Plaintiffs hereby
object to the Proofs of Claim because no amount is due to Defendants.

104.     The Proofs of Claim seek damages that are not recoverable under
applicable law.

105.     The Proofs of Claim do not take into consideration the debts that
Defendants owe Plaintiffs under the Agreements.  When the debts owed by Defendants to
Plaintiffs are taken into consideration in the reconciliation of Defendants' claims, the allowable
amount of the Proofs of Claim is $0.

106.     In addition, the Proofs of Claim are barred, in whole or in part, by the
following affirmative defenses:

---

(...continued)

aggregate amount owed under  "Inappropriate Amounts Claimed by [Vermont Telco]" is no less than
$14,161.68, although the total amount of claims in this category adds up to an aggregate of $14,241.68).

[34]     *See Conboy v. AT&T Corp.*, 241 F.3d 242, 250 (2d. Cir. 2001) (dismissing customer's damage claim for
purported violations of the Telecommunications Act because customer did not make monthly payments to
AT&T for compliance with the Telecommunications Act).

(a) Plaintiffs are authorized under the Agreements to refuse or discontinue services to Defendants based on Defendants' non-payment for such services;

(b) Defendants have not complied with the billing dispute procedures contained in the Agreements;

(c) Defendants have failed to mitigate damages;

(d) Plaintiffs' actions, which the Defendants complain about, are specifically authorized under the applicable tariffs and agreements, which conclusively control the rights and liabilities of the parties;

(e) Defendants' claims are barred by the filed tariff doctrine;

(f) Defendants' claims are barred by setoff;

(g) Defendants lack standing to assert one or more of their claims;

(h) Defendants' claims are barred in whole or in part by the applicable statute of limitations;

(i) The Proofs of Claim are barred by the doctrine of res judicata and/or collateral estoppel;

(j) Defendants' claims are barred by the doctrine of laches;

(k) Defendants' claims are barred by the doctrine of accord and satisfaction;

(l) Defendants' claims are barred by the doctrine of waiver;

(m) Defendants' claims are barred by the doctrine of estoppel;

(n) Defendants' claims are barred by the doctrine of unclean hands;

(o) Defendants' claims are barred by failure of consideration; and

(p) Defendants' claims are barred by the doctrine of pre-emption.

107. For the foregoing reasons, the Proofs of Claim should be disallowed and expunged in their entirety.

108. Plaintiffs hereby reserve their rights to assert additional affirmative defenses to the Proofs of Claim.

## COUNT 3
### (Objection to Proofs of Claim Based on Section 11.3.3(iii) of the Plan –
### Res Judicata and/or Collateral Estoppel)

109.    Plaintiffs incorporate by reference all prior paragraphs of this Complaint.

110.    The Agreements provide for the purchase, by Defendants, of access to FairPoint's facilities or services.

111.    The Agreements are executory contracts for purposes of the Plan.

112.    FairPoint has not filed a motion to assume or reject any executory contracts that exist between Plaintiffs and Defendants.

113.    The Agreements have been assumed pursuant to section 11.3.3(iii) of the Plan.

114.    The Plan and Confirmation Order are entitled to have res judicata or collateral estoppel effect with respect to the Defendants and the Proofs of Claim.

115.    Defendants have not objected to section 11.3.3(iii) of the Plan.

116.    Defendants are bound by the terms and provisions of the Plan and the Confirmation Order, including section 11.3.3(iii) of the Plan, under principles of res judicata and/or collateral estoppel.

117.    Accordingly, no cure shall be paid and no other form of refund or billing credit is due to Defendants in connection with the assumption of the Agreements.

118.    The Proofs of Claim relate to or arise from transactions that are governed by the terms of the Agreements.

119.    For the foregoing reasons, the Proofs of Claim should be expunged and disallowed in their entirety.

## COUNT 4
(Objection to Billing Dispute Claims)

120.    Plaintiffs incorporate by reference all prior paragraphs of this Complaint.

121.    Pursuant to section 502(b)(1) of the Bankruptcy Code, Plaintiffs hereby object to the Billing Dispute Claims in the amount of $1,816,719.78 because Plaintiffs do not owe that sum to Defendants.

122.    The Agreements provide that the Defendants shall pay Plaintiffs for services rendered.  There is no requirement that Plaintiffs shall pay Defendants for services rendered by Plaintiffs to Defendants.

123.    The Billing Dispute Claims are not "claims" under section 101(5) of the Bankruptcy Code.  A "right to payment" must exist for a creditor to have a claim in bankruptcy. Instead of a "right to payment," the Billing Dispute Claims represent, at most, the Defendants' *defenses* to Plaintiffs' right to payment from Defendants.  Regardless of whether the Defendants have valid defenses against Plaintiffs' efforts to collect payment from the Defendants, the Plaintiffs cannot seek payment from Plaintiffs for billing disputes.

124.    For the foregoing reasons, the Billing Dispute Claims should be disallowed and expunged in their entirety.

## COUNT 5
(Objection to Penalty Interest Claim)

125.    Plaintiffs incorporate by reference all prior paragraphs of this Complaint.

126.    Pursuant to section 502(b)(1) of the Bankruptcy Code, Plaintiffs hereby object to the Penalty Interest Claim in the amount of $17,462.06 because Plaintiffs do not owe that sum to Defendants.

127.     Plaintiffs have complied with all of the terms of the applicable Agreements with Defendants.

128.     Moreover, like many of the Defendants' claims, the allegation that Plaintiffs owe $17,462.06 for so-called "penalty interest" is a "black-box."  That is, Defendants have stated their desired output without giving any basis for that conclusion.

129.     The Proofs of Claim are utterly devoid of any facts to support the conclusion that penalty interest is due to Defendants, including such basic information as the amount of the disputed charge, the date that the disputed charge was paid by Defendants, and the date the disputed charge was resolved in Defendants' favor.[35]

130.     There are no charges paid by Defendants that would give rise to a claim for penalty interest under the Agreements.

131.     For the foregoing reasons, the Penalty Interest Claim should be disallowed and expunged in its entirety.

## COUNT 6
(Objection to Unpaid Bills Claims)

132.     Plaintiffs incorporate by reference all prior paragraphs of this Complaint.

133.     Pursuant to section 502(b)(1) of the Bankruptcy Code, Plaintiffs hereby object to the Unpaid Bills Claim in the amount of $65,343.14 because Plaintiffs do not owe that sum to Defendants.

134.     Segtel provides no supporting evidence or proof for the Unpaid Bills Claim.

---

[35]     *See supra,* note 30 (discussing the standards for stating a claim for relief).

135.     Plaintiffs' books and records indicate $58,538.84 is due to Segtel on account of the Unpaid Bills Claims.

136.     Section 558 of the Bankruptcy Code and section 9.13 of the Plan preserve Plaintiffs' right to setoff against or recoup from Defendants' claims and the payments to be made pursuant to the Plan in respect of such claims.

137.     New England Telco is entitled to setoff any unpaid Segtel bills against Segtel's debt to New England Telco.

138.     For the foregoing reasons, the Unpaid Bills Claim should be reduced to $58,538.84 and then setoff against Segtel's debt to New England Telco.

### COUNT 7
(Objection to Settlement Claims)

139.     Plaintiffs incorporate by reference all prior paragraphs of this Complaint.

140.     The Settlement Agreement was the end result of litigation commenced by Segnet on August 2006 in the U.S. District Court of Massachusetts against Verizon NE as a result of a billing dispute between Verizon NE and Segnet.[36]

141.     New England Telco and Vermont Telco were joined in the proceedings following FairPoint Communications' acquisition of Verizon NE's landline operations in Northern New England.

142.     New England Telco and Vermont Telco, Segnet and Verizon NE entered into the Settlement Agreement on July 16, 2008.

143.     The Settlement Agreement provided for a one-time settlement payment by New England Telco and Vermont Telco to Segnet.

---

[36]     *segNET Techs., Inc. v. Verizon New England Inc.*, Case No. 06-11547 (DPW) (D. Ct. Mass. Aug. 29, 2006).

144.     On or about August 24, 2008, Segnet received the settlement payment to satisfy all obligations under the Settlement Agreement.

145.     Pursuant to section 502(b)(1) of the Bankruptcy Code, Plaintiffs hereby object to Segnet's Settlement Claims in the amount of $50,368.00.

146.     Segnet fails to provide any facts or evidence for the Settlement Claims.

147.     All obligations under the Settlement Agreement have been satisfied.

148.     Segnet's assertion that certain charges are barred by the terms of the Settlement Agreement is not a "claim" under section 101(5) of the Bankruptcy Code.  Rather, Segnet is, at most, asserting a *defense* against Plaintiffs.  As such, Segnet has failed to state a claim.

149.     For the foregoing reasons, the Settlement Claims are invalid and should be disallowed and expunged in their entirety.

### COUNT 8
(Objection to Competitive Violation Claims)

150.     Plaintiffs incorporate by reference all prior paragraphs of this Complaint.

151.     Pursuant to section 502(b)(1) of the Bankruptcy Code, Plaintiffs hereby object to the Competitive Violation Claims in the amount of $1,059,982 because Plaintiffs do not owe that sum to Defendants.

**A.      The Competitive Violation Claims Are Expressly Barred Under The Terms of Applicable Tariffs and Agreements, And by the Filed Tariff Doctrine**

152.     The Competitive Violation Claims are invalid because the damages Defendants seek are for lost revenue, costs incurred to obtain alternative services and other forms of incidental and consequential damages.  These types of damages are expressly prohibited by the Agreements.

153. The FCC Tariff expressly prohibits claims for lost revenue, costs incurred to obtain alternative services and other forms of incidental and consequential damages.[37]

154. The NH Tariff expressly prohibits claims for lost revenue, costs incurred to obtain alternative services and other forms of incidental and consequential damages.[38]

155. The Maine Tariff expressly prohibits claims for lost revenue, costs incurred to obtain alternative services and other forms of incidental and consequential damages.[39]

156. The Vermont Tariff expressly prohibits claims for lost revenue, costs incurred to obtain alternative services and other forms of incidental and consequential damages.[40]

---

[37] *See* FCC Tariff 1 § 2.1.3(A) (stating Vermont Telco's "liability, if any, shall not exceed an amount equal to the proportionate charge for the service for the period during which the service was affected"); FCC Tariff 2 § 2.1.3(A) (same).

[38] *See* NH Tariff 83 § 1.4.3 (stating New England Telco's liability "will not exceed an amount equal to a proportional amount of the [New England Telco's] billing for the period of service during which such mistake, omission, interruption, delay, error, defect in transmission, or injury occurs."); NH Tariff 84 § 1.6.2(E); NH Tariff 85 § 2.3.2(B); NH Tariff 86 § 2.1 (stating that the general regulations provisions in NH Tariff 83 apply).

[39] *See* Maine Tariff 15 § 1.4.2 (A) (stating that New England Telco's liability "shall in no event exceed an amount equivalent to the proportionate charge to the customer for the period of service during which such mistake, omission, interruption, delay, error or defect in transmission, or failure or defect in facilities, occurs"); Maine Tariff 17 § 2.1.1(A) (stating that the limitation of liability provision in FCC Tariff 1 applies); Maine Tariff 18 § 2.1.1(B) (stating that limitation of liability provision in Maine Tariff 17 applies); Maine Tariff 20 § 1.6.2(B) (stating that New England Telco's liability "shall not exceed an amount equal to the proportionate charge for the service for the period during which the service was affected").

[40] *See* Vermont GATT § 14.2.4 (stating Vermont Telco is not liable for "indirect, incidental, consequential, reliance or special damages, including (without limitation) damages for loss of profits"); Vermont Tariff 20 § 1.4.3 (A) (stating that Vermont Telco's liability "shall in no event exceed an amount equivalent to the proportionate charge to the customer for the period during which such mistake, omission, interruption, delay, error or defect in transmission, or failure or defect in facilities, occurs"); Vermont Tariff 22 § 1.6.2 (F) (same); Vermont Tariff 23 § 2.3.3 (B) (same); Vermont Tariff 24 § 2.1.1 (A) (stating that limitation of liability provision in Vermont Tariff 23 applies); Vermont Tariff 26 § 13.1.1 (A) (stating that Vermont Telco The Licensor shall not be liable .. for any interruption of the Licensee's service or for interference with the operation of the Licensee's communications services arising in any manner, except from the Licensor's sole negligence, out of the use of the Licensor's poles"); Vermont Tariff 29 § 2.3.2 (B) (stating that Vermont Telco's liability "shall not exceed an amount equal to the proportionate charge for the service for the period during which the service was affected").

157.     The Maine Interconnection Agreement expressly prohibits claims for lost revenue, costs incurred to obtain alternative services and other forms of incidental and consequential damages.[41]

158.     The Pole Attachment Agreements expressly prohibits claims for lost revenue, costs incurred to obtain alternative services and other forms of incidental and consequential damages.[42]

159.     The Conduit Agreements expressly prohibits claims for lost revenue, costs incurred to obtain alternative services and other forms of incidental and consequential damages.[43]

160.     Moreover, the damages Defendants seek under the FairPoint Tariffs are barred by the filed-tariff doctrine.  The purpose of the filed-tariff doctrine is to prevent parties from challenging the terms of properly filed tariffs in court.[44]  All customers who pay for services under such tariffs are presumed to have *constructive knowledge* of the tariffs, and a customer's purported ignorance of a filed tariff is not a defense to its enforcement.[45]  Defendants

---

[41]     *See* Maine Interconnection Agreement § 25.2 (stating that "Claims arising out of a Service Failure shall not exceed an amount equal to the pro rata applicable monthly charge for the Services that are subject to the Service Failure for the period in which such Service Failure occurs"); *id.* § 25.3 (stating that New England Telco is not liable for any "special, indirect, incidental, consequential, reliance, exemplary, punitive, or like damages including, but not limited to, damages for lost revenues, profits or savings, or other commercial or economic loss").

[42]     *See* Pole Attachment Agreements § 13.1 ("Licensor shall not be liable to Licensee for any interruption of Licensee's service or for interference with the operation of Licensee's communications services arising in any manner, except from Licensor's sole negligence, out of the use of the Licensor's poles").

[43]     *See* Conduit Agreements § 13.1 ("Licensor shall not be liable to Licensee for any interruption of Licensee's service or for interference with the operation of Licensee's communications services arising in any manner, except from Licensor's sole negligence, out of the use of Licensor's conduit").

[44]     *Wegoland Ltd. v. NYNEX Corp.*, 27 F.3d 17, 18-19 (2d Cir. 1994).

[45]     *See Fax Telecommunicaciones, Inc. v. AT &T*, 138 F.3d 479, 491 (2d Cir. 1998) (citing *Maislin Indus., U.S. v. Primary Steel, Inc.*, 497 U.S. 116, 120 (1990)) (holding that a customer's ignorance or a carrier's misquotation of a filed rate does not serve as a defense to the collection of the filed rate); *cf. In re Worldcom, Inc.*, 322 B.R. 530, 537 (Bankr. S.D.N.Y. 2005) (dismissing a breach of contract claim because the terms of the filed tariff, not the contract, controlled).

are therefore bound by the terms of FairPoint Tariffs and are not entitled to claims for lost revenue, costs incurred to obtain alternative services and other forms of incidental and consequential damages.

161.     In addition, under Maine, New Hampshire, and Vermont law – which, as applicable, govern the Maine Interconnection Agreement, Pole Attachment Agreements, Conduit Agreements and the Telecommunication Service Agreements – a party may not recover lost profits or consequential damages when there is a limitation of liability clause in the contract.[46] Defendants are bound by the terms of the foregoing agreements and as a matter of law are not entitled to claims for lost revenue, costs incurred to obtain alternative services and other forms of incidental and consequential damages.[47]

**B.     Plaintiffs Have Not Engaged in Discriminatory Pricing**

162.     Segtel claims that New England Telco has "engaged in pricing for rental fees for access to poles, ducts, conduit, and rights of way … that is discriminatory and not completely neutral, in violation of 47 U.S.C. § 224 and state law …[Segtel] has been damaged in the amount of $106,562 …based on the payment of rates that are discriminatory and not competitively neutral."[48]

---

[46]     *See, e.g., Nelson & Small, Inc. v. Polaris Indus.*, No. CV-89-378, 1989 Me. Super. LEXIS 199, at *6-7 (Me. Super. Ct. Sept. 20, 1989) (finding contractual clause prohibited incidental and consequential damages); *Shaer Shoe Corp. v. Granite State Alarm Inc.*, 110 N.H. 132, 135-36 (N.H. 1970) (finding contractual clause limiting liability valid); *Leavens v. Am. Exp. Co.*, 85 A. 557, 558-59 (Vt. 1913) (finding limitation of liability provision in bill of lading valid and enforceable as long as it was just and reasonable and not inconsistent with public policy).

[47]     *See Davenport v. Holbert*, 227 N.Y.S. 137, 239 (N.Y. Sup. 1928) (holding that a contract voluntarily signed and executed by a party, in the absence of misrepresentation or fraud, with full opportunity of information as to its contents, cannot be avoided on the ground of his negligence or omission to read it, or avail himself of such information"); *see also Upton v. Tribilock*, 91 U.S. 45, 50 (1875) ("It will not do for a man to enter into a contract, and, when called upon to respond to its obligations, to say that he did not read it when he signed it, or did not know what it contained. If this were permitted, contracts would not be worth the paper on which they are written; but such is not the law").

[48]     ¶ II.E.9. of Exhibit A to Claim 6513.

163.     Segtel claims that New England Telco has "engaged in pricing for make-ready work and processing applications for access to poles, ducts, conduits, and rights-of-way … that is discriminatory and not completely neutral, in violation of 47 U.S.C. § 224 and state law … [New England Telco] has failed to refund amounts that [Segtel] prepaid for such work to the extent the amount of the prepayment exceeded the actual cost of the work or where the work was not performed … [Segtel] has been damaged in the amount of $176,000 by these breaches and violations, plus additional amounts incurred after the Petition Date."[49]

164.     The prices charged by New England Telco to Segtel for access to poles, ducts, conduit, and rights of way are determined by the terms of the Agreements.

165.     The prices charged by New England Telco to Segtel for make-ready work and processing applications for access to poles, ducts, conduits, and rights-of-way are determined by the terms of the Agreements.

166.     Segtel is party to and is bound by the terms of the Agreements.

167.     Segtel has not alleged that New England Telco has breached the Agreements.

168.     Segtel is barred from asserting that New England Telco engaged in discriminatory pricing when Segtel agreed to and is bound by the pricing structure contained in terms of the Agreements.

---

[49]     ¶ II.E.10. of Exhibit A to Claim 6513.

### C. Plaintiffs Are Not in Violation of their Obligations Under Section 224 of the Telecommunications Act

169.     Section 224 of the Telecommunications Act enumerates certain duties of ILECs to provide CLECs with access to poles and conduit so that CLECs can attach the equipment they need to relay audio or video signals.[50]

170.     Under section 224 of the Telecommunications Act, ILECs have discretion to deny such access when, among other things, there is insufficient capacity, safety or reliability issues exist, or the attachments are not practicable for engineering reasons.[51]

171.     To the extent that Plaintiffs have denied Defendants access to poles and conduit, such access was denied because there was insufficient capacity, safety or reliability issues, or the attachments were not practicable for engineering reasons.

172.     Under section 224 of the Telecommunications Act, CLECs are required to bear a proportionate share of any costs incurred by the ILECs in making its poles and conduits accessible.[52]

173.     Defendants are required to bear a proportionate share of any costs incurred by Plaintiffs in making the poles and conduits accessible.  Defendants have failed to bear their proportionate share of the costs incurred by the Plaintiffs to make the poles and conduits accessible.

### D. Plaintiffs Are Not in Violation of their Obligations Under Sections 251 or 271 of the Telecommunications Act

174.     Sections 251 and 271 of the Telecommunications Act require Plaintiffs to provide Segtel with access to certain listed and enumerated services and network elements,

---

[50]      42 U.S.C. § 224.

[51]      47 U.S.C. § 224(f)(2).

which the FCC has limited to basic and necessary elements such as switches, loops, and transport cables (collectively, the "Enumerated Network Elements").[53]

175.    Consistent with sections 251 and 271 of the Telecommunications Act, Plaintiffs have provided Enumerated Network Elements to Segtel to the extent that Enumerated Network Elements were requested by Segtel and were available on Plaintiffs' networks.

176.    Consistent with sections 251 and 271 of the Telecommunications Act, Plaintiffs have also provided Segtel with services that are required to be offered for resale.

177.    For the foregoing reasons, among others identified above, Segtel's Competitive Violation Claims are without basis in law or fact, are invalid and should be disallowed as a matter of law.

**E.    Segnet's Competitive Violation Claims Are Meritless Because Segnet Has No Statutory Right to Enumerated Network Elements Or Resale Services And Does Not Even Purchase Those Services From Plaintiffs**

178.    By its own admission, Segnet is an internet services provider.  As such, Segnet is not a "telecommunications carrier" as defined in the Telecommunications Act.

179.    Plaintiffs have no duty to provide Enumerated Network Elements or services required for resale to Segnet under sections 251 and 271 of the Telecommunications Act because Segnet is not a "telecommunications carrier" under the Telecommunications Act.[54]

180.    Segnet has not ordered Enumerated Network Elements or resale services from Plaintiffs.[55]

---

(...continued)

[52]      47 U.S.C. § 224(e)(2).

[53]      *See generally*, *Bellsouth Comm'n, Inc.*, *supra* note 65 (explaining the requirements under section 251 and 271 of the Telecommunications Act).

[54]      *See* 47 U.S.C. 251(a)(1) (providing for interconnection with facilities and equipment of other telecommunications carriers); 47 U.S.C. 271(c)(2)(B) (providing for access or interconnection to telecommunications carriers).

181.    As a result, Segnet is not in privity with Plaintiffs for such services.

182.    Segnet has no standing to assert claims arising out of services that Segnet acquired from third parties.

183.    For the foregoing reasons, among others identified above, Segnet's Competitive Violation Claims are without basis in law or fact, are invalid, and should be disallowed as a matter of law.

**F.    Defendants Do Not Have Any Valid State Law Basis for Competitive Violation Claims**

184.    Defendants refer to unidentified state law in support of their Competitive Violation Claims.[56]

185.    Plaintiffs have conducted their own analysis of state law to ascertain whether a cause of action for "competitive violations" exists.  Simply put, there is no applicable state law that New England Telco or Vermont Telco could have possibly violated that would provide a basis for the Competitive Violation Claims.

186.    The only state laws that Plaintiffs have been able to identify relating to "anticompetitive conduct" are: (a) the New Hampshire antitrust statute,[57] (b) the New Hampshire

---

(...continued)

[55]    *See* ¶ II.D. of Exhibit A to Claim 6512 (asserting that Segnet was damaged due to Plaintiffs' failure to provide Segnet with services for resale).

[56]    *See* ¶ II.E.4. of Exhibit A to Claim 6513 (alleging New England Telco violated New Hampshire and Maine state law by refusing to allow Segtel to construct manhole breakouts);  ¶ II.E.9. of Exhibit A to Claim 6513 (alleging that New England Telco violated New Hampshire and Maine state law by engaging in discriminatory pricing for access to poles, ducts, and rights-of-way). ¶ II.E.10. of Exhibit A to Claim 6513 (alleging New England Telco violated New Hampshire and Maine state law by engaging in discriminatory pricing for make-ready work); ¶ II.E.13. of Exhibit A to Claim 6513 (alleging New England Telco violated New Hampshire and Maine state law by failing to provide Segtel with working platform for special access to unbundled network element conversions).

[57]    *See* N.H. Rev. Stat. Ann. tit. 31, § 356:3 (codifying that the "establishment, maintenance or use of monopoly power, or any attempt to establish, maintain or use monopoly power over trade or commerce for the purpose of affecting competition or controlling, fixing or maintaining prices is unlawful" in New Hampshire).

car dealer statute,[58] (c) the New Hampshire consumer protection statute,[59] (d) the New Hampshire human rights statute,[60] (e) the New Hampshire state insurance statute,[61] (f) the Maine Unfair Trade Practices Act,[62] and (f) the Maine antitrust laws.[63]  Because Defendants (1) have not asserted antitrust claims, (2) did not buy a car from the Plaintiffs, (3) are not statutory "consumers," (4) are not human beings, (5) have not engaged in an insurance transaction with Plaintiffs, and (6) have purchased services that are subject to regulation by a state or federal agency, these legal authorities are inapplicable to the transactions between the Defendants and the Plaintiffs.

187.    In addition, Plaintiffs have the legal right to deny Defendants access to poles and conduit where there is insufficient capacity, or safety or reliability issues exist, or the requested attachments are not practicable for engineering reasons.

188.    There is no state law that provides a basis for the Competitive Violation Claims and therefore, the Competitive Violation Claims should be disallowed as a matter of law.

---

[58]    *See* N.H. Rev. Stat. Ann. tit. 31, § 357-C:3 (prohibiting unfair and anti-competitive business practices between motor vehicle manufacturers, distributors and dealers in New Hampshire).

[59]    *See* N.H. Rev. Stat. Ann. tit. 34, § 358-A (regulating business practices for consumer protection).

[60]    *See* N.H. Rev. Stat. Ann. tit. 31, § 354-A:17 (codifying that it is "unlawful discriminatory practice [in New Hampshire] for any person, being the owner, lessee, proprietor, manager, superintendent, agent or employee of any place of public accommodation, because of the age, sex, race, creed, color, marital status, physical or mental disability or national origin of any person, directly or indirectly, to refuse, withhold from or deny to such person any of the accommodations, advantages, facilities or privileges thereof").

[61]    *See* N.H. Rev. Stat. Ann. tit. 37, § 401-B:3-a (prohibiting acquisition of insurance companies if acquisition would create a monopoly or substantially lessen competition in New Hampshire).

[62]    *See* Me. Rev. Stat. Ann. tit. 5, § 205-A (regulating unfair trade practices in Maine).  The Maine Unfair Trade Practices Act does not apply to this dispute.  *See* Me. Rev. Stat. Ann. tit. 5, §§ 208 (stating that the Maine Unfair Trade Practices Act does not apply to "business activities [that] are subject to regulation by a state or federal agency.").

[63]    *See* Me. Rev. Stat. Ann. tit. 10, § 1101 (codifying that "every contract, combination in the form of trusts or otherwise, or conspiracy, in restraint of trade or commerce in [Maine] is declared to be illegal.").

## G. Defendants Do Not Have A Private Cause of Action For Damages Under Section 224, 251 or 271 of the Telecommunications Act

189. Even if Defendants had not waived the damages that they seek, Defendants have no private cause of action to enforce the regulatory regime established by Congress in the Telecommunications Act. The Telecommunications Act did not create private rights for individual plaintiffs to seek damages from telephone companies.[64]

190. Courts have repeatedly held that sections 224, 251 and 271 of the Telecommunications Act do not confer a private right of action upon individual plaintiffs.[65]

191. Moreover, the New Hampshire Public Utilities Commission, the Maine Public Utilities Commission and the Vermont Public Service Board have all ruled that they do not have authority to award damages under the Telecommunications Act or any other applicable law to litigants who have grievances against utilities.[66]

---

[64] *See Conboy v. AT&T Corp.*, 241 F.3d at 250; *Scripps-Howard Radio, Inc. v. FCC*, 316 U.S. 4, 14 (1942); *see also United Tel. Co. of Carolinas, Inc. v. F.C.C.*, 559 F.2d. 720, 723 (D.C. Cir. 1997) (ruling that the purpose of Telecommunications Act is to protect the public interest rather than providing a forum for settlement of private disputes).

[65] *See*, *e.g.*, *Va. Elec. and Power Co. v. Comcast of Va.*, No. 1:09-CV-1149, 2010 WL 916953, at *4 (E.D. Va. Mar. 8, 2010) (holding that section 224 of the Telecommunications Act does not provide for a private right of action); *N. County Commc'ns Corp. v Cal. Catalog & Tech*, 594 F.3d. 1149, 1155-56 (9th Cir. 2010) (holding that section 251 of the Telecommunications Act does not provide for a private right of action); *AT&T Comm'n of Cal. v. Pac. Bell*, 60 F. Supp. 2d. 997, 1002 (N.D. Cal. 1999) (holding that section 251 of the Telecommunications Act does not provide for a private right of action); *Bellsouth Comm'n, Inc. v. Kentucky Pub. Serv. Comm'n*, No. 06-65-KKC, 2007 WL 2736544 at *7-8 (E.D. Ky. Sept. 18, 2007) (holding that section 271 of the Telecommunications Act does not provide for a private right of action).

[66] *See Verizon New Hampshire Petition to Approve Carrier to Carrier Performance Guidelines and Performance Assessment Plan*, *Order Regarding Metrics and Plan*, Order No. 23,940 (N.H. P.U.C. 2002), at 70-71 (ruling that the New Hampshire Public Utilities Commission lacks authority to award damages other than as provided for in a voluntary performance assurance plan); *Ames v. Hydro-Electric Co.*, Docket No. 85-167, 71 PUR 4th 212 (Me. P.U.C. 1985), at 2 (holding that Maine Public Utilities Commission lacks authority to award damages to a private litigant for harms caused by power outages and surges); *Green Mountain Power Corp. v. Sprint Communications,* 172 Vt. 416, 423 (2001) (holding that the Public Service Board lacks authority to determine liability for damages to fiber optic cable during an excavation).

192.     Defendants have no right to monetary damages for any of the alleged violations by the Plaintiffs under the Telecommunications Act and therefore the Competitive Violation Claims should be disallowed as a matter of law.

### COUNT 9
(Objection to Tort Claims)

193.     Plaintiffs incorporate by reference all prior paragraphs of this Complaint.

194.     Pursuant to section 502(b)(1) of the Bankruptcy Code, Plaintiffs hereby object to the Tort Claims in the amount of $261,000  because Plaintiffs do not owe that sum to Defendants.

195.     Segtel has failed to state a claim upon which relief can be granted.

196.     Segtel fails to allege any facts regarding New England Telco's supposed misuse or incorrect dissemination of customer information.

197.     Even if Segtel has a factual predicate for these allegations, which it does not, the Telecommunications Act does not provide a basis for the Tort Claims.[67]  As noted above, (a) Defendants do not have a private right of action to assert damages under section 222 of the Telecommunications Act,[68] (b) Defendants do not have a private right of action to assert damages under section 251 of the Telecommunications Act,[69] and (c) Defendants do not have a private right of action to assert damages under section 271 of the Telecommunications Act.[70]

---

[67]     *See Conboy v. AT&T Corp.*, 241 F.3d at 250.

[68]     *Scripps-Howard Radio, supra* note 64, at 14 (1942); *United Tel. Co. of Carolinas, Inc. v. F.C.C.*, *supra* note 64 (ruling that the purpose of the Telecommunications Act is to protect the public interest rather than providing a forum for settlement of private disputes).

[69]     *See N. County Commc'ns Corp.*, *supra* note 65, at 1152 (affirming that section 251 of the Telecommunications Act does not provide for a private right of action); *Pacific Bell*, supra note 25, at 1002.

[70]     *See Bellsouth Comm'n, Inc.*, *supra* note 65, at *7-8 (holding that section 271 of the Telecommunications Act does not provide for a private right of action).

198.    Moreover, Defendants have not stated a claim for tortious interference with contracts under state law.  In New Hampshire, to establish a cause of action for tortious interference with a prospective agreement or tortious interference with a contractual relationship, a plaintiff must *establish* that (1) the plaintiff had a contractual relationship with a third party, (2) the defendant knew of the contractual relationship between the third party and the plaintiff, and (3) the defendant wrongly induced the third party to breach its agreement with the plaintiff.[71]

199.    Segtel has failed to plead any facts that would establish a cause of action for tortious interference with any existing contractual relationship.  Like most of Defendant's claims, this claim is also based solely upon conjecture, speculation and surmise.

200.    For the foregoing reasons, the Tort Claims are invalid and should be disallowed and expunged in their entirety as a matter of law.

### COUNT 10
(Objection to PAP Credit Claims)

201.    Plaintiffs incorporate by reference all prior paragraphs of this Complaint.

202.    Pursuant to section 502(b)(1) of the Bankruptcy Code, Plaintiffs hereby object to Segtel's PAP Credit claims in the amount of $1,911,567 because Plaintiffs do not owe that sum to Segtel.

203.    The PAPs were initially developed by the state regulatory agencies in Northern New England (the "PUCs") to ensure that Plaintiffs' predecessor, Verizon, met certain service quality standards in Northern New England.   Copies of the Maine PAP, New Hampshire PAP and the Vermont PAP are attached hereto as Exhibit M, Exhibit N and Exhibit O, respectively.

---

[71]    *See, e.g.*, *Montrone v. Maxfield*, 122 N.H. 724, 726 (1982).

204.     Plaintiffs agreed to become subject to the PAPs when FairPoint Communications acquired Verizon's wire-line operations in Northern New England.

205.     Plaintiffs' performance under the PAPs is measured by certain metrics that quantify the quality or timeliness of Plaintiffs' performance of work, undertaken to enable interconnection among Plaintiffs and other carriers.

206.     PAP metrics cover the areas of pre-order, ordering, provisioning, maintenance and repair, billing, network performance, and change control.

207.     A pre-specified (capped) amount of annual billing credits is available to eligible CLECs should Plaintiffs fail to meet threshold performance requirements under the PAPs.

208.     The PAPs are implemented by the PUCs and not by the FCC.

209.     Plaintiffs have not breached or violated any of their obligations under the PAPs.

210.     Any PAP Credit due to Segtel is determined through self-reporting by Plaintiffs.  The reports prepared by Plaintiffs specify whether they have satisfied the metrics and the amount of any credit due for performance below the required minimum standards.

211.     PAP Credits are issued when Plaintiffs prepare PAP reports regarding their performance during the reporting period.

212.     PAP reports are available to each CLEC that is eligible to receive PAP Credits.

213.     The amount of PAP Credits due to Segtel has been accurately calculated and is available for inspection and review by Segtel.

214.     Based on New England Telco's self-executing PAP, PAP Credits in the amount $139,216 are due to Segtel under the New Hampshire PAP as of the Petition Date.

215.     Based on New England Telco's self-executing PAP, PAP Credits in the amount $1,259 are due to Segtel under the Maine PAP as of the Petition Date.

216.     Under the Vermont PAP, Segtel is only entitled to a portion of PAP Credits attributable to "Critical Measures" and "Special Provision" criteria.  The "Mode of Entry" ("MOE") obligations under the Vermont PAP are satisfied through contributions to the Vermont Universal Service Fund and Segtel lacks standing to assert claims for the Vermont Universal Service Fund.

217.     Segtel is not due any PAP Credits under the Vermont PAP as of the Petition Date.

218.     Plaintiffs have not reported any other PAP Credits due to Segtel, and in fact no other PAP Credits are due to Segtel.

219.     Under the Maine PAP and New Hampshire PAP, a PAP Credit is not a payment but, rather, it is a credit that is issued and applied to future charges.

220.     No payments are due to Segtel under the PAPs unless all services rendered to Segtel are cancelled and the amount of unpaid charges outstanding is less than the amount of PAP Credits due to Segtel.  Segtel has not cancelled all of the services it purchases from Plaintiffs.

221.     On information and belief, most if not all of Segtel's claim for PAP Credits relate to the period prior to Cutover.

222.    On information and belief, prior to Cutover, Verizon reported modest PAP credits in amounts of $202.77 and $966.69, and these credits were satisfied by Verizon in the ordinary course of business.

223.    On information and belief, Segtel has taken the amount of PAP Credits that Plaintiffs reported during the period following Cutover and has extrapolated that this amount would also be the amount of the PAP Credits that would have been due from Verizon during the pre-Cutover period.   There is no basis for this approach.

224.    Following the Merger, but prior to Cutover, Verizon continued to manage Plaintiffs' operating systems in Northern New England pursuant to the term of the TSA.

225.    On information and belief, all PAP Credits due to Segtel prior to the Merger, if any, have already been applied to Segtel bills by Verizon.

226.    There is no plausible reason why the mere execution of the Merger Agreement by FairPoint would suddenly affect the performance of a network that Verizon had been operating for approximately one hundred years.

227.    Apart from the unapplied PAP Credits that Plaintiffs have reported in the amount of $140,475, Segtel's claims for PAP Credits are baseless.

228.    For the foregoing reasons, Segtel's claims for PAP Credits are invalid and should be disallowed and expunged to the extent that they exceed $140,475.

## COUNT 11
(Claim for Breach of Contract and Breach of Obligations
Under FairPoint Tariffs Against Defendants)

229.    Plaintiffs incorporate by reference all prior paragraphs of this Complaint.

230.    Defendants and Plaintiffs are parties to the Agreements.

231.    The Agreements are binding on Defendants.

232.    Defendants have each ordered and received, and continue to order and receive, access usage, collocation, UNEs and other services provided by the defendants under the Agreements.

233.    Plaintiffs have performed under the Agreements and have provided access usage, collocation, UNEs and other services to the Defendants under the Agreements.

234.    Defendants have promised to pay for access usage, collocation, UNEs and other services provided by the Plaintiffs to the Defendants under the Agreements.

235.    Defendants have failed to pay Plaintiffs for these services.

236.    As a result, Defendants have breached the Agreements.

237.    The amount past due for services provided to Segtel pursuant to the FairPoint Tariffs is more than $589,047.

238.    The amount past due for services provided to Segtel pursuant to the Maine Interconnection Agreement, Pole Attachment Agreements, Conduit Agreements and Telecommunication Service Agreements is more than $3,626**.**

239.    The amount past due for services provided to Segnet pursuant to the FairPoint Tariffs is more than $105,973.

240.    Defendants have breached, and are continuing to breach, their obligations by failing and refusing to deliver monies due to Plaintiffs under the Agreements.

241.    Plaintiffs have been damaged as a result of the breach by Defendants.

242.    As a result of Defendants' breach of the Agreements and failure to pay the full amount for services received pursuant to those agreements and tariffs, Plaintiffs are entitled to recover damages in an amount not less than $698,647, plus prejudgment and post-judgment interest.

## COUNT 12
### (Unjust Enrichment against Defendants)

243.　　Plaintiffs incorporate by reference all prior paragraphs of this Complaint.

244.　　In reliance on Defendants' representations that they would pay all charges incurred for services provided to Defendants, Plaintiffs have delivered services to Defendants totaling $698,647.

245.　　Despite having received the benefit of these services, Defendants have failed to pay Plaintiffs the amount which they are due.  Rather, Defendants have repeatedly taken services from Plaintiffs, resold those services to third parties, received payment for those services from Defendants' customers and distributors, and refused to pay Plaintiffs.

246.　　Defendants have wrongfully withheld payments which in equity and good conscience belong to Plaintiffs.

247.　　Defendants have been unjustly enriched by obtaining services without paying for them.  Moreover, Defendants have been enriched at the expense of the Plaintiffs and, ultimately, at the expense of Plaintiffs' estates and creditors.

248.　　Equity and good conscience require full restitution of the full amount Defendants owe Plaintiffs, together with pre- and post-judgment interest.

## COUNT 13
### (Equitable Accounting Against Defendants)

249.　　Plaintiffs incorporate by reference all prior paragraphs of this Complaint.

250.　　Defendants, in their respective Proof of Claims, have alleged past due amounts for services rendered to Plaintiffs, as well as amounts due as a result of billing irregularities.

251.　　Plaintiffs dispute these amounts as being owed and dispute the calculated setoff amount asserted by Defendants.

252. Defendants have failed to state with particularity against which contracts and upon which charges or fees they base the billing disputes alleged in the Proofs of Claim.

253. Given that failure, it is not possible for Plaintiffs to determine the amounts (or the bases) of all sums owed by Plaintiffs, or to determine the basis (if any) upon which the Defendants contest Plaintiffs' calculations of amounts due and owing to Plaintiffs.

254. Given the complicated and intricate nature of the various accounts and financial transactions, an accounting is necessary to determine the amounts involved.

255. Plaintiffs are entitled to an accounting of all revenues, fees, charges, accounts and transactions between Plaintiffs and Defendants since April 1, 2008.

256. With respect to the requested accounting, Plaintiffs have no adequate remedy at law. Accordingly, Plaintiffs are entitled to preliminary and permanent equitable relief and an accounting.

257. Upon completion of an accounting, all monies determined to be owed Plaintiffs should be paid to Plaintiffs pursuant to the terms and conditions of the Agreements.

## COUNT 14
(Turnover of Amounts Pursuant To 11 U.S.C. §§ 542 and 550)

258. Plaintiffs incorporate by reference all prior paragraphs of this Complaint.

259. Plaintiffs have a legal and equitable interest under section 542 of the Bankruptcy Code in the amount due under the contracts and tariffs, which total not less than $698,647, plus interest thereon from the invoice dates.

260. Despite demand, Defendants have wrongfully failed and refused to pay to Plaintiffs the sum of $698,647.

261.    The Plaintiffs are entitled to judgment against Defendants, pursuant to sections 542 and 550 of the Bankruptcy Code, in an amount not less than $698,647 plus interest thereon from the invoice due dates.

### COUNT 15
(Additional Objection to Proofs of Claims Pursuant To 11 U.S.C. § 502(d))

262.    Plaintiffs incorporate by reference all prior paragraphs of this Complaint.

263.    Defendants have not paid to Plaintiffs the Turnover Property.

264.    To the extent that any Defendant is determined to hold otherwise allowable claims against the Plaintiff's bankruptcy estates, such claims must be disallowed pursuant to section 502(d) of the Bankruptcy Code unless and until such Defendant has paid any and all amounts for which it is determined to be liable under sections 542 and/or 550 of the Bankruptcy Code.

### COUNT 16
(Declaratory Judgment Regarding Cure Amounts)

265.    Plaintiffs incorporate by reference all prior paragraphs of this Complaint.

266.    Under the Agreements, Defendants promised to pay Plaintiffs for services rendered.

267.    Plaintiffs have fully performed their respective obligations to Defendants under the Agreements.

268.    The Agreements have been assumed by FairPoint in accordance with section 11.3.3(iii) of the Plan and the provisions and the requirements of section 365 of the Bankruptcy Code.

269.     Because there has not been a default by Plaintiffs under the Agreements, no cure amount must be paid to Defendants pursuant to section 365(b) of the Bankruptcy Code in order to assume any executory contracts that exist between Defendants and Plaintiffs.

270.     Pursuant to section 11.3.3(iii) of the Plan, no cure shall be paid and no other form of refund or billing credit is due to Defendants in connection with the assumption of the Agreements.

271.     Under the Declaratory Judgment Act, the Court may, "[i]n the case of actual controversy within its jurisdiction, … declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."[72]

272.     This Complaint presents an actual controversy, within the meaning of  28 U.S.C. § 2201(a), concerning whether or not cure is owed to Defendants to assume any executory contracts that exist between Defendants and Plaintiffs under section 365 of the Bankruptcy Code and section 11.3.3(iii) of the Plan.

273.     For the foregoing reasons, Plaintiffs respectfully request that the Court overrule the Cure Objection, and declare the rights and liabilities of the parties, including a declaration that no cure is owed to Defendants to assume any executory contracts that exist between Defendants and Plaintiffs under section 365 of the Bankruptcy Code and section 11.3.3(iii) of the Plan.

## COUNT 17
(Declaratory Judgment Regarding Adequate
Assurance of Payment from Defendants)

274.     Plaintiffs incorporate by reference all prior paragraphs of this Complaint.

---

[72]      28 U.S.C. § 2201(a).

275.     Under the Maine Interconnection Agreement and the FairPoint Tariffs, New England Telco and Vermont Telco are entitled to cash deposits (the "Cash Deposits") from the Defendants as an adequate assurance of payment.

276.     Under section 6 of the Maine Interconnection Agreement, New England Telco is entitled to a cash deposit in an amount equal to the anticipated charges for two months if Segtel has failed to timely pay its bills.

277.     Segtel has failed to timely pay New England Telco bills under the Maine Interconnection Agreement.

278.     Under section 1.5.6 of Maine Tariff 15, New England Telco is entitled to a cash deposit from Defendants in accordance with the provisions of Chapter 290 of the Maine Public Utilities Commission Rules (the "Maine Rules").  Under section 9.A.3 of the Maine Rules, New England Telco may require a deposit from Defendants for nonresidential service regardless of Defendants' creditworthiness; *provided that* such deposit does not exceed Defendants' basic service charges for two months.  New England Telco is entitled to a cash deposit from Defendants in an amount equal to the anticipated basic service charges for two months.

279.     Section 2.1.1 of Maine Tariff 17 expressly incorporates by reference all regulations terms and conditions of section 2 of FCC Tariff 1.  Pursuant to Section 2.4.1 of FCC Tariff 1, New England Telco is entitled to a cash deposit from the Defendants in an amount equal to the anticipated charges for two months if Defendants have a proven history of late payments under Maine Tariff 17.

280.     Segtel has a proven history of failing to timely pay New England Telco bills under the Maine Tariff 17.

281. Segnet has a proven history of failing to timely pay New England Telco bills under the Maine Tariff 17.

282. Section 2.1.1(B) of Maine Tariff 18 expressly incorporates the conditions, rates, and charges set forth in Maine Tariff 17. Section 2.1.1 of Maine Tariff 17 expressly incorporates by reference all regulations terms and conditions of section 2 of FCC Tariff 1. Pursuant to Section 2.4.1 of FCC Tariff 1, New England Telco may require a deposit from the Defendants in an amount equal to the anticipated charges for two months if Defendants have a proven history of late payments under Maine Tariff 18.

283. Segtel has a proven history of failing to timely pay New England Telco bills under Maine Tariff 18.

284. Segnet has a proven history of failing to timely pay New England Telco bills under Maine Tariff 18.

285. Under section 4.1.6 of Maine Tariff 20, New England Telco is entitled to require that Segtel pay a cash deposit in an amount equal to the anticipated charges for two months if Segtel has a proven history of late payments under Maine Tariff 20.

286. Segtel has a proven history of failing to timely pay New England Telco bills under Maine Tariff 20.

287. Under section 1.5.6 of NH Tariff 83, New England Telco is entitled to require Defendants to pay a cash deposit equal to the anticipated charges for two months under NH Tariff 83 in order to safeguard itself against losses. New England Telco is entitled to a cash deposit from Defendants in an amount equal the anticipated basic service charges for two months.

288.     Under section 4.1.6 of NH Tariff 84, New England Telco is entitled to require Segtel to pay a cash deposit equal to the anticipated charges for two months under NH Tariff 84 if Segtel has a proven history of late payments under NH Tariff 84.

289.     Segtel has a proven history of failing to timely pay New England Telco bills under NH Tariff 84.

290.     Under section 4.1.6 of NH Tariff 85, New England Telco is entitled to require Defendants to pay a cash deposit equal to the anticipated charges for two months if Defendants have a proven history of late payments under NH Tariff 85.

291.     Segtel has a proven history of failing to timely pay New England Telco bills under NH Tariff 85.

292.     Segnet has a proven history of failing to timely pay New England Telco bills under NH Tariff 85.

293.     Under section 4.1.6 of NH Tariff 86, New England Telco is entitled to require Segtel to pay a cash deposit equal to the anticipated charges for two months if Segtel has a proven history of late payments under NH Tariff 86.

294.     Segtel has a proven history of failing to timely pay New England Telco bills under NH Tariff 86.

295.     Under section 4.2.4.1 of Vermont GATT, Vermont Telco is entitled to require Segtel to pay a cash deposit equal to the anticipated charges for two months if Segtel has a proven history of late payments under the Vermont GATT.

296.     Segtel has a proven history of failing to timely pay Vermont Telco bills under the Vermont GATT.

297.     Under section 1.5.6 of Vermont Tariff 20, Vermont Telco is entitled to require Segtel to pay a cash deposit equal to the anticipated charges for two months under Vermont Tariff 22 if Segtel has a proven history of late payments under Vermont Tariff 22.

298.     Segtel has a proven history of failing to timely pay Vermont Telco bills under Vermont Tariff 20.

299.     Under section 4.1.6 of Vermont Tariff 22, Vermont Telco is entitled to require Segtel to pay a deposit equal to the anticipated charges for two months under Vermont Tariff 22 if Segtel has a proven history of late payments under Vermont Tariff 22.

300.     Segtel has a proven history of failing to timely pay Vermont Telco bills under Vermont Tariff 22.

301.     Under section 4.1.6 of Vermont Tariff 23, Vermont Telco is entitled to require Defendants to pay a cash deposit equal to the anticipated charges for two months under Vermont Tariff 23 if Segtel has a proven history of late payments under Vermont Tariff 23.

302.     Segtel has a proven history of failing to timely pay Vermont Telco bills under Vermont Tariff 23.

303.     Segnet has a proven history of failing to timely pay Vermont Telco bills under Vermont Tariff 23.

304.     Section 2.1.1 of Vermont Tariff 24 expressly incorporates by reference the regulations, rate, and charges set forth in Vermont Tariff 23.  Pursuant to section 4.1.6 of Vermont Tariff 23, Vermont Telco is entitled to require Defendants to pay a cash deposit equal to the anticipated charges for two months under Vermont Tariff 24 if Segtel has a proven history of late payments under Vermont Tariff 24.

305. Segtel has a proven history of failing to timely pay Vermont Telco bills under Vermont Tariff 24.

306. Segnet has a proven history of failing to timely pay Vermont Telco bills under Vermont Tariff 24.

307. Under Section 2.4.1 of FCC Tariff 1, Vermont Telco may require a cash deposit from the Defendants in an amount equal to the anticipated charges for two months if Defendants have a proven history of late payments under FCC Tariff 1.

308. Segtel has a proven history of failing to timely pay Vermont Telco's bills under FCC Tariff 1.

309. Segnet has a proven history of failing to timely pay Vermont Telco's bills under FCC Tariff 1.

310. Under Section 2.4.1 of FCC Tariff 2, Vermont Telco may require a cash deposit from the Defendants in an amount equal to the anticipated charges for two months if Defendants have a proven history of late payments under FCC Tariff 2.

311. Segtel has a proven history of failing to timely pay Vermont Telco's bills under FCC Tariff 2.

312. Segnet has a proven history of failing to timely pay Vermont Telco's bills under FCC Tariff 2.

313. New England Telco is entitled to demand that Segtel pay New England Telco $325,228 in Cash Deposits, which represents the anticipated charges for two months under the Maine Interconnection Agreement, Maine Tariff 15, Maine Tariff 17, Maine Tariff 18, Maine Tariff 20, NH Tariff 83, NH Tariff 84, NH Tariff 85 and NH Tariff 86.

314. New England Telco is entitled to demand that Segnet pay New England Telco $10,226 in Cash Deposits, which represents the anticipated charges for two months under Maine Tariff 15, Maine Tariff 17, Maine Tariff 18, NH Tariff 83 and NH Tariff 85.

315. Vermont Telco is entitled to demand that Segtel pay Vermont Telco $27,022 in Cash Deposits, which represents the anticipated charges for two months under Vermont GATT, Vermont Tariff 20, Vermont Tariff 22, Vermont Tariff 23, Vermont Tariff 24, FCC Tariff 1 and FCC Tariff 2.

316. Vermont Telco is entitled to demand that Segnet pay Vermont Telco $5,774 in Cash Deposits, which represents the anticipated charges for two months under Vermont Tariff 23, Vermont Tariff 24, FCC Tariff 1 and FCC Tariff 2.

317. For the foregoing reasons, Plaintiffs respectfully request that the Court declare the rights and liabilities of the parties, including a declaration that Cash Deposits in the aggregate amount of $368,250 are due to the Plaintiffs from the Defendants.

## VI.    PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request that the Court grant judgment in their favor and against all Defendants as follows:

1. On Count 1, for failure to state a claim upon which relief can be granted, disallowing and expunging the Proofs of Claim;

2. On Count 2, pursuant to section 502(b)(1) of the Bankruptcy Code, disallowing and expunging the Proofs of Claim;

3. On Count 3, pursuant to the doctrine of res judicata and/or collateral estoppel, disallowing and expunging the Proofs of Claim;

4. On Count 4, pursuant to section 502(b)(1) of the Bankruptcy Code, disallowing and expunging the Billing Dispute Claims;

5. On Count 5, pursuant to section 502(b)(1) of the Bankruptcy Code, disallowing and expunging the Penalty Interest Claim;

6. On Count 6, pursuant to sections 502(b)(1) and 558 of the Bankruptcy Code, reducing the Unpaid Bills Claim to $58,538.84, and then setting off such amounts against Segtel's debt to New England Telco;

7. On Count 7, pursuant to section 502(b)(1) of the Bankruptcy Code, disallowing and expunging the Settlement Claims;

8. On Count 8, pursuant to section 502(b)(1) of the Bankruptcy Code, disallowing and expunging the Competitive Violation Claims;

9. On Count 9, pursuant to section 502(b)(1) of the Bankruptcy Code, disallowing and expunging the Tort Claims;

10. On Count 10, pursuant to section 502(b)(1) of the Bankruptcy Code, disallowing and expunging Segtel's claim for PAP Credits;

11. On Count 11, that Defendants have breached the Agreements and therefore Plaintiffs are entitled to recover damages in an amount not less than $698,647, plus prejudgment and post-judgment interest;

12. On Count 12, finding that equity and good conscience require full restitution of the full amount Defendants owe Plaintiffs, together with pre- and post-judgment interest;

13. On Count 13, finding that (a) Plaintiffs are entitled to an accounting of all revenues, fees, charges, accounts and transactions between Plaintiffs and Defendants since April 1, 2008, and (b) upon completion of an accounting, all monies determined to be owed Plaintiffs should be paid to Plaintiffs pursuant to the terms and conditions of the Agreements;

14. On Count 14, pursuant to sections 542 and 550(a) of the Bankruptcy Code, finding that Plaintiffs are entitled to judgment against Defendants, in an amount not less than $698,647 plus interest thereon from the invoice due dates and that Defendants are liable to turnover such amounts to Plaintiffs.

15. On Count 15, pursuant to section 502(d) of the Bankruptcy Code, disallowing all claims asserted by the Defendants against Plaintiffs unless and until the Defendants have paid any and all amounts for which they are determined to be liable under section 542 of the Bankruptcy Code and section 550 of the Bankruptcy Code.

16. On Count 16, declaring that no cure is owed to Defendants to assume any executory contracts that exist between Defendants and Plaintiffs under section 365 of the Bankruptcy Code and section 11.3.3(iii) of the Plan.

17. On Count 17, declaring that Cash Deposits in the aggregate of $368,250 are due to the Plaintiffs from the Defendants.

18.      Costs and disbursements in bringing this action, including attorneys fees.

19.      Such other or additional relief in favor of Plaintiffs as the Court deems just.

Dated: April 15, 2011
      New York, New York

/s/ James T. Grogan_____
Luc A. Despins, Esq.
James T. Grogan, Esq.
PAUL HASTINGS JANOFSKY &
WALKER LLP
Park Avenue Tower
75 E. 55th Street, First Floor
New York, NY 10022
Telephone: (212) 318-6000
Facsimile: (212) 319-4090

*Counsel to the Plaintiffs*