# Exhibit B

Jeffrey A. Masoner
Vice President
Interconnection Services Policy & Planning



**Wholesale Markets**
1310 N Court House Rd
9th fl, RM 9E104
Arlington, VA 22201

Tel. 703 974-4610
Fax 703 974-0314
jeffrey.a.masoner@verizon.com

November 3, 2005

Jeremy Katz
Chief Executive Officer
segTEL, Inc.
P.O. Box 369
Enfield, NH 03748-0369

Re:     Requested Adoption Under Section 252(i) of the TA96

Dear Mr. Katz

Verizon New England Inc., d/b/a Verizon Maine, f/k/a New England Telephone
and Telegraph Company, d/b/a Bell Atlantic - Maine ("Verizon"), a New York
corporation, with principal place of business at 185 Franklin Street, Boston, MA
02110, has received your letter stating that, under Section 252(i) of the
Telecommunications Act of 1996 (the "Act"), segTEL, Inc. ("segTEL"), a New
Hampshire corporation, with principal place of business at 9 Landing Road,
Enfield, NH 03748 wishes to adopt the terms of the Interconnection Agreement
between Biddeford Internet Corporation d/b/a Great Works Internet ("Great
Works") and Verizon that was approved by the Maine Public Utilities Commission
(the "Commission") as an effective agreement in the State of Maine, as such
agreement exists on the date hereof (including any effective and approved
amendments thereto [1]) after giving effect to operation of law (the "Terms").   I

---

1 As of the effective date of this adoption, there are only two amendments to the Great Works Interconnection Agreement.
The first amendment, a Rate Plan A amendment, became effective on June 14, 2001. The second amendment, a Dark
Fiber amendment, became effective on May 9, 2003.

understand segTEL has a copy of the Terms. Please note the following with respect to segTEL's adoption of the Terms.

1. By segTEL's countersignature on this letter, segTEL hereby represents and agrees to A through G below:

   A. segTEL adopts (and agrees to be bound by) the Terms of the Great Works/Verizon agreement for interconnection as it is in effect on the date hereof after giving effect to operation of law, and in applying the Terms, agrees that segTEL shall be substituted in place of Biddeford Internet Corporation d/b/a Great Works Internet and Great Works in the Terms wherever appropriate.

   B. For avoidance of doubt, adoption of the Terms does not include adoption of any provision imposing an unbundling obligation on Verizon that no longer applies to Verizon under the Report and Order and Order on Remand (FCC 03-36) released by the Federal Communications Commission ("FCC") on August 21, 2003 in CC Docket Nos. 01-338, 96-98, 98-147 ("Triennial Review Order"), the Order on Remand in WC Docket No. 04-313 and CC Docket No. 01-338, released by the FCC on February 4, 2005 (the "TRO Remand Order"), or that is otherwise not required by both 47 U.S.C. Section 251(c)(3) and 47 C.F.R. Part 51.

   C. Notice to segTEL and Verizon as may be required under the Terms shall be provided as follows:

      To segTEL, Inc.:

             Attention:  Jeremy Katz
             Chief Executive Officer
             P.O. Box 369
             Enfield, NH 03748-0369
             Telephone Number:  (603) 643-5883
             Facsimile Number:  (603) 643-9854
             Internet Address:  jeremy@segtel.com

             Attention:  Eric. J. Branfman and Philip Macres
             Swidler Berlin LLP
             3000 K Street, N.W., Suite 300
             Washington, DC 20007
             Telephone Number:  (202) 424-7500
             Facsimile Number:  (202) 424-7643
             Internet Address:  ejbranfman@swidlaw.com and
             pjmacres@swidlaw.com

To Verizon:

> Director-Contract Performance & Administration
> Verizon Wholesale Markets
> 600 Hidden Ridge
> HQEWMNOTICES
> Irving, TX 75038
> Telephone Number: (972) 718-5988
> Facsimile Number: (972) 719-1519
> Internet Address: wmnotices@verizon.com

with a copy to:

> Vice President and Associate General Counsel
> Verizon Wholesale Markets
> 1515 N. Court House Road
> Suite 500
> Arlington, VA 22201
> Facsimile: (703) 351-3664

D. segTEL represents and warrants that it is a certified provider of local telecommunications service in the State of Maine, and that its adoption of the Terms will cover services in the State of Maine only.

E. [Intentionally Omitted.]

F. [Intentionally Omitted.]

G. segTEL's adoption of the Great Works Terms shall become effective on September 21, 2005. Verizon shall file this adoption letter with the Commission promptly upon receipt of an original of this letter countersigned by segTEL as to the points set out in Paragraph One hereof. The term and termination provisions of the Great Works/Verizon agreement shall govern segTEL's adoption of the Terms.

2. As the Terms are being adopted by you pursuant to your statutory rights under section 252(i), Verizon does not provide the Terms to you as either a voluntary or negotiated agreement. The filing and performance by Verizon of the Terms does not in any way constitute a waiver by Verizon of any position as to the Terms or a portion thereof, nor does it constitute a waiver by Verizon of all rights and remedies it may have to seek review of the Terms, or to seek review in any way of any provisions included in these Terms as a result of segTEL's 252(i) election.

3.  Nothing herein shall be construed as or is intended to be a concession or admission by Verizon that any provision in the Terms complies with the rights and duties imposed by the Act, the decisions of the FCC and the Commission, the decisions of the courts, or other law, and Verizon expressly reserves its full right to assert and pursue claims arising from or related to the Terms.

4.  Verizon reserves the right to deny segTEL's application of the Terms, in whole or in part, at any time:

    A.  when the costs of providing the Terms to segTEL are greater than the costs of providing them to Great Works;

    B.  if the provision of the Terms to segTEL is not technically feasible; and/or

    C.  to the extent that Verizon otherwise is not required to make the Terms available to segTEL under applicable law.

5.  For avoidance of doubt, please note that adoption of the Terms will not result in reciprocal compensation payments for Internet traffic. Verizon has always taken the position that reciprocal compensation was not due to be paid for Internet traffic under section 251(b)(5) of the Act. Verizon's position that reciprocal compensation is not to be paid for Internet traffic was confirmed by the FCC in the Order on Remand and Report and Order adopted on April 18, 2001 ("*FCC Internet Order*"), which held that Internet traffic constitutes "information access" outside the scope of the reciprocal compensation obligations set forth in section 251(b)(5) of the Act.[2] Accordingly, any compensation to be paid for Internet traffic will be handled pursuant to the terms of the *FCC Internet Order*, not pursuant to adoption of the Terms.[3]  Moreover, in light of the *FCC Internet Order*, even if the Terms include provisions invoking an intercarrier compensation mechanism for Internet traffic, any reasonable amount of time permitted for adopting such provisions has expired under the FCC's rules implementing section 252(i) of the Act.[4]  In fact, the *FCC Internet Order* made clear that carriers may not adopt provisions of an existing

---

[2] Order on Remand and Report and Order, In the Matters of: Implementation of the Local Competition Provisions in the Telecommunications Act of 1996 and Intercarrier Compensation for ISP-Bound Traffic, CC Docket No. 99-68 (rel. April 27, 2001) ("*FCC Remand Order*") ¶44, remanded, WorldCom, Inc. v. FCC, No. 01-1218 (D.C. Cir. May 3, 2002). Although the D.C. Circuit remanded the *FCC Remand Order* to permit the FCC to clarify its reasoning, it left the order in place as governing federal law. See WorldCom, Inc. v. FCC, No. 01-1218, slip op. at 5 (D.C. Cir. May 3, 2002).
[3] For your convenience, an industry letter distributed by Verizon explaining its plans to implement the *FCC Internet Order* can be viewed at Verizon's Customer Support Website at URL www.verizon.com/wise (select Verizon East Customer Support, Business Resources, Customer Documentation, Resources, Industry Letters, CLEC, May 21, 2001 Order on Remand).
[4]  See, e.g., 47 C.F.R. Section 51.809(c).

interconnection agreement to the extent that such provisions provide compensation for Internet traffic.[5]

6.      Should segTEL attempt to apply the Terms in a manner that conflicts with Paragraph Three through Paragraph Six above, Verizon reserves its rights to seek appropriate legal and/or equitable relief.

7.      In the event that a voluntary or involuntary petition has been or is in the future filed against segTEL under bankruptcy or insolvency laws, or any law relating to the relief of debtors, readjustment of indebtedness, debtor reorganization or composition or extension of debt (any such proceeding, an "Insolvency Proceeding"), then: (i) all rights of Verizon under such laws, including, without limitation, all rights of Verizon under 11 U.S.C. § 366, shall be preserved, and segTEL's adoption of the Verizon Terms shall in no way impair such rights of Verizon; and (ii) all rights of segTEL resulting from segTEL's adoption of the Verizon Terms shall be subject to and modified by any Stipulations and Orders entered in the Insolvency Proceeding, including, without limitation, any Stipulation or Order providing adequate assurance of payment to Verizon pursuant to 11 U.S.C. § 366.

---

5 *FCC Internet Order* ¶ 82.

## SIGNATURE PAGE

Please arrange for a duly authorized representative of segTEL to sign this letter in the space provided below and return it to Verizon.

Sincerely,

VERIZON NEW ENGLAND INC., D/B/A VERIZON MAINE

Jeffrey A. Masoner
Vice President
Interconnection Services Policy & Planning

Reviewed and countersigned as to points A, B, C, D, E, F and G of Paragraph 1. It is the position of segTEL that, although it is adopting the Great Works Terms, segTEL has the right to order products and services available under any effective Verizon tariff or any tariff that Verizon may file in the future and its adoption of the Great Works Terms shall not in any way limit that right.:

SEGTEL, INC.

Jeremy Katz
Chief Executive Officer

c:    Michelle Miller - Verizon

**AGREEMENT**

by and between

BIDDEFORD INTERNET CORPORATION D/B/A GREAT WORKS INTERNET

and

VERIZON NEW ENGLAND INC., D/B/A VERIZON MAINE, F/K/A NEW ENGLAND
TELEPHONE AND TELEGRAPH COMPANY, D/B/A BELL ATLANTIC - MAINE

FOR THE STATE OF

MAINE

# TABLE OF CONTENTS

AGREEMENT ...................................................................................................................... 1

1. The Agreement ....................................................................................................... 1

2. Term and Termination............................................................................................ 1

3. Glossary and Attachments..................................................................................... 2

4. Applicable Law ...................................................................................................... 2

5. Assignment............................................................................................................ 3

6. Assurance of Payment........................................................................................... 3

7. Audits ..................................................................................................................... 4

8. Authorization ......................................................................................................... 5

9. Billing and Payment; Disputed Amounts................................................................ 5

10. Confidentiality........................................................................................................ 6

11. Counterparts .......................................................................................................... 8

12. Default ................................................................................................................... 8

13. Discontinuance of Service by Great Works............................................................ 8

14. Dispute Resolution................................................................................................. 9

15. Force Majeure ....................................................................................................... 9

16. Forecasts............................................................................................................... 10

17. Fraud...................................................................................................................... 10

18. Good Faith Performance ....................................................................................... 10

19. Headings ................................................................................................................ 10

20. Indemnification ...................................................................................................... 10

21. Insurance................................................................................................................ 12

22. Intellectual Property .............................................................................................. 13

23. Joint Work Product ................................................................................................ 14

24. Law Enforcement. .................................................................................................. 14

25. Liability ................................................................................................................... 14

26.    Network Management .................................................................. 15

27.    Non-Exclusive Remedies ............................................................. 16

28.    Notice of Network Changes ......................................................... 16

29.    Notices .................................................................................... 16

30.    Ordering and Maintenance .......................................................... 17

31.    Performance Standards .............................................................. 18

32.    Point of Contact for Great Works Customers ................................. 18

33.    Predecessor Agreements ............................................................ 18

34.    Publicity and Use of Trademarks or Service Marks .......................... 19

35.    References .............................................................................. 19

36.    Relationship of the Parties .......................................................... 19

37.    Reservation of Rights ................................................................. 20

38.    Subcontractors ......................................................................... 20

39.    Successors and Assigns ............................................................. 20

40.    Survival ................................................................................... 21

41.    Taxes ...................................................................................... 21

42.    Technology Upgrades ................................................................. 23

43.    Territory .................................................................................. 23

44.    Third Party Beneficiaries ............................................................ 23

45.    251 and 271 Requirements .......................................................... 23

46.    252(i) Obligations ...................................................................... 24

47.    Use of Service ........................................................................... 24

48.    Waiver ..................................................................................... 24

49.    Warranties ............................................................................... 24

50.    Withdrawal of Services ............................................................... 24

SIGNATURE PAGE ................................................................................ 26

GLOSSARY ......................................................................................... 27

1.     General Rule ............................................................................. 27

2.    Definitions ........................................................................................... 27

ADDITIONAL SERVICES ATTACHMENT ........................................................ 39

1.    Alternate Billed Calls ........................................................................ 39

2.    Dialing Parity - Section 251(b)(3) ...................................................... 39

3.    Directory Assistance (DA) and Operator Services (OS)....................... 39

4.    Directory Listing and Directory Distribution ....................................... 39

5.    Voice Information Service Traffic ....................................................... 41

6.    Intercept and Referral Announcements.............................................. 42

7.    Originating Line Number Screening (OLNS) ....................................... 43

8.    Operations Support Systems (OSS) Services...................................... 43

9.    Poles, Ducts, Conduits and Rights-of-Way ........................................ 49

10.   Telephone Numbers .......................................................................... 49

11.   Routing for Operator Services and Directory Assistance Traffic .......... 50

INTERCONNECTION ATTACHMENT ............................................................. 51

1.    General ............................................................................................ 51

2.    Methods for Interconnection and Trunk Types.................................... 51

3.    Alternative Interconnection Arrangements ......................................... 57

4.    Initiating Interconnection ................................................................. 57

5.    Transmission and Routing of Telephone Exchange Service Traffic ....... 58

6.    Traffic Measurement and Billing over Interconnection Trunks.............. 59

7.    Reciprocal Compensation Arrangements Pursuant to Section 251(b)(5) of the Act............................................................................................. 60

8.    Other Types of Traffic ...................................................................... 63

9.    Transmission and Routing of Exchange Access Traffic........................ 64

10.   Meet-Point Billing Arrangements....................................................... 64

11.   Toll Free Service Access Code (e.g., 800/888/877) Traffic .................. 67

12.   Tandem Transit Traffic...................................................................... 68

13.   Number Resources, Rate Center Areas and Routing Points.................. 69

14. Joint Network Implementation and Grooming Process; and Installation, Maintenance, Testing and Repair ........................................................................... 70

15. Number Portability – Section 251(B)(2) ........................................................... 72

**RESALE ATTACHMENT** ................................................................................................. 76

1. General ............................................................................................................... 76

2. Use of Verizon Telecommunications Services ................................................... 76

3. Availability of Verizon Telecommunications Services ........................................ 77

4. Responsibility for Charges ................................................................................ 77

5. Operations Matters ............................................................................................ 77

6. Rates and Charges ............................................................................................ 78

**NETWORK ELEMENTS ATTACHMENT** ...................................................................... 79

1. General ............................................................................................................... 79

2. Verizon's Provision of Network Elements .......................................................... 80

3. Loop Transmission Types .................................................................................. 81

4. Line Sharing ....................................................................................................... 87

5. Line Splitting ...................................................................................................... 94

6. Sub-Loop ............................................................................................................ 94

7. Inside Wire ......................................................................................................... 98

8. Dark Fiber ......................................................................................................... 100

9. Network Interface Device .................................................................................. 104

10. Unbundled Switching Elements ....................................................................... 105

11. Unbundled Interoffice Facilities ....................................................................... 106

12. Signaling Networks and Call-Related Databases ............................................ 106

13. Operations Support Systems ........................................................................... 108

14. Availability of Other Network Elements on an Unbundled Basis ..................... 108

15. Maintenance of Network Elements ................................................................... 109

16. Combinations .................................................................................................... 110

17. Rates and Charges ........................................................................................... 110

**COLLOCATION ATTACHMENT** ............................................................................................... 111

    1.    Verizon's Provision of Collocation ............................................................... 111

    2.    Great Works's Provision of Collocation ...................................................... 111

**911 ATTACHMENT** .......................................................................................................... 112

    1.    911/E-911 Arrangements ............................................................................... 112

    2.    Electronic Interface ........................................................................................ 112

    3.    911 Interconnection ....................................................................................... 113

    4.    911 Facilities ................................................................................................... 113

    5.    Local Number Portability for use with 911 .................................................. 113

    6.    PSAP Coordination ........................................................................................ 113

    7.    911 Compensation ......................................................................................... 113

    8.    911 Rules and Regulations ........................................................................... 113

**PRICING ATTACHMENT** ................................................................................................. 114

    1.    General ............................................................................................................ 114

    2.    Verizon Telecommunications Services Provided to Great Works for Resale Pursuant to the Resale Attachment ............................................................... 114

    3.    Great Works Prices ........................................................................................ 116

    4.    Section 271 ...................................................................................................... 116

    5.    Regulatory Review of Prices ......................................................................... 116

**APPENDIX A TO THE PRICING ATTACHMENT** ........................................................... 117

# AGREEMENT

## PREFACE

This Agreement ("Agreement") shall be deemed effective as of October 3, 2001 (the "Effective Date"), between Biddeford Internet Corporation d/b/a Great Works Internet ("Great Works"), a corporation organized under the laws of the State of Maine, with offices at 8 Pomerleau Street, Biddeford, Maine 04005 and Verizon New England Inc., d/b/a Verizon Maine, f/k/a New England Telephone and Telegraph Company, d/b/a Bell Atlantic - Maine ("Verizon"), a corporation organized under the laws of the State of New York with offices at 185 Franklin Street, Boston, MA 02110 (Verizon and Great Works may be referred to hereinafter, each, individually as a "Party", and, collectively, as the "Parties").

## GENERAL TERMS AND CONDITIONS

In consideration of the mutual promises contained in this Agreement, and intending to be legally bound, pursuant to Section 252 of the Act, Verizon and Great Works hereby agree as follows:

1. **The Agreement**

    1.1 This Agreement includes: (a) the Principal Document; (b) the Tariffs of each Party applicable to the Services that are offered for sale by it in the Principal Document (which Tariffs are incorporated into and made a part of this Agreement by reference); and, (c) an Order by a Party that has been accepted by the other Party.

    1.2 Except as otherwise expressly provided in the Principal Document (including, but not limited to, the Pricing Attachment), conflicts among provisions in the Principal Document, Tariffs, and an Order by a Party that has been accepted by the other Party, shall be resolved in accordance with the following order of precedence, where the document identified in subsection "(a)" shall have the highest precedence: (a) the Principal Document; (b) the Tariffs; and, (c) an Order by a Party that has been accepted by the other Party. The fact that a provision appears in the Principal Document but not in a Tariff, or in a Tariff but not in the Principal Document, shall not be interpreted as, or deemed grounds for finding, a conflict for the purposes of this Section 1.2.

    1.3 This Agreement constitutes the entire agreement between the Parties on the subject matter hereof, and supersedes any prior or contemporaneous agreement, understanding, or representation, on the subject matter hereof. Except as otherwise provisioned in the Principal Document, the Principal Document may not be waived or modified except by a written document that is signed by the Parties. Subject to the requirements of Applicable Law, a Party shall have the right to add, modify, or withdraw, its Tariff(s) at any time, without the consent of, or notice to, the other Party.

2. **Term and Termination**

    2.1 This Agreement shall be effective as of the Effective Date and, unless cancelled or terminated earlier in accordance with the terms hereof, shall continue in effect until October 2, 2003 (the "Initial Term"). Thereafter, this Agreement shall continue in force and effect unless and until cancelled or terminated as provided in this Agreement.

    2.2 Either Great Works or Verizon may terminate this Agreement effective upon the expiration of the Initial Term or effective upon any date after expiration of the

Initial Term by providing written notice of termination at least ninety (90) days in advance of the date of termination.

2.3 If either Great Works or Verizon provides notice of termination pursuant to Section 2.2 and on or before the proposed date of termination either Great Works or Verizon has requested negotiation of a new interconnection agreement, unless this Agreement is cancelled or terminated earlier in accordance with the terms hereof (including, but not limited to, pursuant to Section 12), this Agreement shall remain in effect until the earlier of: (a) the effective date of a new interconnection agreement between Great Works and Verizon; or, (b) the date one (1) year after the proposed date of termination.

2.4 If either Great Works or Verizon provides notice of termination pursuant to Section 2.2 and by 11:59 PM Eastern Time on the proposed date of termination neither Great Works nor Verizon has requested negotiation of a new interconnection agreement, (a) this Agreement will terminate at 11:59 PM Eastern Time on the proposed date of termination, and (b) the Services being provided under this Agreement at the time of termination will be terminated, except to the extent that the Purchasing Party has requested that such Services continue to be provided pursuant to an applicable Tariff or SGAT.

3. **Glossary and Attachments**

The Glossary and the following Attachments are a part of this Agreement:

> Additional Services Attachment
>
> Interconnection Attachment
>
> Resale Attachment
>
> UNE Attachment
>
> Collocation Attachment
>
> 911 Attachment
>
> Pricing Attachment

4. **Applicable Law**

4.1 The construction, interpretation and performance of this Agreement shall be governed by (a) the laws of the United States of America and (b) the laws of the State of Maine, without regard to its conflicts of laws rules. All disputes relating to this Agreement shall be resolved through the application of such laws.

4.2 Each Party shall remain in compliance with Applicable Law in the course of performing this Agreement.

4.3 Neither Party shall be liable for any delay or failure in performance by it that results from requirements of Applicable Law, or acts or failures to act of any governmental entity or official.

4.4 Each Party shall promptly notify the other Party in writing of any governmental action that limits, suspends, cancels, withdraws, or otherwise materially affects, the notifying Party's ability to perform its obligations under this Agreement.

4.5 If any provision of this Agreement shall be invalid or unenforceable under Applicable Law, such invalidity or unenforceability shall not invalidate or render unenforceable any other provision of this Agreement, and this Agreement shall be construed as if it did not contain such invalid or unenforceable provision;

provided, that if the invalid or unenforceable provision is a material provision of this Agreement, or the invalidity or unenforceability materially affects the rights or obligations of a Party hereunder or the ability of a Party to perform any material provision of this Agreement, the Parties shall promptly renegotiate in good faith and amend in writing this Agreement in order to make such mutually acceptable revisions to this Agreement as may be required in order to conform the Agreement to Applicable Law.

4.6     If any legislative, regulatory, judicial or other governmental decision, order, determination or action, or any change in Applicable Law, materially affects any material provision of this Agreement, the rights or obligations of a Party hereunder, or the ability of a Party to perform any material provision of this Agreement, the Parties shall promptly renegotiate in good faith and amend in writing this Agreement in order to make such mutually acceptable revisions to this Agreement as may be required in order to conform the Agreement to Applicable Law.

4.7     Notwithstanding anything in this Agreement to the contrary, if, as a result of any legislative, judicial, regulatory or other governmental decision, order, determination or action, or any change in Applicable Law, Verizon is not required by Applicable Law to provide any Service, payment or benefit, otherwise required to be provided to Great Works hereunder, then Verizon may discontinue the provision of any such Service, payment or benefit, and Great Works shall reimburse Verizon for any payment previously made by Verizon to Great Works that was not required by Applicable Law. Verizon will provide thirty (30) days prior written notice to Great Works of any such discontinuance of a Service, unless a different notice period or different conditions are specified in this Agreement (including, but not limited to, in an applicable Tariff) or Applicable Law for termination of such Service in which event such specified period and/or conditions shall apply.

## 5.    Assignment

Neither Party may assign this Agreement or any right or interest under this Agreement, nor delegate any obligation under this Agreement, without the prior written consent of the other Party, which consent shall not be unreasonably withheld, conditioned or delayed. Any attempted assignment or delegation in violation of this Section 5 shall be void and ineffective and constitute default of this Agreement.

## 6.    Assurance of Payment

6.1     Upon request by Verizon, Great Works shall provide to Verizon adequate assurance of payment of amounts due (or to become due) to Verizon hereunder.

6.2     Assurance of payment of charges may be requested by Verizon if Great Works (a) in Verizon's reasonable judgment, at the Effective Date or at any time thereafter, does not have established credit with Verizon, (b) in Verizon's reasonable judgment, at the Effective Date or at any time thereafter, is unable to demonstrate that it is creditworthy, (c) fails to timely pay a bill rendered to Great Works by Verizon, or (d) admits its inability to pay its debts as such debts become due, has commenced a voluntary case (or has had a case commenced against it) under the U.S. Bankruptcy Code or any other law relating to bankruptcy, insolvency, reorganization, winding-up, composition or adjustment of debts or the like, has made an assignment for the benefit of creditors or is subject to a receivership or similar proceeding.

6.3 Unless otherwise agreed by the Parties, the assurance of payment shall, at Verizon's option, consist of (a) a cash security deposit in U.S. dollars held by Verizon or (b) an unconditional, irrevocable standby letter of credit naming Verizon as the beneficiary thereof and otherwise in form and substance satisfactory to Verizon from a financial institution acceptable to Verizon. The cash security deposit or letter of credit shall be in an amount equal to two (2) months anticipated charges (including, but not limited to, both recurring and non-recurring charges), as reasonably determined by Verizon, for the Services to be provided by Verizon to Great Works in connection with this Agreement.

6.4 To the extent that Verizon elects to require a cash deposit, the Parties intend that the provision of such deposit shall constitute the grant of a security interest in the deposit pursuant to Article 9 of the Uniform Commercial Code as in effect in any relevant jurisdiction.

6.5 If payment of interest on a cash deposit is required by an applicable Verizon Tariff or by Applicable Law, interest will be paid on any such cash deposit held by Verizon at the higher of the interest rate stated in such Tariff or the interest rate required by Applicable Law.

6.6 Verizon may (but is not obligated to) draw on the letter of credit or cash deposit, as applicable, upon notice to Great Works in respect of any amounts to be paid by Great Works hereunder that are not paid within thirty (30) days of the date that payment of such amounts is required by this Agreement.

6.7 If Verizon draws on the letter of credit or cash deposit, upon request by Verizon, Great Works shall provide a replacement or supplemental letter of credit or cash deposit conforming to the requirements of Section 6.2.

6.8 Notwithstanding anything else set forth in this Agreement, if Verizon makes a request for assurance of payment in accordance with the terms of this Section, then Verizon shall have no obligation thereafter to perform under this Agreement until such time as Great Works has provided Verizon with such assurance of payment.

6.9 The fact that a deposit or a letter of credit is requested by Verizon hereunder shall in no way relieve Great Works from compliance with the requirements of this Agreement (including, but not limited to, any applicable Tariffs) as to advance payments and payment for Services, nor constitute a waiver or modification of the terms herein pertaining to the discontinuance of Services for nonpayment of any amounts payment of which is required by this Agreement.

7. **Audits**

7.1 Except as may be otherwise specifically provided in this Agreement, either Party ("Auditing Party") may audit the other Party's ("Audited Party") books, records, documents, facilities and systems for the purpose of evaluating the accuracy of the Audited Party's bills. Such audits may be performed once in each Calendar Year; provided, however, that audits may be conducted more frequently (but no more frequently than once in each Calendar Quarter) if the immediately preceding audit found previously uncorrected net inaccuracies in billing in favor of the Audited Party having an aggregate value of at least $1,000,000.

7.2 The audit shall be performed by independent certified public accountants selected and paid by the Auditing Party. The accountants shall be reasonably acceptable to the Audited Party. Prior to commencing the audit, the accountants shall execute an agreement with the Audited Party in a form reasonably

acceptable to the Audited Party that protects the confidentiality of the information disclosed by the Audited Party to the accountants. The audit shall take place at a time and place agreed upon by the Parties; provided, that the Auditing Party may require that the audit commence no later than sixty (60) days after the Auditing Party has given notice of the audit to the Audited Party.

7.3  Each Party shall cooperate fully in any such audit, providing reasonable access to any and all employees, books, records, documents, facilities and systems, reasonably necessary to assess the accuracy of the Audited Party's bills.

7.4  Audits shall be performed at the Auditing Party's expense, provided that there shall be no charge for reasonable access to the Audited Party's employees, books, records, documents, facilities and systems necessary to assess the accuracy of the Audited Party's bills.

## 8.  Authorization

8.1  Verizon represents and warrants that it is a corporation duly organized, validly existing and in good standing under the laws of the State of New York and has full power and authority to execute and deliver this Agreement and to perform its obligations under this Agreement.

8.2  Great Works represents and warrants that it is a corporation duly organized, validly existing and in good standing under the laws of the State of Maine, and has full power and authority to execute and deliver this Agreement and to perform its obligations under this Agreement.

8.3  <u>Great Works Certification.</u>

Notwithstanding any other provision of this Agreement, Verizon shall have no obligation to perform under this Agreement until such time as Great Works has obtained such FCC and Commission authorization as may be required by Applicable Law for conducting business in Maine. Great Works shall not place any orders under this Agreement until it has obtained such authorization. Great Works shall provide proof of such authorization to Verizon upon request.

## 9.  Billing and Payment; Disputed Amounts

9.1  Except as otherwise provided in this Agreement, each Party shall submit to the other Party on a monthly basis in an itemized form, statement(s) of charges incurred by the other Party under this Agreement.

9.2  Except as otherwise provided in this Agreement, payment of amounts billed for Services provided under this Agreement, whether billed on a monthly basis or as otherwise provided in this Agreement, shall be due, in immediately available U.S. funds, on the later of the following dates (the "Due Date"): (a) the due date specified on the billing Party's statement; or, (b) twenty (20) days after the date the statement is received by the billed Party. Payments shall be transmitted by electronic funds transfer.

9.3  If any portion of an amount billed by a Party under this Agreement is subject to a good faith dispute between the Parties, the billed Party shall give notice to the billing Party of the amounts it disputes ("Disputed Amounts") and include in such notice the specific details and reasons for disputing each item. A Party may also dispute prospectively with a single notice a class of charges that it disputes. Notice of a dispute may be given by a Party at any time, either before or after an amount is paid, and a Party's payment of an amount shall not constitute a waiver

of such Party's right to subsequently dispute its obligation to pay such amount or to seek a refund of any amount paid. The billed Party shall pay by the Due Date all undisputed amounts. Billing disputes shall be subject to the terms of Section 14, Dispute Resolution.

9.4 Charges due to the billing Party that are not paid by the Due Date, shall be subject to a late payment charge. The late payment charge shall be in an amount specified by the billing Party which shall not exceed a rate of one-and-one-half percent (1.5%) of the overdue amount (including any unpaid previously billed late payment charges) per month.

9.5 Although it is the intent of both Parties to submit timely statements of charges, failure by either Party to present statements to the other Party in a timely manner shall not constitute a breach or default, or a waiver of the right to payment of the incurred charges, by the billing Party under this Agreement, and, except for assertion of a provision of Applicable Law that limits the period in which a suit or other proceeding can be brought before a court or other governmental entity of appropriate jurisdiction to collect amounts due, the billed Party shall not be entitled to dispute the billing Party's statement(s) based on the billing Party's failure to submit them in a timely fashion.

## 10. Confidentiality

10.1 As used in this Section 10, "Confidential Information" means the following information that is disclosed by one Party ("Disclosing Party") to the other Party ("Receiving Party") in connection with, or anticipation of, this Agreement:

10.1.1 Books, records, documents and other information disclosed in an audit pursuant to Section 7;

10.1.2 Any forecasting information provided pursuant to this Agreement;

10.1.3 Customer Information (except to the extent that (a) the Customer Information is published in a directory, (b) the Customer information is disclosed through or in the course of furnishing a Telecommunications Service, such as a Directory Assistance Service, Operator Service, Caller ID or similar service, or LIDB service, or, (c) the Customer to whom the Customer Information is related has authorized the Receiving Party to use and/or disclose the Customer Information);

10.1.4 information related to specific facilities or equipment (including, but not limited to, cable and pair information);

10.1.5 any information that is in written, graphic, electromagnetic, or other tangible form, and marked at the time of disclosure as "Confidential" or "Proprietary;" and

10.1.6 any information that is communicated orally or visually and declared to the Receiving Party at the time of disclosure, and by written notice with a statement of the information given to the Receiving Party within ten (10) days after disclosure, to be "Confidential or "Proprietary".

Notwithstanding any other provision of this Agreement, a Party shall have the right to refuse to accept receipt of information which the other Party has identified as Confidential Information pursuant to Sections 10.1.5 or 10.1.6.

10.2 Except as otherwise provided in this Agreement, the Receiving Party shall:

10.2.1 use the Confidential Information received from the Disclosing Party only in performance of this Agreement; and,

10.2.2 using the same degree of care that it uses with similar confidential information of its own (but in no case a degree of care that is less than commercially reasonable), hold Confidential Information received from the Disclosing Party in confidence and restrict disclosure of the Confidential Information solely to those of the Receiving Party's Affiliates and the directors, officers, employees, Agents and contractors of the Receiving Party and the Receiving Party's Affiliates, that have a need to receive such Confidential Information in order to perform the Receiving Party's obligations under this Agreement. The Receiving Party's Affiliates and the directors, officers, employees, Agents and contractors of the Receiving Party and the Receiving Party's Affiliates, shall be required by the Receiving Party to comply with the provisions of this Section 10 in the same manner as the Receiving Party. The Receiving Party shall be liable for any failure of the Receiving Party's Affiliates or the directors, officers, employees, Agents or contractors of the Receiving Party or the Receiving Party's Affiliates, to comply with the provisions of this Section 10.

10.3 The Receiving Party shall return or destroy all Confidential Information received from the Disclosing Party, including any copies made by the Receiving Party, within thirty (30) days after a written request by the Disclosing Party is delivered to the Receiving Party, except for (a) Confidential Information that the Receiving Party reasonably requires to perform its obligations under this Agreement, and (b) one copy for archival purposes only.

10.4 Unless otherwise agreed, the obligations of Sections 10.2 and 10.3 do not apply to information that:

10.4.1 was, at the time of receipt, already in the possession of or known to the Receiving Party free of any obligation of confidentiality and restriction on use;

10.4.2 is or becomes publicly available or known through no wrongful act of the Receiving Party, the Receiving Party's Affiliates, or the directors, officers, employees, Agents or contractors of the Receiving Party or the Receiving Party's Affiliates;

10.4.3 is rightfully received from a third person having no direct or indirect obligation of confidentiality or restriction on use to the Disclosing Party with respect to such information;

10.4.4 is independently developed by the Receiving Party;

10.4.5 is approved for disclosure or use by written authorization of the Disclosing Party (including, but not limited to, in this Agreement); or

10.4.6 is required to be disclosed by the Receiving Party pursuant to Applicable Law, provided that the Receiving Party shall have made commercially reasonable efforts to give adequate notice of the requirement to the Disclosing Party in order to enable the Disclosing Party to seek protective arrangements.

10.5 Notwithstanding the provisions of Sections 10.1 through 10.4, the Receiving Party may use and disclose Confidential Information received from the Disclosing

Party to the extent necessary to enforce the Receiving Party's rights under this Agreement or Applicable Law. In making any such disclosure, the Receiving Party shall make reasonable efforts to preserve the confidentiality and restrict the use of the Confidential Information while it is in the possession of any person to whom it is disclosed, including, but not limited to, by requesting any governmental entity to whom the Confidential Information is disclosed to treat it as confidential and restrict its use to purposes related to the proceeding pending before it.

10.6    The Disclosing Party shall retain all of the Disclosing Party's right, title and interest in any Confidential Information disclosed by the Disclosing Party to the Receiving Party. Except as otherwise expressly provided in this Agreement, no license is granted by this Agreement with respect to any Confidential Information (including, but not limited to, under any patent, trademark or copyright), nor is any such license to be implied solely by virtue of the disclosure of Confidential Information.

10.7    The provisions of this Section 10 shall be in addition to and not in derogation of any provisions of Applicable Law, including, but not limited to, 47 U.S.C. § 222, and are not intended to constitute a waiver by a Party of any right with regard to the use, or protection of the confidentiality of, CPNI provided by Applicable Law.

10.8    Each Party's obligations under this Section 10 shall survive expiration, cancellation or termination of this Agreement.

## 11.    Counterparts

This Agreement may be executed in two or more counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same instrument.

## 12.    Default

If either Party ("Defaulting Party") fails to make a payment required by this Agreement (including, but not limited to, any payment required by Section 9.3 of undisputed amounts to the billing Party) or materially breaches any other material provision of this Agreement, and such failure or breach continues for thirty (30) days after written notice thereof from the other Party, the other Party may, by written notice to the Defaulting Party, (a) suspend the provision of any or all Services hereunder, or (b) cancel this Agreement and terminate the provision of all Services hereunder.

## 13.    Discontinuance of Service by Great Works

13.1    If Great Works proposes to discontinue, or actually discontinues, its provision of service to all or substantially all of its Customers, whether voluntarily, as a result of bankruptcy, or for any other reason, Great Works shall send written notice of such discontinuance to Verizon, the Commission, and each of Great Works's Customers. Great Works shall provide such notice such number of days in advance of discontinuance of its service as shall be required by Applicable Law. Unless the period for advance notice of discontinuance of service required by Applicable Law is more than thirty (30) days, to the extent commercially feasible, Great Works shall send such notice at least thirty (30) days prior to its discontinuance of service.

13.2    Such notice must advise each Great Works Customer that unless action is taken by the Great Works Customer to switch to a different carrier prior to Great

Works's proposed discontinuance of service, the Great Works Customer will be without the service provided by Great Works to the Great Works Customer.

13.3 Should a Great Works Customer subsequently become a Verizon Customer, Great Works shall provide Verizon with all information necessary for Verizon to establish service for the Great Works Customer, including, but not limited to, the Great Works Customer's billed name, listed name, service address, and billing address, and the services being provided to the Great Works Customer.

13.4 Nothing in this Section 13 shall limit Verizon's right to cancel or terminate this Agreement or suspend provision of Services under this Agreement.

## 14. Dispute Resolution

14.1 Except as otherwise provided in this Agreement, any dispute between the Parties regarding the interpretation or enforcement of this Agreement or any of its terms shall be addressed by good faith negotiation between the Parties. To initiate such negotiation, a Party must provide to the other Party written notice of the dispute that includes both a detailed description of the dispute or alleged nonperformance and the name of an individual who will serve as the initiating Party's representative in the negotiation. The other Party shall have ten Business Days to designate its own representative in the negotiation. The Parties' representatives shall meet at least once within 45 days after the date of the initiating Party's written notice in an attempt to reach a good faith resolution of the dispute. Upon agreement, the Parties' representatives may utilize other alternative dispute resolution procedures such as private mediation to assist in the negotiations.

14.2 If the Parties have been unable to resolve the dispute within 45 days of the date of the initiating Party's written notice, either Party may pursue any remedies available to it under this Agreement, at law, in equity, or otherwise, including, but not limited to, instituting an appropriate proceeding before the Commission, the FCC, or a court of competent jurisdiction.

## 15. Force Majeure

15.1 Neither Party shall be responsible for any delay or failure in performance which results from causes beyond its reasonable control ("Force Majeure Events"), whether or not foreseeable by such Party. Such Force Majeure Events include, but are not limited to, adverse weather conditions, flood, fire, explosion, earthquake, volcanic action, power failure, embargo, boycott, war, revolution, civil commotion, act of public enemies, labor unrest (including, but not limited to, strikes, work stoppages, slowdowns, picketing or boycotts), inability to obtain equipment, parts, software or repairs thereof, acts or omissions of the other Party, and acts of God.

15.2 If a Force Majeure Event occurs, the non-performing Party shall give prompt notification of its inability to perform to the other Party. During the period that the non-performing Party is unable to perform, the other Party shall also be excused from performance of its obligations to the extent such obligations are reciprocal to, or depend upon, the performance of the non-performing Party that has been prevented by the Force Majeure Event. The non-performing Party shall use commercially reasonable efforts to avoid or remove the cause(s) of its non-performance and both Parties shall proceed to perform once the cause(s) are removed or cease.

15.3 Notwithstanding the provisions of Sections 15.1 and 15.2, in no case shall a Force Majeure Event excuse either Party from an obligation to pay money as required by this Agreement.

15.4 Nothing in this Agreement shall require the non-performing Party to settle any labor dispute except as the non-performing Party, in its sole discretion, determines appropriate.

## 16. Forecasts

In addition to any other forecasts required by this Agreement, upon request by Verizon, Great Works shall provide to Verizon forecasts regarding the Services that Great Works expects to purchase from Verizon, including, but not limited to, forecasts regarding the types and volumes of Services that Great Works expects to purchase and the locations where such Services will be purchased.

## 17. Fraud

Great Works assumes responsibility for all fraud associated with its Customers and accounts. Verizon shall bear no responsibility for, and shall have no obligation to investigate or make adjustments to Great Works's account in cases of, fraud by Great Works's Customers or other third parties.

## 18. Good Faith Performance

The Parties shall act in good faith in their performance of this Agreement. Except as otherwise expressly stated in this Agreement (including, but not limited to, where consent, approval, agreement or a similar action is stated to be within a Party's sole discretion), where consent, approval, mutual agreement or a similar action is required by any provision of this Agreement, such action shall not be unreasonably withheld, conditioned or delayed.

## 19. Headings

The headings used in the Principal Document are inserted for convenience of reference only and are not intended to be a part of or to affect the meaning of the Principal Document.

## 20. Indemnification

20.1 Each Party ("Indemnifying Party") shall indemnify, defend and hold harmless the other Party ("Indemnified Party"), the Indemnified Party's Affiliates, and the directors, officers and employees of the Indemnified Party and the Indemnified Party's Affiliates, from and against any and all Claims that arise out of bodily injury to or death of any person, or damage to, or destruction or loss of, tangible real and/or personal property of any person, to the extent such injury, death, damage, destruction or loss, was proximately caused by the grossly negligent or intentionally wrongful acts or omissions of the Indemnifying Party, the Indemnifying Party's Affiliates, or the directors, officers, employees, Agents or contractors (excluding the Indemnified Party) of the Indemnifying Party or the Indemnifying Party's Affiliates, in connection with this Agreement.

20.2 Indemnification Process.

20.2.1 As used in this Section 20, "Indemnified Person" means a person whom an Indemnifying Party is obligated to indemnify, defend and/or hold harmless under Section 20.1.

20.2.2 An Indemnifying Party's obligations under Section 20.1 shall be conditioned upon the following:

20.2.3 The Indemnified Person: (a) shall give the Indemnifying Party notice of the Claim promptly after becoming aware thereof (including a statement of facts known to the Indemnified Person related to the Claim and an estimate of the amount thereof); (b) prior to taking any material action with respect to a Third Party Claim, shall consult with the Indemnifying Party as to the procedure to be followed in defending, settling, or compromising the Claim; (c) shall not consent to any settlement or compromise of a Third Party Claim without the written consent of the Indemnifying Party; (d) shall permit the Indemnifying Party to assume the defense of a Third Party Claim (including, except as provided below, the compromise or settlement thereof) at the Indemnifying Party's own cost and expense, provided, however, that the Indemnified Person shall have the right to approve the Indemnifying Party's choice of legal counsel.

20.2.4 If the Indemnified Person fails to comply with Section 20.2.1 with respect to a Claim, to the extent such failure shall have a material adverse effect upon the Indemnifying Party, the Indemnifying Party shall be relieved of its obligation to indemnify, defend and hold harmless the Indemnified Person with respect to such Claim under this Agreement.

20.2.5 Subject to 20.2.6 and 20.2.7, below, the Indemnifying Party shall have the authority to defend and settle any Third Party Claim.

20.2.6 With respect to any Third Party Claim, the Indemnified Person shall be entitled to participate with the Indemnifying Party in the defense of the Claim if the Claim requests equitable relief or other relief that could affect the rights of the Indemnified Person. In so participating, the Indemnified Person shall be entitled to employ separate counsel for the defense at the Indemnified Person's expense. The Indemnified Person shall also be entitled to participate, at its own expense, in the defense of any Claim, as to any portion of the Claim as to which it is not entitled to be indemnified, defended and held harmless by the Indemnifying Party.

20.2.7 In no event shall the Indemnifying Party settle a Third Party Claim or consent to any judgment with regard to a Third Party Claim without the prior written consent of the Indemnified Party, which shall not be unreasonably withheld, conditioned or delayed. In the event the settlement or judgment requires a contribution from or affects the rights of an Indemnified Person, the Indemnified Person shall have the right to refuse such settlement or judgment with respect to itself and, at its own cost and expense, take over the defense against the Third Party Claim, provided that in such event the Indemnifying Party shall not be responsible for, nor shall it be obligated to indemnify or hold harmless the Indemnified Person against, the Third Party Claim for any amount in excess of such refused settlement or judgment.

20.2.8 The Indemnified Person shall, in all cases, assert any and all provisions in applicable Tariffs and Customer contracts that limit liability to third persons as a bar to, or limitation on, any recovery by a third-person claimant.

20.2.9 The Indemnifying Party and the Indemnified Person shall offer each other all reasonable cooperation and assistance in the defense of any Third Party Claim.

20.3 Each Party agrees that it will not implead or bring any action against the other Party, the other Party's Affiliates, or any of the directors, officers or employees of the other Party or the other Party's Affiliates, based on any claim by any person for personal injury or death that occurs in the course or scope of employment of such person by the other Party or the other Party's Affiliate and that arises out of performance of this Agreement.

20.4 Each Party's obligations under this Section 20 shall survive expiration, cancellation or termination of this Agreement.

21. **Insurance**

21.1 Great Works shall maintain during the term of this Agreement and for a period of two years thereafter all insurance and/or bonds required to satisfy its obligations under this Agreement (including, but not limited to, its obligations set forth in Section 20 hereof) and all insurance and/or bonds required by Applicable Law. The insurance and/or bonds shall be obtained from an insurer having an A.M. Best insurance rating of at least A-, financial size category VII or greater. At a minimum and without limiting the foregoing undertaking, Great Works shall maintain the following insurance:

21.1.1 Commercial General Liability Insurance, on an occurrence basis, including but not limited to, premises-operations, broad form property damage, products/completed operations, contractual liability, independent contractors, and personal injury, with limits of at least $2,000,000 combined single limit for each occurrence.

21.1.2 Commercial Motor Vehicle Liability Insurance covering all owned, hired and non-owned vehicles, with limits of at least $2,000,000 combined single limit for each occurrence.

21.1.3 Excess Liability Insurance, in the umbrella form, with limits of at least $10,000,000 combined single limit for each occurrence.

21.1.4 Worker's Compensation Insurance as required by Applicable Law and Employer's Liability Insurance with limits of not less than $2,000,000 per occurrence.

21.1.5 All risk property insurance on a full replacement cost basis for all of Great Works's real and personal property located at any Collocation site or otherwise located on or in any Verizon premises (whether owned, leased or otherwise occupied by Verizon), facility, equipment or right-of-way.

21.2 Any deductibles, self-insured retentions or loss limits ("Retentions") for the foregoing insurance must be disclosed on the certificates of insurance to be provided to Verizon pursuant to Sections 21.4 and 21.5, and Verizon reserves the right to reject any such Retentions in its reasonable discretion. All Retentions shall be the responsibility of Great Works.

21.3 Great Works shall name Verizon and Verizon's Affiliates as additional insureds on the foregoing liability insurance.

21.4 Great Works shall, within two (2) weeks of the Effective Date hereof at the time of each renewal of, or material change in, Great Works 's insurance policies, and at such other times as Verizon may reasonably specify, furnish certificates or other proof of the foregoing insurance reasonably acceptable to Verizon. The certificates or other proof of the foregoing insurance shall be sent to: Director - Contract Performance & Administration, Verizon Wholesale Markets, 600 Hidden Ridge, HQEWMNOTICES, Irving. TX 75038.

21.5 Great Works shall require its contractors, if any, that may enter upon the premises or access the facilities or equipment of Verizon or Verizon's affiliates to maintain insurance in accordance with Sections 21.1 through 21.3 and, if requested, to furnish Verizon certificates or other adequate proof of such insurance acceptable to Verizon in accordance with Section 21.4

21.6 If Great Works or Great Works's contractors fail to maintain insurance as required in Sections 21.1 through 21.5, above, Verizon may (but shall not be obligated to) purchase such insurance and Great Works shall reimburse Verizon for the cost of the insurance.

21.7 Certificates furnished by Great Works or Great Works's contractors shall contain a clause stating: "Verizon New England Inc., d/b/a Verizon Maine, f/k/a New England Telephone and Telegraph Company, d/b/a Bell Atlantic - Maine shall be notified in writing at least thirty (30) days prior to cancellation of, or any material change in, the insurance."

## 22. Intellectual Property

22.1 Except as expressly stated in this Agreement, this Agreement shall not be construed as granting a license with respect to any patent, copyright, trade name, trademark, service mark, trade secret or any other intellectual property, now or hereafter owned, controlled or licensable by either Party. Except as expressly stated in this Agreement, neither Party may use any patent, copyrightable materials, trademark, trade name, trade secret or other intellectual property right, of the other Party except in accordance with the terms of a separate license agreement between the Parties granting such rights.

22.2 Except as stated In Section 22.4, neither Party shall have any obligation to defend, indemnify or hold harmless, or acquire any license or right for the benefit of, or owe any other obligation or have any liability to, the other Party or its Affiliates or Customers based on or arising from any Third Party Claim alleging or asserting that the provision or use of any service, facility, arrangement, or software by either Party under this Agreement, or the performance of any service or method, either alone or in combination with the other Party, constitutes direct, vicarious or contributory infringement or inducement to infringe, or misuse or misappropriation of any patent, copyright, trademark, trade secret, or any other proprietary or intellectual property right of any Party or third person. Each Party, however, shall offer to the other reasonable cooperation and assistance in the defense of any such claim.

22.3 NOTWITHSTANDING ANY OTHER PROVISION OF THIS AGREEMENT, THE PARTIES AGREE THAT NEITHER PARTY HAS MADE, AND THAT THERE DOES NOT EXIST, ANY WARRANTY, EXPRESS OR IMPLIED, THAT THE USE BY EACH PARTY OF THE OTHER'S SERVICES PROVIDED UNDER THIS AGREEMENT SHALL NOT GIVE RISE TO A CLAIM OF INFRINGEMENT, MISUSE, OR MISAPPROPRIATION OF ANY INTELLECTUAL PROPERTY RIGHT.

22.4    Great Works agrees that the Services provided by Verizon hereunder shall be subject to the terms, conditions and restrictions contained in any applicable agreements (including, but not limited to software or other intellectual property license agreements) between Verizon and Verizon's vendors. Verizon agrees to advise Great Works, directly or through a third party, of any such terms, conditions or restrictions that may limit any Great Works use of a Service provided by Verizon that is otherwise permitted by this Agreement. At Great Works's written request, to the extent required by Applicable Law, Verizon will use Verizon's best efforts, as commercially practicable, to obtain intellectual property rights from Verizon's vendor to allow Great Works to use the Service in the same manner as Verizon that are coextensive with Verizon's intellectual property rights, on terms and conditions that are equal in quality to the terms and conditions under which Verizon has obtained Verizon's intellectual property rights. Great Works shall reimburse Verizon for the cost of obtaining such rights.

## 23. Joint Work Product

The Principal Document is the joint work product of the Parties, has been negotiated by the Parties, and shall be fairly interpreted in accordance with its terms. In the event of any ambiguities, no inferences shall be drawn against either Party.

## 24. Law Enforcement.

24.1    Each Party may cooperate with law enforcement authorities and national security authorities to the full extent required or permitted by Applicable Law in matters related to Services provided by it under this Agreement, including, but not limited to, the production of records, the establishment of new lines or the installation of new services on an existing line in order to support law enforcement and/or national security operations, and, the installation of wiretaps, trap-and-trace facilities and equipment, and dialed number recording facilities and equipment.

24.2    A Party shall not have the obligation to inform the other Party or the Customers of the other Party of actions taken in cooperating with law enforcement or national security authorities, except to the extent required by Applicable Law.

24.3    Where a law enforcement or national security request relates to the establishment of lines (including, but not limited to, lines established to support interception of communications on other lines), or the installation of other services, facilities or arrangements, a Party may act to prevent the other Party from obtaining access to information concerning such lines, services, facilities and arrangements, through operations support system interfaces.

## 25. Liability

25.1    As used in this Section 25, "Service Failure" means a failure to comply with a direction to install, restore or terminate Services under this Agreement, a failure to provide Services under this Agreement, and failures, mistakes, omissions, interruptions, delays, errors, defects or the like, occurring in the course of the provision of any Services under this Agreement.

25.2    Except as otherwise stated in Section 25.5, the liability, if any, of a Party, a Party's Affiliates, and the directors, officers and employees of a Party and a Party's Affiliates, to the other Party, the other Party's Customers, and to any other person, for Claims arising out of a Service Failure shall not exceed an amount equal to the pro rata applicable monthly charge for the Services that are subject to the Service Failure for the period in which such Service Failure occurs.

25.3    Except as otherwise stated in Section 25.5, a Party, a Party's Affiliates, and the directors, officers and employees of a Party and a Party's Affiliates, shall not be liable to the other Party, the other Party's Customers, or to any other person, in connection with this Agreement (including, but not limited to, in connection with a Service Failure or any breach, delay or failure in performance, of this Agreement) for special, indirect, incidental, consequential, reliance, exemplary, punitive, or like damages, including, but not limited to, damages for lost revenues, profits or savings, or other commercial or economic loss, even if the person whose liability is excluded by this Section has been advised of the possibility of such damages.

25.4    The limitations and exclusions of liability stated in Sections 25.1 through 25.3 shall apply regardless of the form of a claim or action, whether statutory, in contract, warranty, strict liability, tort (including, but not limited to, negligence of a Party), or otherwise.

25.5    Nothing contained in Sections 25.1 through 25.4 shall exclude or limit liability:

     25.5.1   under Sections 20, Indemnification, or 41, Taxes.

     25.5.2   for any obligation to indemnify, defend and/or hold harmless that a Party may have under this Agreement.

     25.5.3   for damages arising out of or resulting from bodily injury to or death of any person, or damage to, or destruction or loss of, tangible real and/or personal property of any person, or Toxic or Hazardous Substances, to the extent such damages are otherwise recoverable under Applicable Law;

     25.5.4   for a claim for infringement of any patent, copyright, trade name, trade mark, service mark, or other intellectual property interest;

     25.5.5   under Section 258 of the Act or any order of FCC or the Commission implementing Section 258; or

     25.5.6   under the financial incentive or remedy provisions of any service quality plan required by the FCC or the Commission.

25.6    In the event that the liability of a Party, a Party's Affiliate, or a director, officer or employee of a Party or a Party's Affiliate, is limited and/or excluded under both this Section 25 and a provision of an applicable Tariff, the liability of the Party or other person shall be limited to the smaller of the amounts for which such Party or other person would be liable under this Section or the Tariff provision.

25.7    Each Party shall, in its tariffs and other contracts with its Customers, provide that in no case shall the other Party, the other Party's Affiliates, or the directors, officers or employees of the other Party or the other Party's Affiliates, be liable to such Customers or other third-persons for any special, indirect, incidental, consequential, reliance, exemplary, punitive or other damages, arising out of a Service Failure.

## 26.    Network Management

26.1    Cooperation. The Parties will work cooperatively in a commercially reasonable manner to install and maintain a reliable network. Great Works and Verizon will exchange appropriate information (e.g., network information, maintenance contact numbers, escalation procedures, and information required to comply with requirements of law enforcement and national security agencies) to achieve this

desired reliability. In addition, the Parties will work cooperatively in a commercially reasonable manner to apply sound network management principles to alleviate or to prevent traffic congestion and subject to Section 17, to minimize fraud associated with third number billed calls, calling card calls, and other services related to this Agreement.

26.2 <u>Responsibility for Following Standards</u>. Each Party recognizes a responsibility to follow the standards that may be agreed to between the Parties and to employ characteristics and methods of operation that will not interfere with or impair the service, network or facilities of the other Party or any third parties connected with or involved directly in the network or facilities of the other.

26.3 <u>Interference or Impairment.</u> If a Party ("Impaired Party") reasonably determines that the services, network, facilities, or methods of operation, of the other Party ("Interfering Party") will or are likely to interfere with or impair the Impaired Party's provision of services or the operation of the Impaired Party's network or facilities, the Impaired Party may interrupt or suspend any Service provided to the Interfering Party to the extent necessary to prevent such interference or impairment, subject to the following:

26.3.1 Except in emergency situations (e.g., situations involving a risk of bodily injury to persons or damage to tangible property, or an interruption in Customer service) or as otherwise provided in this Agreement, the Impaired Party shall have given the Interfering Party at least ten (10) days' prior written notice of the interference or impairment or potential interference or impairment and the need to correct the condition within said time period; and,

26.3.2 Upon correction of the interference or impairment, the Impaired Party will promptly restore the interrupted or suspended Service. The Impaired Party shall not be obligated to provide an out-of-service credit allowance or other compensation to the Interfering Party in connection with the suspended Service.

26.4 <u>Outage Repair Standard</u>. In the event of an outage or trouble in any Service being provided by a Party hereunder, the Providing Party will follow Verizon's standard procedures for isolating and clearing the outage or trouble.

## 27.   Non-Exclusive Remedies

Except as otherwise expressly provided in this Agreement, each of the remedies provided under this Agreement is cumulative and is in addition to any other remedies that may be available under this Agreement or at law or in equity.

## 28.   Notice of Network Changes

If a Party makes a change in the information necessary for the transmission and routing of services using that Party's facilities or network, or any other change in its facilities or network that will materially affect the interoperability of its facilities or network with the other Party's facilities or network, the Party making the change shall publish notice of the change at least ninety (90) days in advance of such change, and shall use reasonable efforts, as commercially practicable, to publish such notice at least one hundred eighty (180) days in advance of the change; provided, however, that if an earlier publication of notice of a change is required by Applicable Law (including, but not limited to, 47 CFR 51.325 through 51. 335) notice shall be given at the time required by Applicable Law.

## 29.   Notices

29.1 Except as otherwise provided in this Agreement, notices given by one Party to the other Party under this Agreement:

29.1.1 shall be in writing;

29.1.2 shall be delivered (a) personally, (b) by express delivery service with next Business Day delivery, (c) by First Class, certified or registered U.S. mail, postage prepaid, or (d) by facsimile telecopy, with a copy delivered in accordance with (a), (b) or (c), preceding; and

29.1.3 shall be delivered to the following addresses of the Parties:

To Great Works:

Legal
8 Pomerleau Street
Biddeford, Maine 04005
Telephone Number:  (207) 286-8686 ext. 116
Facsimile Number:  (207) 286-2061
Internet Address:  legal@gwi.net

To Verizon:

Director-Contract Performance & Administration
Verizon Wholesale Markets
600 Hidden Ridge
HQEWMNOTICES
Irving, TX  75038
Telephone Number:  972-718-5988
Facsimile Number:  972-719-1519
Internet Address:  wmnotices@verizon.com

with a copy to:

Vice President and Associate General Counsel
Verizon Wholesale Markets
1515 North Court House Road
Suite 500
Arlington, VA  22201
Facsimile:  703-351-3664

or to such other address as either Party shall designate by proper notice.

Notices will be deemed given as of the earlier of (a) where there is personal delivery of the notice, the date of actual receipt, (b) where the notice is sent via express delivery service for next Business Day delivery, the next Business Day after the notice is sent, (c) where the notice is sent via First Class U.S. Mail, three (3) Business Days after mailing, (d) where notice is sent via certified or registered U.S. mail, the date of receipt shown on the Postal Service receipt, and (e) where the notice is sent via facsimile telecopy, if the notice is sent on a Business Day and before 5 PM. in the time zone where it is received, on the date set forth on the telecopy confirmation, or if the notice is sent on a non-Business Day or if the notice is sent after 5 PM in the time zone where it is received, the next Business Day after the date set forth on the telecopy confirmation .

**30.    Ordering and Maintenance**

Great Works shall use Verizon's electronic Operations Support System access platforms to submit Orders and requests for maintenance and repair of Services, and to engage in other pre-ordering, ordering, provisioning, maintenance and repair transactions. If Verizon has not yet deployed an electronic capability for Great Works to perform a pre-ordering, ordering, provisioning, maintenance or repair, transaction offered by Verizon, Great Works shall use such other processes as Verizon has made available for performing such transaction (including, but not limited, to submission of Orders by telephonic facsimile transmission and placing trouble reports by voice telephone transmission).

31. **Performance Standards**

31.1 Verizon shall provide Services under this Agreement in accordance with the performance standards required by Applicable Law, including, but not limited to, Section 251(c) of the Act.

31.2 To the extent required by Appendix D, Section V, "Carrier-to-Carrier Performance Plan (Including Performance Measurements)," and Appendix D, Attachment A, "Carrier-to-Carrier Performance Assurance Plan," of the Merger Order, Verizon shall provide performance measurement results to Great Works.

31.3 Great Works shall provide Services under this Agreement in accordance with the performance standards required by Applicable Law.

32. **Point of Contact for Great Works Customers**

32.1 Great Works shall establish telephone numbers and mailing addresses at which Great Works Customers may communicate with Great Works and shall advise Great Works Customers of these telephone numbers and mailing addresses.

32.2 Except as otherwise agreed to by Verizon, Verizon shall have no obligation, and may decline, to accept a communication from a Great Works customer, including, but not limited to, a Great Works Customer request for repair or maintenance of a Verizon Service provided to Great Works.

33. **Predecessor Agreements**

33.1 Except as stated in Section 33.1.1 or as otherwise agreed in writing by the Parties:

33.1.1 any prior interconnection or resale agreement between the Parties for the State of Maine pursuant to Section 252 of the Act and in effect immediately prior to the Effective Date is hereby terminated; and

33.1.2 any Services that were purchased by one Party from the other Party under a prior interconnection or resale agreement between the Parties for the State of Maine pursuant to Section 252 of the Act and in effect immediately prior to the Effective Date, shall as of the Effective Date be subject to and purchased under this Agreement.

33.2 Except as otherwise agreed in writing by the Parties, if a Service purchased by a Party under a prior interconnection or resale agreement between the Parties pursuant to Section 252 of the Act was subject to a contractual commitment that it would be purchased for a period of longer than one month, and such period had not yet expired as of the Effective Date and the Service had not been terminated prior to the Effective Date, to the extent not inconsistent with this Agreement, such commitment shall remain in effect and the Service will be

purchased under this Agreement; provided, that if this Agreement would materially alter the terms of the commitment, either Party make elect to cancel the commitment.

33.3    If either Party elects to cancel the commitment pursuant to the proviso in Section 33.1.1, the Purchasing Party shall not be liable for any termination charge that would otherwise have applied. However, if the commitment was cancelled by the Purchasing Party, the Providing Party shall be entitled to payment from the Purchasing Party of the difference between the price of the Service that was actually paid by the Purchasing Party under the commitment and the price of the Service that would have applied if the commitment had been to purchase the Service only until the time that the commitment was cancelled.

## 34.    Publicity and Use of Trademarks or Service Marks

34.1    A Party, its Affiliates, and their respective contractors and Agents, shall not use the other Party's trademarks, service marks, logos or other proprietary trade dress, in connection with the sale of products or services, or in any advertising, press releases, publicity matters or other promotional materials, unless the other Party has given its written consent for such use, which consent the other Party may grant or withhold in its sole discretion.

34.2    Neither Party may imply any direct or indirect affiliation with or sponsorship or endorsement of it or its services or products by the other Party.

34.3    Any violation of this Section 34 shall be considered a material breach of this Agreement.

## 35.    References

35.1    All references to Sections, Appendices and Exhibits shall be deemed to be references to Sections, Appendices and Exhibits of this Agreement unless the context shall otherwise require.

35.2    Unless the context shall otherwise require, any reference to a Tariff, agreement, technical or other document (including Verizon or third party guides, practices or handbooks), or provision of Applicable Law, is to such Tariff, agreement, document, or provision of Applicable Law, as amended and supplemented from time to time (and, in the case of a Tariff or provision of Applicable Law, to any successor Tariff or provision).

## 36.    Relationship of the Parties

36.1    The relationship of the Parties under this Agreement shall be that of independent contractors and nothing herein shall be construed as creating any other relationship between the Parties.

36.2    Nothing contained in this Agreement shall make either Party the employee of the other, create a partnership, joint venture, or other similar relationship between the Parties, or grant to either Party a franchise, distributorship or similar interest.

36.3    Except for provisions herein expressly authorizing a Party to act for another Party, nothing in this Agreement shall constitute a Party as a legal representative or Agent of the other Party, nor shall a Party have the right or authority to assume, create or incur any liability or any obligation of any kind, express or implied, against, in the name or on behalf of the other Party unless otherwise

expressly permitted by such other Party in writing, which permission may be granted or withheld by the other Party in its sole discretion.

36.4 Each Party shall have sole authority and responsibility to hire, fire, compensate, supervise, and otherwise control its employees, Agents and contractors. Each Party shall be solely responsible for payment of any Social Security or other taxes that it is required by Applicable Law to pay in conjunction with its employees, Agents and contractors, and for withholding and remitting to the applicable taxing authorities any taxes that it is required by Applicable Law to collect from its employees.

36.5 Except as otherwise expressly provided in this Agreement, no Party undertakes to perform any obligation of the other Party, whether regulatory or contractual, or to assume any responsibility for the management of the other Party's business.

36.6 The relationship of the Parties under this Agreement is a non-exclusive relationship.

37. **Reservation of Rights**

37.1 Notwithstanding anything to the contrary in this Agreement, neither Party waives, and each Party hereby expressly reserves, its rights: (a) to appeal or otherwise seek the reversal of and changes in any arbitration decision associated with this Agreement; (b) to challenge the lawfulness of this Agreement and any provision of this Agreement; (c) to seek changes in this Agreement (including, but not limited to, changes in rates, charges and the Services that must be offered) through changes in Applicable Law; and, (d) to challenge the lawfulness and propriety of, and to seek to change, any Applicable Law, including, but not limited to any rule, regulation, order or decision of the Commission, the FCC, or a court of applicable jurisdiction. Nothing in this Agreement shall be deemed to limit or prejudice any position a Party has taken or may take before the Commission, the FCC, any other state or federal regulatory or legislative bodies, courts of applicable jurisdiction, or industry fora. The provisions of this Section shall survive the expiration, cancellation or termination of this Agreement.

37.2 Great Works acknowledges Great Works has been advised by Verizon that it is Verizon's position that:

37.2.1 This Agreement contains certain provisions which are intended to reflect Applicable Law and Commission and/or FCC arbitration decisions; and

37.2.2 For the purposes of Appendix D, Sections 31 and 32, of the Merger Order, such provisions shall not be deemed to have been voluntarily negotiated or agreed to by Verizon and shall not be available to carriers pursuant to Appendix D, Sections 31 and 32 of the Merger Order.

38. **Subcontractors**

A Party may use a contractor of the Party (including, but not limited to, an Affiliate of the Party) to perform the Party's obligations under this Agreement; provided, that a Party's use of a contractor shall not release the Party from any duty or liability to fulfill the Party's obligations under this Agreement.

39. **Successors and Assigns**

This Agreement shall be binding on and inure to the benefit of the Parties and their respective legal successors and permitted assigns.

40.  **Survival**

The rights, liabilities and obligations of a Party for acts or omissions occurring prior to the expiration, cancellation or termination of this Agreement, the rights, liabilities and obligations of a Party under any provision of this Agreement regarding confidential information (including but not limited to, Section 10, indemnification or defense (including, but not limited to, Section 20, or limitation or exclusion of liability (including, but not limited to, Section 25, and the rights, liabilities and obligations of a Party under any provision of this Agreement which by its terms or nature is intended to continue beyond or to be performed after the expiration, cancellation or termination of this Agreement, shall survive the expiration, cancellation or termination of this Agreement.

41.  **Taxes**

41.1  <u>In General</u>.  With respect to any purchase hereunder of Services, if any federal, state or local tax, fee, surcharge or other tax-like charge (a "Tax") is required or permitted by Applicable Law or a Tariff to be collected from the Purchasing Party by the Providing Party, then (a) the Providing Party shall properly bill the Purchasing Party for such Tax, (b) the Purchasing Party shall timely remit such Tax to the Providing Party and (c) the Providing Party shall timely remit such collected Tax to the applicable taxing authority.

41.2  <u>Taxes Imposed on the Providing Party</u>.  With respect to any purchase hereunder of Services, if any federal, state or local Tax is imposed by Applicable Law on the receipts of the Providing Party, and such Applicable Law permits the Providing Party to exclude certain receipts received from sales for resale to a public utility, distributor, telephone company, local exchange carrier, telecommunications company or other communications company ("Telecommunications Company"), such exclusion being based solely on the fact that the Purchasing Party is also subject to a tax based upon receipts ("Receipts Tax"), then the Purchasing Party (a) shall provide the Providing Party with notice in writing in accordance with Section 41.6 of this Agreement of its intent to pay the Receipts Tax and (b) shall timely pay the Receipts Tax to the applicable tax authority.

41.3  <u>Taxes Imposed on Customers</u>.  With respect to any purchase hereunder of Services that are resold to a third party, if any federal, state or local Tax is imposed by Applicable Law on the subscriber, end-user, Customer or ultimate consumer ("Subscriber") in connection with any such purchase, which a Telecommunications Company is required to impose and/or collect from a Subscriber, then the Purchasing Party (a) shall be required to impose and/or collect such Tax from the Subscriber and (b) shall timely remit such Tax to the applicable taxing authority.

41.4  <u>Liability for Uncollected Tax, Interest and Penalty</u>.  If the Providing Party has not received an exemption certificate from the Purchasing Party and the Providing Party fails to bill the Purchasing Party for any Tax as required by Section 41.1, then, as between the Providing Party and the Purchasing Party, (a) the Purchasing Party shall remain liable for such unbilled Tax and (b) the Providing Party shall be liable for any interest assessed thereon and any penalty assessed with respect to such unbilled Tax by such authority. If the Providing Party properly bills the Purchasing Party for any Tax but the Purchasing Party fails to remit such Tax to the Providing Party as required by Section 41.1, then, as between the Providing Party and the Purchasing Party, the Purchasing Party shall be liable for such uncollected Tax and any interest assessed thereon, as

well as any penalty assessed with respect to such uncollected Tax by the applicable taxing authority. If the Providing Party does not collect any Tax as required by Section 41.1 because the Purchasing Party has provided such Providing Party with an exemption certificate that is later found to be inadequate by a taxing authority, then, as between the Providing Party and the Purchasing Party, the Purchasing Party shall be liable for such uncollected Tax and any interest assessed thereon, as well as any penalty assessed with respect to such uncollected Tax by the applicable taxing authority. If the Purchasing Party fails to pay the Receipts Tax as required by Section 41.2, then, as between the Providing Party and the Purchasing Party, (x) the Providing Party shall be liable for any Tax imposed on its receipts and (y) the Purchasing Party shall be liable for any interest assessed thereon and any penalty assessed upon the Providing Party with respect to such Tax by such authority. If the Purchasing Party fails to impose and/or collect any Tax from Subscribers as required by Section 41.3, then, as between the Providing Party and the Purchasing Party, the Purchasing Party shall remain liable for such uncollected Tax and any interest assessed thereon, as well as any penalty assessed with respect to such uncollected Tax by the applicable taxing authority. With respect to any Tax that the Purchasing Party has agreed to pay, or is required to impose on and/or collect from Subscribers, the Purchasing Party agrees to indemnify and hold the Providing Party harmless on an after-tax basis for any costs incurred by the Providing Party as a result of actions taken by the applicable taxing authority to recover the Tax from the Providing Party due to the failure of the Purchasing Party to timely pay, or collect and timely remit, such Tax to such authority. In the event either Party is audited by a taxing authority, the other Party agrees to cooperate fully with the Party being audited in order to respond to any audit inquiries in a proper and timely manner so that the audit and/or any resulting controversy may be resolved expeditiously.

41.5    Tax exemptions and Exemption Certificates. If Applicable Law clearly exempts a purchase hereunder from a Tax, and if such Applicable Law also provides an exemption procedure, such as an exemption-certificate requirement, then, if the Purchasing Party complies with such procedure, the Providing Party shall not collect such Tax during the effective period of such exemption. Such exemption shall be effective upon receipt of the exemption certificate or affidavit in accordance with the terms set forth in Section 41.6. If Applicable Law clearly exempts a purchase hereunder from a Tax, but does not also provide an exemption procedure, then the Providing Party shall not collect such Tax if the Purchasing Party (a) furnishes the Providing Party with a letter signed by an officer requesting such an exemption and citing the provision in the Applicable Law which clearly allows such exemption and (b) supplies the Providing Party with an indemnification agreement, reasonably acceptable to the Providing Party (e.g., an agreement commonly used in the industry), which holds the Providing Party harmless on an after-tax basis with respect to its forbearing to collect such Tax.

41.6    All notices, affidavits, exemption-certificates or other communications required or permitted to be given by either Party to the other, for purposes of this Section 41, shall be made in writing and shall be delivered in person or sent by certified mail, return receipt requested, or registered mail, or a courier service providing proof of service, and sent to the addressees set forth in Section 29 as well as to the following:

To Verizon:

Tax Administration
Verizon Communications
1095 Avenue of the Americas
Room 3109
New York, NY 10036

To Great Works:

Legal
8 Pomerleau Street
Biddeford, Maine 04005

Either Party may from time to time designate another address or other addressees by giving notice in accordance with the terms of this Section. Any notice or other communication shall be deemed to be given when received.

### 42. Technology Upgrades

Notwithstanding any other provision of this Agreement, Verizon shall have the right to deploy, upgrade, migrate and maintain its network at its discretion. The Parties acknowledge that Verizon, at its election, may deploy fiber throughout its network and that such fiber deployment may inhibit or facilitate Great Works's ability to provide service using certain technologies. Nothing in this Agreement shall limit Verizon's ability to modify its network through the incorporation of new equipment or software or otherwise. Great Works shall be solely responsible for the cost and activities associated with accommodating such changes in its own network.

### 43. Territory

43.1 This Agreement applies to the territory in which Verizon operates as an Incumbent Local Exchange Carrier in the State of Maine.

43.2 Notwithstanding any other provision of this Agreement, Verizon may terminate this Agreement as to a specific operating territory or portion thereof if Verizon sells or otherwise transfers its operations in such territory or portion thereof to a third-person. Verizon shall provide Great Works with at least 90 calendar days prior written notice of such termination, which shall be effective upon the date specified in the notice. Verizon shall be obligated to provide Services under this Agreement only within this territory.

### 44. Third Party Beneficiaries

Except as expressly set forth in this Agreement, this Agreement is for the sole benefit of the Parties and their permitted assigns, and nothing herein shall create or be construed to provide any third-persons (including, but not limited to, Customers or contractors of a Party) with any rights (including, but not limited to, any third-party beneficiary rights) hereunder. Except as expressly set forth in this Agreement, a Party shall have no liability under this Agreement to the Customers of the other Party or to any other third person.

### 45. 251 and 271 Requirements

45.1 The Parties agree that the performance of the terms of this Agreement will satisfy Verizon's obligations under Section 251 of the Act, and the requirements of the Checklist under Section 271 of the Act.

45.2 The Parties understand and agree that this Agreement will be filed with the Commission and may thereafter be filed with the FCC as an integral part of an

application by Verizon or an Affiliate of Verizon pursuant to Section 271(d) of the Act. In the event that any one or more of the provisions contained herein in Verizon's reasonable determination is likely to adversely affect the application pursuant to Section 271(d) of the Act, the Parties agree to make the revisions necessary to eliminate such adverse effect on the application.

**46.  252(i) Obligations**

46.1    To the extent required by Applicable Law, each Party shall comply with Section 252(i) of the Act and Appendix D, Sections 30 through 32, of the Merger Order ("Merger Order MFN Provisions").

46.2    To the extent that the exercise by Great Works of any rights it may have under Section 252(i) or the Merger Order MFN Provisions results in the rearrangement of Services by Verizon, Great Works shall be solely liable for all costs associated therewith, as well as for any termination charges associated with the termination of existing Verizon Services.

**47.  Use of Service**

Each Party shall make commercially reasonable efforts to ensure that its Customers comply with the provisions of this Agreement (including, but not limited to the provisions of applicable Tariffs) applicable to the use of Services purchased by it under this Agreement.

**48.  Waiver**

A failure or delay of either Party to enforce any of the provisions of this Agreement, or any right or remedy available under this Agreement or at law or in equity, or to require performance of any of the provisions of this Agreement, or to exercise any option which is provided under this Agreement, shall in no way be construed to be a waiver of such provisions, rights, remedies or options.

**49.  Warranties**

EXCEPT AS EXPRESSLY STATED IN THIS AGREEMENT, NEITHER PARTY MAKES OR RECEIVES ANY WARRANTY, EXPRESS OR IMPLIED, WITH RESPECT TO THE SERVICES PROVIDED, OR TO BE PROVIDED, UNDER THIS AGREEMENT AND THE PARTIES DISCLAIM ANY OTHER WARRANTIES, INCLUDING BUT NOT LIMITED TO, WARRANTIES OF MERCHANTABILITY, WARRANTIES OF FITNESS FOR A PARTICULAR PURPOSE WARRANTIES AGAINST INFRINGEMENT, AND WARRANTIES ARISING BY TRADE CUSTOM, TRADE USAGE, COURSE OF DEALING OR PERFORMANCE, OR OTHERWISE.

**50.  Withdrawal of Services**

50.1    Notwithstanding anything contained in this Agreement, except as otherwise required by Applicable Law, Verizon may terminate its offering and/or provision of any Service under this Agreement upon thirty (30) days prior written notice to Great Works.

50.2    Notwithstanding anything contained in this Agreement, except as otherwise required by Applicable Law, Verizon may with thirty (30) days prior written notice to Great Works terminate any provision of this Agreement that provides for the payment by Verizon to Great Works of compensation related to traffic, including, but not limited to, Reciprocal Compensation and other types of compensation for termination of traffic delivered by Verizon to Great Works. Following such

termination, except as otherwise agreed in writing by the Parties, Verizon shall be obligated to provide compensation to Great Works related to traffic only to the extent required by Applicable Law. If Verizon exercises its right of termination under this Section, the Parties shall negotiate in good faith appropriate substitute provisions for compensation related to traffic; provided, however, that except as otherwise voluntarily agreed by Verizon in writing in its sole discretion, Verizon shall be obligated to provide compensation to Great Works related to traffic only to the extent required by Applicable Law. If within thirty (30) days after Verizon's notice of termination the Parties are unable to agree in writing upon mutually acceptable substitute provisions for compensation related to traffic, either Party may submit their disagreement to dispute resolution in accordance with Section 14 of this Agreement.

**SIGNATURE PAGE**

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed as of the Effective Date.

**BIDDEFORD INTERNET CORPORATION D/B/A GREAT WORKS INTERNET**

By: _____

Printed: <u>Thomas C. Hazzard</u>

Title: <u>President/General Counsel</u>

**VERIZON NEW ENGLAND INC., D/B/A VERIZON MAINE**

By: _____

Printed: <u>Steven J. Pitterle</u> _____

Title: <u>Director – Negotiations</u> _____
<u>Network Services</u>

# GLOSSARY

1. **General Rule**

   1.1   The provisions of Sections 1.2 through 1.4 and Section 2 apply with regard to the Principal Document. Terms used in a Tariff shall have the meanings stated in the Tariff.

   1.2   Unless the context clearly indicates otherwise, when a term listed in this Glossary is used in the Principal Document, the term shall have the meaning stated in this Glossary. A defined term intended to convey the meaning stated in this Glossary is capitalized when used. Other terms that are capitalized, and not defined in this Glossary or elsewhere in the Principal Document, shall have the meaning stated in the Act. Additional definitions that are specific to the matters covered in a particular provision of the Principal Document may appear in that provision. To the extent that there may be any conflict between a definition set forth in this Glossary and any definition in a specific provision, the definition set forth in the specific provision shall control with respect to that provision.

   1.3   Unless the context clearly indicates otherwise, any term defined in this Glossary which is defined or used in the singular shall include the plural, and any term defined in this Glossary which is defined or used in the plural shall include the singular.

   1.4   The words "shall" and "will" are used interchangeably throughout the Principal Document and the use of either indicates a mandatory requirement. The use of one or the other shall not confer a different degree of right or obligation for either Party.

2. **Definitions**

   2.1   <u>Act.</u>

   The Communications Act of 1934 (47 U.S.C. §151 et seq.), as from time to time amended (including, but not limited to, by the Telecommunications Act of 1996).

   2.2   <u>ADSL (Asymmetrical Digital Subscriber Line).</u>

   A transmission technology on twisted pair copper Loop plant, which transmits an asymmetrical digital signal of up to 8 Mbps toward the Customer and up to 1 Mbps from the Customer, as specified in ANSI standards T1.413-1998 and Bell Atlantic Technical Reference TR-72575.

   2.3   <u>Affiliate.</u>

   Shall have the meaning set forth in the Act.

   2.4   <u>Agent.</u>

   An agent or servant.

   2.5   <u>Agreement.</u>

   This Agreement, as defined in Section 1 of the General Terms and Conditions.

2.6    Ancillary Traffic.

All traffic that is destined for ancillary services, or that may have special billing requirements, including but not limited to the following: Directory Assistance, 911/E911, Operator Services (IntraLATA call completion), IntraLATA third party, collect and calling card, 800/888 database query, LIDB, and Voice Information Services Traffic as described in Section 5 of the Additional Services Attachment.

2.7    ANI (Automatic Number Identification).

The signaling parameter that refers to the number transmitted through the network identifying the billing number of the calling party.

2.8    Applicable Law.

All effective laws, government regulations and government orders, applicable to each Party's performance of its obligations under this Agreement.

2.9    ASR (Access Service Request).

An industry standard form, which contains data elements and usage rules used by the Parties to add, establish, change or disconnect services or trunks for the purposes of interconnection.

2.10    BFR (Bona Fide Request).

The process described in the Network Element Attachment that prescribes the terms and conditions relating to a Party's request that the other Party provide a UNE that it is not otherwise required to provide under the terms of this Agreement.

2.11    Business Day.

Monday through Friday, except for holidays.

2.12    Calendar Quarter.

January through March, April through June, July through September, or October through December.

2.13    Calendar Year.

_____ January through December.

2.14    CCS (Common Channel Signaling).

A method of transmitting call set-up and network control data over a digital signaling network separate from the public switched telephone network facilities that carry the actual voice or data content of the call.

2.15    Central Office.

A local switching system for connecting lines to lines, lines to trunks, or trunks to trunks for the purpose of originating/terminating calls over the public switched telephone network. A single Central Office may handle several Central Office codes ("NXX"). Sometimes this term is used to refer to a telephone company building in which switching systems and telephone equipment are installed.

2.16 Central Office Switch.

A switch used to provide Telecommunications Services, including, but not limited to, an End Office Switch or a Tandem Switch. A Central Office Switch may also be employed as a combination End Office/Tandem Office Switch.

2.17 Claims.

Any and all claims, demands, suits, actions, settlements, judgments, fines, penalties, liabilities, injuries, damages, losses, costs (including, but not limited to, court costs), and expenses (including, but not limited to, reasonable attorney's fees).

2.18 CLEC (Competitive Local Exchange Carrier).

Any Local Exchange Carrier other than Verizon that is operating as a Local Exchange Carrier in the territory in which Verizon operates as an ILEC in the State of Maine. Great Works is or shortly will become a CLEC.

2.19 CLLI Codes.

Common Language Location Identifier Codes.

2.20 CMDS (Centralized Message Distribution System).

The billing record and clearing house transport system that LECs use to exchange out collects and in collects as well as Carrier Access Billing System (CABS) records.

2.21 Commission.

Maine Public Utilities Commission.

2.22 CPN (Calling Party Number).

A CCS parameter that identifies the calling party's telephone number.

2.23 CPNI (Customer Proprietary Network Information).

Shall have the meaning set forth in Section 222 of the Act, 47 U.S.C. § 222.

2.24 Cross Connection.

For a Collocation arrangement, the facilities between the collocating Party's equipment and the equipment or facilities of the housing Party (such as the housing Party's digital signal cross connect, Main Distribution Frame, or other suitable frame or panel).

2.25 Customer.

A third party residence or business end-user subscriber to Telephone Exchange Services provided by either of the Parties.

2.26 Digital Signal Level.

One of several transmission rates in the time-division multiplex hierarchy.

2.27 <u>DS0 (Digital Signal Level 0).</u>

The 64kbps zero-level signal in the time-division multiplex hierarchy.

2.28 <u>DS1 (Digital Signal Level 1).</u>

The 1.544 Mbps first-level signal in the time-division multiplex hierarchy.

2.29 <u>DS3 (Digital Signal Level 3).</u>

The 44.736 Mbps third-level signal in the time-division multiplex hierarchy.

2.30 <u>EMI (Exchange Message Interface).</u>

Standard used for the interexchange of telecommunications message information between local exchange carriers and interexchange carriers for billable, non-billable, sample, settlement and study data. Data is provided between companies via a unique record layout that contains Customer billing information, account summary and tracking analysis. EMI format is contained in document SR-320 published by the Alliance for Telcom Industry Solutions.

2.31 <u>End Office Switch or End Office.</u>

A switching entity that is used to terminate Customer station Loops for the purpose of interconnection to each other and to trunks.

2.32 <u>Entrance Facility.</u>

The facilities between a Party's designated premises and the Central Office serving that designated premises.

2.33 <u>Exchange Access.</u>

Shall have the meaning set forth in the Act.

2.34 <u>Extended Local Calling Scope Arrangement.</u>

An arrangement that provides a Customer a local calling scope (Extended Area Service, "EAS"), outside of the Customer's basic exchange serving area. Extended Local Calling Scope Arrangements may be either optional or non-optional. "Optional Extended Local Calling Scope Arrangement Traffic" is traffic that under an optional Extended Local Calling Scope Arrangement chosen by the Customer terminates outside of the Customer's basic exchange serving area.

2.35 <u>FCC.</u>

The Federal Communications Commission.

2.36 <u>FCC Internet Order.</u>

Order on Remand and Report and Order, *In the Matter of Implementation of the Local Competition Provisions in the Telecommunications Act of 1996, Intercarrier Compensation for ISP Bound Traffic*, FCC 01-131, CC Docket Nos. 96-98 and 99-68, (adopted April 18, 2001).

2.37 <u>FCC Regulations.</u>

The unstayed, effective regulations promulgated by the FCC, as amended from time to time.

2.38    HDSL (High-Bit Rate Digital Subscriber Line).

A transmission technology that transmits up to a DS1 level signal, using any one of the following line codes: 2 Binary/1 Quartenary (2B1Q), Carrierless AM/PM, Discrete Multitone (DMT), or 3 Binary/1 Octal (3BO).

2.39    IDLC (Integrated Digital Loop Carrier).

A subscriber Loop carrier system that integrates within the switch at a DS1 level, which is twenty-four (24) Loop transmission paths combined into a 1.544 Mbps digital signal.

2.40    ILEC (Incumbent Local Exchange Carrier).

Shall have the meaning stated in the Act.

2.41    Inside Wire or Inside Wiring.

All wire, cable, terminals, hardware, and other equipment or materials, on the Customer's side of the Rate Demarcation Point.

2.42    Internet Traffic.

Any traffic that is transmitted to or returned from the Internet at any point during the duration of the transmission.

2.43    InterLATA Service.

Shall have the meaning set forth in the Act.

2.44    IntraLATA.

Telecommunications that originate and terminate within the same LATA.

2.45    IP (Interconnection Point).

For Reciprocal Compensation Traffic, the point at which a Party who receives Reciprocal Compensation Traffic from the other Party assesses Reciprocal Compensation charges for the further transport and termination of that Reciprocal Compensation Traffic.

2.46    ISDN (Integrated Services Digital Network).

A switched network service providing end-to-end digital connectivity for the simultaneous transmission of voice and data. Basic Rate Interface-ISDN (BRI-ISDN) provides for digital transmission of two (2) 64 kbps bearer channels and one (1) 16 kbps data and signaling channel (2B+D). Primary Rate Interface-ISDN (PRI-ISDN) provides for digital transmission of twenty-three (23) 64 kbps bearer channels and one (1) 64 kbps data and signaling channel (23B+D).

2.47    IXC (Interexchange Carrier).

A Telecommunications Carrier that provides, directly or indirectly, InterLATA or IntraLATA Telephone Toll Services.

2.48     LATA (Local Access and Transport Area).

Shall have the meaning set forth in the Act.

2.49     LEC (Local Exchange Carrier).

Shall have the meaning set forth in the Act.

2.50     LERG (Local Exchange Routing Guide).

A Telcordia Technologies reference containing NPA/NXX routing and homing information.

2.51     LIDB (Line Information Data Base).

Line Information databases which provide, among other things, calling card validation functionality for telephone line number cards issued by Verizon and other entities and validation data for collect and third number-billed calls(e.g., data for billed number screening).

2.52     Line Side.

An End Office Switch connection that provides transmission, switching and optional features suitable for Customer connection to the public switched network, including loop start supervision, ground start supervision and signaling for BRI-ISDN service.

2.53     Loop.

A transmission path that extends from a Main Distribution Frame, DSX-panel, or functionally comparable piece of equipment in a Customer's serving End Office, to the Rate Demarcation Point (or NID if installed at the Rate Demarcation Point) in or at the Customer's premises. The actual transmission facilities used to provide a Loop may utilize any of several technologies.

2.54     LSR (Local Service Request).

An industry standard form, which contains data elements and usage rules, used by the Parties to establish, add, change or disconnect resold Telecommunications Services and Network Elements.

2.55     MDF (Main Distribution Frame).

The primary point at which outside plant facilities terminate within a Wire Center, for interconnection to other Telecommunications facilities within the Wire Center. The distribution frame used to interconnect cable pairs and line trunk equipment terminating on a switching system.

2.56     Measured Internet Traffic.

Dial-up, switched Internet Traffic originated by a Customer of one Party on that Party's network at a point in a Verizon local calling area, and delivered to a Customer or an Internet Service Provider served by the other Party, on that other Party's network at a point in the same Verizon local calling area. Verizon local calling areas shall be as defined by Verizon. For the purposes of this definition, a Verizon local calling area includes a Verizon non-optional Extended Local Calling Scope Arrangement, but does not include a Verizon optional Extended Local

Calling Scope Arrangement. Calls originated on a 1+ presubscription basis, or on a casual dialed (10XXX/101XXXX) basis, are not considered Measured Internet Traffic.

### 2.57 MECAB (Multiple Exchange Carrier Access Billing).

A document prepared by the Billing Committee of the Ordering and Billing Forum (OBF), which functions under the auspices of the Carrier Liaison Committee (CLC) of the Alliance for Telecommunications Industry Solutions (ATIS). The MECAB document, published by Telcordia Technologies as Special Report SR-BDS-000983, contains the recommended guidelines for the billing of an Exchange Access Service provided by two or more LECs, or by one LEC in two or more states, within a single LATA.

### 2.58 MECOD (Multiple Exchange Carriers Ordering and Design Guidelines for Access Services - Industry Support Interface).

A document developed by the Ordering/Provisioning Committee under the auspices of the Ordering and Billing Forum (OBF), which functions under the auspices of the Carrier Liaison Committee (CLC) of the Alliance for Telecommunications Industry Solutions (ATIS). The MECOD document, published by Telcordia Technologies as Special Report SR-STS-002643, establishes methods for processing orders for Exchange Access Service that is to be provided by two or more LECs.

### 2.59 Merger Order.

The FCC's ORDER "In re Application of GTE Corporation, Transferor, and Bell Atlantic Corporation, Transferee, For Consent to Transfer of Control of Domestic and International Section 214 and 310 Authorizations and Application to Transfer of a Submarine Cable Landing License", Memorandum Opinion and Order, FCC CC Docket No. 98-184, FCC 00-221 (June 16, 2000), as modified from time to time.

### 2.60 NANP (North American Numbering Plan).

The system of telephone numbering employed in the United States, Canada, Bermuda, Puerto Rico and certain Caribbean islands. The NANP format is a 10-digit number that consist of a 3-digit NPA Code (commonly referred to as the area code), followed by a 3-digit NXX code and 4 digit line number.

### 2.61 Network Element.

Shall have the meaning stated in the Act.

### 2.62 NID (Network Interface Device).

The Verizon provided interface terminating Verizon's Telecommunications network on the property where the Customer's service is located at a point determined by Verizon. The NID contains an FCC Part 68 registered jack from which Inside Wire may be connected to Verizon's network.

### 2.63 NPA (Numbering Plan Area).

Also sometimes referred to as an area code, is the first three-digit indicator of each 10-digit telephone number within the NANP. There are two general

categories of NPA, "Geographic NPAs" and "Non-Geographic NPAs". A Geographic NPA is associated with a defined geographic area, and all telephone numbers bearing such NPA are associated with services provided within that geographic area. A Non-Geographic NPA, also known as a "Service Access Code" or "SAC Code" is typically associated with a specialized Telecommunications Service that may be provided across multiple geographic NPA areas. 500, 700, 800, 888 and 900 are examples of Non-Geographic NPAs.

2.64 NXX, NXX Code, Central Office Code or CO Code.

The three-digit switch entity indicator (i.e. the first three digits of a seven-digit telephone number).

2.65 Order.

An order or application to provide, change or terminate a Service (including, but not limited to, a commitment to purchase a stated number or minimum number of lines or other Services for a stated period or minimum period of time).

2.66 POI (Point of Interconnection).

The physical location where the one Party's facilities physically interconnect with the other Party's facilities for the purpose of exchanging traffic.

2.67 Port.

A line card (or equivalent) and associated peripheral equipment on an End Office Switch that interconnects individual Loops or individual Customer trunks with the switching components of an End Office Switch and the associated switching functionality in that End Office Switch. Each Port is typically associated with one (or more) telephone number(s) that serves as the Customer's network address. The Port is part of the provision of unbundled Local Switching Element.

2.68 Principal Document.

This document, including, but not limited to, the Title Page, the Table of Contents, the Preface, the General Terms and Conditions, the signature page, this Glossary, the Attachments, and the Appendices to the Attachments

2.69 Providing Party.

A Party offering or providing a Service to the other Party under this Agreement.

2.70 Purchasing Party.

A Party requesting or receiving a Service from the other Party under this Agreement.

2.71 Rate Center Area.

The geographic area that has been identified by a given LEC as being associated with a particular NPA-NXX code assigned to the LEC for its provision of Telephone Exchange Services. The Rate Center Area is the exclusive geographic area that the LEC has identified as the area within which it will provide Telephone Exchange Services bearing the particular NPA-NXX designation associated with the specific Rate Center Area.

2.72   Rate Center Point.

A specific geographic point, defined by a V&H coordinate, located within the Rate Center Area and used to measure distance for the purpose of billing for distance-sensitive Telephone Exchange Services and Toll Traffic. Pursuant to Telcordia Practice BR-795-100-100, the Rate Center Point may be an End Office location, or a "LEC Consortium Point Of Interconnection."

2.73   Rate Demarcation Point.

The physical point in a Verizon provided network facility at which Verizon's responsibility for maintaining that network facility ends and the Customer's responsibility for maintaining the remainder of the facility begins, as set forth in this Agreement, Verizon's applicable Tariffs, if any, or as otherwise prescribed under Applicable Law.

2.74   Reciprocal Compensation.

The arrangement for recovering, in accordance with Section 251(b)(5) of the Act, the FCC Internet Order, and other applicable FCC orders and FCC Regulations, costs incurred for the transport and termination of Reciprocal Compensation Traffic originating on one Party's network and terminating on the other Party's network (as set forth in Section 7 of the Interconnection Attachment).

2.75   Reciprocal Compensation Traffic.

Telecommunications traffic originated by a Customer of one Party on that Party's network and terminated to a Customer of the other Party on that other Party's network, except for Telecommunications traffic that is interstate or intrastate Exchange Access, Information Access, or exchange services for Exchange Access or Information Access. The determination of whether Telecommunications traffic is Exchange Access or Information Access shall be based upon Verizon's local calling areas as defined by Verizon. Reciprocal Compensation Traffic does not include: (1) any Internet Traffic; (2) traffic that does not originate and terminate within the same Verizon local calling area as defined by Verizon; (3) Toll Traffic, including, but not limited to, calls originated on a 1+ presubscription basis, or on a casual dialed (10XXX/101XXXX) basis; (4) Optional Extended Local Calling Scope Arrangement Traffic; (5) special access, private line, Frame Relay, ATM, or any other traffic that is not switched by the terminating Party; (6) Tandem Transit Traffic; or, (7) Voice Information Service Traffic (as defined in Section 5 of the Additional Services Attachment). For the purposes of this definition, a Verizon local calling area includes a Verizon non-optional Extended Local Calling Scope Arrangement, but does not include a Verizon optional Extended Local Calling Scope Arrangement.

2.76   Retail Prices.

The prices at which a Service is provided by Verizon at retail to subscribers who are not Telecommunications Carriers.

2.77   Routing Point.

A specific geographic point identified by a specific V&H coordinate. The Routing Point is used to route inbound traffic to specified NPA-NXXs. The Routing Point must be located within the LATA in which the corresponding NPA-NXX is located. However, the Routing Point associated with each NPA-NXX need not

be the same as the corresponding Rate Center Point, nor must it be located within the corresponding Rate Center Area, nor must there be a unique and separate Routing Point corresponding to each unique and separate Rate Center Area.

2.78    Service.

Any Interconnection arrangement, Network Element, Telecommunications Service, Collocation arrangement, or other service, facility or arrangement, offered by a Party under this Agreement.

2.79    SS7 (Signaling System 7).

The common channel out-of-band signaling protocol developed by the Consultative Committee for International Telephone and Telegraph (CCITT) and the American National Standards Institute (ANSI). Verizon and Great Works currently utilize this out-of-band signaling protocol.

2.80    Subsidiary.

A corporation or other person that is controlled by a Party.

2.81    Switched Access Detail Usage Data.

A category 1101XX record as defined in the EMI Telcordia Practice BR-010-200-010.

2.82    Switched Access Summary Usage Data.

A category 1150XX record as defined in the EMI Telcordia Practice BR-010-200-010.

2.83    Switched Exchange Access Service.

The offering of transmission and switching services for the purpose of the origination or termination of Toll Traffic. Switched Exchange Access Services include but may not be limited to: Feature Group A, Feature Group B, Feature Group D, 700 access, 800 access, 888 access and 900 access.

2.84    Tandem Switch.

A switching entity that has billing and recording capabilities and is used to connect and switch trunk circuits between and among End Office Switches and between and among End Office Switches and carriers' aggregation points, points of termination, or points of presence, and to provide Switched Exchange Access Services.

2.85    Tariff.

2.85.1 Any applicable Federal or state tariff of a Party, as amended from time-to-time; or

2.85.2 Any standard agreement or other document, as amended from time-to-time, that sets forth the generally available terms, conditions and prices under which a Party offers a Service.

The term "Tariff" does not include any Verizon statement of generally available

terms (SGAT) which has been approved or is pending approval by the Commission pursuant to Section 252(f) of the Act.

2.86 **Telcordia Technologies.**

Telcordia Technologies, Inc., formerly known as Bell Communications Research, Inc. (Bellcore).

2.87 **Telecommunications Carrier.**

Shall have the meaning set forth in the Act.

2.88 **Telecommunications Services.**

Shall have the meaning set forth in the Act.

2.89 **Telephone Exchange Service.**

Shall have the meaning set forth in the Act.

2.90 **Third Party Claim.**

A Claim where there is (a) a claim, demand, suit or action by a person who is not a Party, (b) a settlement with, judgment by, or liability to, a person who is not a Party, or (c) a fine or penalty imposed by a person who is not a Party.

2.91 **Toll Traffic.**

Traffic that is originated by a Customer of one Party on that Party's network and terminates to a Customer of the other Party on that other Party's network and is not Reciprocal Compensation Traffic, Measured Internet Traffic, or Ancillary Traffic. Toll Traffic may be either "IntraLATA Toll Traffic" or "InterLATA Toll Traffic", depending on whether the originating and terminating points are within the same LATA.

2.92 **Toxic or Hazardous Substance.**

Any substance designated or defined as toxic or hazardous under any "Environmental Law" or that poses a risk to human health or safety, or the environment, and products and materials containing such substance. "Environmental Laws" means the Comprehensive Environmental Response, Compensation, and Liability Act, the Emergency Planning and Community Right-to-Know Act, the Water Pollution Control Act, the Air Pollution Control Act, the Toxic Substances Control Act, the Resource Conservation and Recovery Act, the Occupational Safety and Health Act, and all other Federal, Sate or local laws or governmental regulations or requirements, that are similar to the above-referenced laws or that otherwise govern releases, chemicals, products, materials or wastes that may pose risks to human health or safety, or the environment, or that relate to the protection of wetlands or other natural resources.

2.93 **Traffic Factor 1.**

For traffic exchanged via Interconnection Trunks, a percentage calculated by dividing the number of minutes of interstate traffic (excluding Measured Internet Traffic) by the total number of minutes of interstate and intrastate traffic. (Interstate Traffic Total Minutes of Use (excluding Measured Internet Traffic

Total Minutes of Use} ÷ {Interstate Traffic Total Minutes of Use + Intrastate Traffic Total Minutes of Use}] x 100). Until the form of a Party's bills is updated to use the term "Traffic Factor 1," the term "Traffic Factor 1" may be referred to on the Party's bills and in billing related communications as "Percent Interstate Usage" or "PIU."

2.94    Traffic Factor 2.

For traffic exchange via Interconnection Trunks, a percentage calculated by dividing the combined total number of minutes of Reciprocal Compensation Traffic and Measured Internet Traffic by the total number of minutes of Intrastate traffic. ([{Reciprocal Compensation Traffic Total Minutes of Use + Measured Internet Traffic Total Minutes of Use} ÷ Intrastate Traffic Total Minutes of Use] x 100). Until the form of a Party's bills is updated to use the term "Traffic Factor 2," the term "Traffic Factor 2" may be referred to on the Party's bills and in billing related communications as "Percent Local Usage" or "PLU."

2.95    Trunk Side.

A Central Office Switch connection that is capable of, and has been programmed to treat the circuit as, connecting to another switching entity, for example, to another carrier's network. Trunk side connections offer those transmission and signaling features appropriate for the connection of switching entities and cannot be used for the direct connection of ordinary telephone station sets.

2.96    UDLC (Universal Digital Loop Carrier).

UDLC arrangements consist of a Central Office Terminal and a Remote Terminal located in the outside plant or at a customer premises. The Central Office and the Remote Terminal units perform analog to digital conversions to allow the feeding facility to be digital. UDLC is deployed where the types of services to be provisioned by the systems cannot be integrated such as non-switched services and UNE Loops.

2.97    V and H Coordinates Method.

A method of computing airline miles between two points by utilizing an established formula that is based on the vertical and horizontal coordinates of the two points.

2.98    Voice Grade.

Either an analog signal of 300 to 3000 Hz or a digital signal of 56/64 kilobits per second. When referring to digital Voice Grade service (a 56-64 kbps channel), the terms "DS0" or "sub-DS1" may also be used.

2.99    Wire Center.

A building or portion thereof which serves as the premises for one or more Central Office Switches and related facilities.

# ADDITIONAL SERVICES ATTACHMENT

**1. Alternate Billed Calls**

1.1 The Parties will engage in settlements of intraLATA intrastate alternate-billed calls (*e.g.*, collect, calling card, and third-party billed calls) originated or authorized by their respective Customers in accordance with an arrangement mutually agreed to by the Parties.

**2. Dialing Parity - Section 251(b)(3)**

Each Party shall provide the other Party with nondiscriminatory access to such services and information as are necessary to allow the other Party to implement local Dialing Parity in accordance with the requirements of Section 251(b)(3) of the Act.

**3. Directory Assistance (DA) and Operator Services (OS)**

3.1 Either Party may request that the other Party provide the requesting Party with nondiscriminatory access to the other Party's directory assistance services (DA), intraLATA operator call completion services (OS), and/or directory assistance listings database. If either Party makes such a request, the Parties shall enter into a mutually acceptable written agreement for such access.

3.2 Great Works shall arrange, at its own expense, the trunking and other facilities required to transport traffic to and from the designated DA and OS switch locations.

**4. Directory Listing and Directory Distribution**

To the extent required by Applicable Law, Verizon will provide directory services to Great Works. Such services will be provided in accordance with the terms set forth herein.

4.1 Listing Information.

As used herein, "Listing Information" means a Great Works Customer's primary name, address (including city, state and zip code), telephone number(s), the delivery address and number of directories to be delivered, and, in the case of a business Customer, the primary business heading under which the business Customer desires to be placed, and any other information Verizon deems necessary for the publication and delivery of directories.

4.2 Listing Information Supply.

Great Works shall provide to Verizon on a regularly scheduled basis, at no charge, and in a format required by Verizon or by a mutually agreed upon industry standard (e.g., Ordering and Billing Forum developed), all Listing Information and the service address for each Great Works Customer whose service address location falls within the geographic area covered by the relevant Verizon directory. Great Works shall also provide to Verizon on a daily basis, (a) information showing Great Works Customers who have disconnected or terminated their service with Great Works; and (b) delivery information for each non-listed or non-published Great Works Customer to enable Verizon to perform its directory distribution responsibilities. Verizon shall promptly provide to Great Works, (normally within forty-eight (48) hours of receipt by Verizon, excluding non-Business Days), a query on any listing that is not acceptable.

### 4.3 Listing Inclusion and Distribution.

Verizon shall include each Great Works Customer's Primary Listing in the appropriate alphabetical directory and, for business Customers, in the appropriate classified (Yellow Pages) directory in accordance with the directory configuration, scope and schedules determined by Verizon in its sole discretion, and shall provide initial distribution of such directories to such Great Works Customers in the same manner it provides initial distribution of such directories to its own Customers. "Primary Listing" means a Customer's primary name, address, and telephone number. Listings of Great Works's Customers shall be interfiled with listings of Verizon's Customers and the Customers of other LECs included in the Verizon directories. Great Works shall pay Verizon's tariffed charges for additional and foreign alphabetical listings and other alphabetical services (e.g. caption arrangements) for Great Works's Customers.

### 4.4 Verizon Information.

Upon request by Great Works, Verizon shall make available to Great Works the following information to the extent that Verizon provides such information to its own business offices: a directory list of relevant NXX codes, directory and "Customer Guide" close dates, publishing data, and Yellow Pages headings. Verizon also will make available to Great Works, upon written request, a copy of Verizon's alphabetical listings standards and specifications manual.

### 4.5 Confidentiality of Listing Information.

Verizon shall accord Great Works Listing Information the same level of confidentiality that Verizon accords its own listing information, and shall use such Listing Information solely for the purpose of providing directory-related services; provided, however, that should Verizon elect to do so, it may use or license Great Works Listing Information for directory publishing, direct marketing, or any other purpose for which Verizon uses or licenses its own listing information, so long as Great Works Customers are not separately identified as such; and provided further that Great Works may identify those of its Customers who request that their names not be sold for direct marketing purposes, and Verizon shall honor such requests to the same extent it does so for its own Customers. Verizon shall not be obligated to compensate Great Works for Verizon's use or licensing of Great Works Listing Information.

### 4.6 Accuracy.

Both Parties shall use commercially reasonable efforts to ensure the accurate publication of Great Works ~~Customer~~ listings. At Great Works's request, Verizon shall provide Great Works with a report of all Great Works Customer listings normally no more than ninety (90) days and no less than thirty (30) days prior to the service order close date for the applicable directory. Verizon shall process any corrections made by Great Works with respect to its listings, provided such corrections are received prior to the close date of the particular directory.

### 4.7 Indemnification.

Great Works shall adhere to all practices, standards, and ethical requirements established by Verizon with regard to listings. By providing Verizon with Listing Information, Great Works warrants to Verizon that Great Works has the right to provide such Listing Information to Verizon on behalf of its Customers. Great Works shall make commercially reasonable efforts to ensure that any business or

person to be listed is authorized and has the right (a) to provide the product or service offered, and (b) to use any personal or corporate name, trade name, trademark, service mark or language used in the listing. Great Works agrees to release, defend, hold harmless and indemnify Verizon from and against any and all claims, losses, damages, suits, or other actions, or any liability whatsoever, suffered, made, instituted, or asserted by any person arising out of Verizon's publication or dissemination of the Listing Information as provided by Great Works hereunder.

4.8     Liability.

Verizon's liability to Great Works in the event of a Verizon error in or omission of a listing shall not exceed the lesser of the amount of charges actually paid by Great Works for such listing or the amount by which Verizon would be liable to its own customer for such error or omission. Great Works agrees to take all reasonable steps, including, but not limited to, entering into appropriate contractual provisions with its Customers, to ensure that its and Verizon's liability to Great Works's Customers in the event of a Verizon error in or omission of a listing shall be subject to the same limitations of liability applicable between Verizon and its own Customers.

4.9     Service Information Pages.

Verizon shall include all Great Works NXX codes associated with the geographic areas to which each directory pertains, to the extent it does so for Verizon's own NXX codes, in any lists of such codes that are contained in the general reference portion of each directory. Great Works's NXX codes shall appear in such lists in the same manner as Verizon's NXX information. In addition, when Great Works is authorized to, and is offering, local service to Customers located within the geographic area covered by a specific directory, at Great Works's request, Verizon shall include, at no charge, in the "Customer Guide" or comparable section of the applicable alphabetical directories, Great Works's critical contact information for Great Works's installation, repair and Customer service, as provided by Great Works. Such critical contact information shall appear alphabetically by local exchange carrier and in accordance with Verizon's generally applicable policies. Great Works shall be responsible for providing the necessary information to Verizon by the applicable close date for each affected directory.

4.10    Directory Publication.

Nothing in this Agreement shall require Verizon to publish a directory where it would not otherwise do so. ——

4.11    Other Directory Services.

Great Works acknowledges that if Great Works desires directory services in addition to those described herein, such additional services must be obtained under separate agreement with Verizon's directory publishing company.

5.     **Voice Information Service Traffic**

5.1     For purposes of this Section 5, (a) Voice Information Service means a service that provides [i] recorded voice announcement information or [ii] a vocal discussion program open to the public; and (b) Voice Information Service Traffic means intraLATA switched voice traffic, delivered to a Voice Information Service.

Voice Information Service Traffic does not include any form of Internet Traffic. Voice Information Service Traffic also does not include 555 traffic or similar traffic with AIN service interfaces, which traffic shall be subject to separate arrangements between the Parties. Voice Information Service Traffic is not subject to Reciprocal Compensation charges under Section 7 the Interconnection Attachment.

5.2 If a Great Works Customer is served by resold Verizon dial tone line Telecommunications Service or a Verizon Local Switching UNE, to the extent reasonably feasible, Verizon will route Voice Information Service Traffic originating from such Service or UNE to the appropriate Voice Information Service connected to Verizon's network unless a feature blocking such Voice Information Service Traffic has been installed. For such Voice Information Service Traffic, Great Works shall pay to Verizon without discount any Voice Information Service provider charges billed by Verizon to Great Works. Great Works shall pay Verizon such charges in full regardless of whether or not Great Works collects such charges from its own Customer.

5.3 Great Works shall have the option to route Voice Information Service Traffic that originates on its own network to the appropriate Voice Information Service connected to Verizon's network. In the event Great Works exercises such option, Great Works will establish, at its own expense, a dedicated trunk group to the Verizon Voice Information Service serving switch. This trunk group will be utilized to allow Great Works to route Voice Information Service Traffic originated on its network to Verizon. For such Voice Information Service Traffic, unless Great Works has entered into a written agreement with Verizon under which Great Works will collect from Great Works's Customer and remit to Verizon the Voice Information Service provider's charges, Great Works shall pay to Verizon without discount any Voice Information Service provider charges billed by Verizon to Great Works. Great Works shall pay Verizon such charges in full regardless of whether or not Great Works collects such charges from its own Customer.

6. **Intercept and Referral Announcements**

6.1 When a Customer changes its service provider from Verizon to Great Works, or from Great Works to Verizon, and does not retain its original telephone number, the Party formerly providing service to such Customer shall provide a referral announcement ("Referral Announcement") on the abandoned telephone number which provides the Customer's new number or other appropriate information, to the extent known to the Party formerly providing service. Notwithstanding the foregoing, a Party shall not be obligated under this Section to provide a Referral Announcement if the Customer owes the Party unpaid overdue amounts or the Customer requests that no Referral Announcement be provided.

6.2 Referral Announcements shall be provided, in the case of business Customers, for a period of not less than one hundred and twenty (120) days after the date the Customer changes its telephone number, and, in the case of residential Customers, not less than thirty (30) days after the date the Customer changes its telephone number; provided that if a longer time period is required by Applicable Law, such longer time period shall apply. Except as otherwise provided by Applicable Law, the period for a referral may be shortened by the Party formerly providing service if a number shortage condition requires reassignment of the telephone number.

6.3 This referral announcement will be provided by each Party at no charge to the other Party; provided that the Party formerly providing service may bill the Customer its standard Tariff charge, if any, for the referral announcement.

7. **Originating Line Number Screening (OLNS)**

Upon Great Works's request, Verizon will update its database used to provide originating line number screening (the database of information which indicates to an operator the acceptable billing methods for calls originating from the calling number (e.g., penal institutions, COCOTS).

8. **Operations Support Systems (OSS) Services**

8.1 <u>Definitions.</u>

The terms listed below shall have the meanings stated below:

8.1.1 <u>Verizon Operations Support Systems</u>: Verizon systems for pre-ordering, ordering, provisioning, maintenance and repair, and billing.

8.1.2 <u>Verizon OSS Services</u>: Access to Verizon Operations Support Systems functions. The term "Verizon OSS Services" includes, but is not limited to: (a) Verizon's provision of Great Works Usage Information to Great Works pursuant to Section 8.3 below; and, (b) "Verizon OSS Information", as defined in Section 8.1.4 below.

8.1.3 <u>Verizon OSS Facilities</u>: Any gateways, interfaces, databases, facilities, equipment, software, or systems, used by Verizon to provide Verizon OSS Services to Great Works.

8.1.4 <u>Verizon OSS Information</u>: Any information accessed by, or disclosed or provided to, Great Works through or as a part of Verizon OSS Services. The term "Verizon OSS Information" includes, but is not limited to: (a) any Customer Information related to a Verizon Customer or a Great Works Customer accessed by, or disclosed or provided to, Great Works through or as a part of Verizon OSS Services; and, (b) any Great Works Usage Information (as defined in Section 8.1.6 below) accessed by, or disclosed or provided to, Great Works.

8.1.5 <u>Verizon Retail Telecommunications Service</u>: Any Telecommunications Service that Verizon provides at retail to subscribers that are not Telecommunications Carriers. The term "Verizon Retail Telecommunications Service" does not include any Exchange Access service (as defined in Section 3(16) of the Act, 47 U.S.C. § 153(16)) provided by Verizon.

8.1.6 <u>Great Works Usage Information</u>: For a Verizon Retail Telecommunications Service purchased by Great Works pursuant to the Resale Attachment, the usage information that Verizon would record if Verizon was furnishing such Verizon Retail Telecommunications Service to a Verizon end-user retail Customer. For a Verizon Local Switching Network Element purchased by Great Works pursuant to the Network Element Attachment, the usage information that Verizon would record if Verizon was using such Local Switching Network Element to furnish a Verizon Retail Telecommunications Service to a Verizon end-user retail Customer.

8.1.7 _Customer Information_: CPNI of a Customer and any other non-public, individually identifiable information about a Customer or the purchase by a Customer of the services or products of a Party.

8.2 Verizon OSS Services.

8.2.1 Upon request by Great Works, Verizon shall provide to Great Works Verizon OSS Services. Such Verizon OSS Services will be provided in accordance with, but only to the extent required by, Applicable Law.

8.2.2 Subject to the requirements of Applicable Law, Verizon Operations Support Systems, Verizon Operations Support Systems functions, Verizon OSS Facilities, Verizon OSS Information, and the Verizon OSS Services that will be offered by Verizon, shall be as determined by Verizon. Subject to the requirements of Applicable Law, Verizon shall have the right to change Verizon Operations Support Systems, Verizon Operations Support Systems functions, Verizon OSS Facilities, Verizon OSS Information, and the Verizon OSS Services, from time-to-time, without the consent of Great Works.

8.2.3 To the extent required by Applicable Law, in providing Verizon OSS Services to Great Works, Verizon will comply with Verizon's applicable OSS Change Management Guidelines, as such Guidelines are modified from time-to-time, including, but not limited to, the provisions of the Guidelines related to furnishing notice of changes in Verizon OSS Services. Verizon's OSS Change Management Guidelines will be set out on a Verizon website.

8.3 Great Works Usage Information.

8.3.1 Upon request by Great Works, Verizon shall provide to Great Works Great Works Usage Information. Such Great Works Usage Information will be provided in accordance with, but only to the extent required by, Applicable Law.

8.3.2 Great Works Usage Information will be available to Great Works through the following:

8.3.2.1 Daily Usage File on Data Tape.

8.3.2.2 Daily Usage File through Network Data Mover (NDM).

8.3.3 Great Works Usage Information will be provided in an Alliance for Telecommunications Industry Solutions EMI format.

8.3.4 Daily Usage File Data Tapes provided pursuant to Section 8.3.2.1 above will be issued each day, Monday through Friday, except holidays observed by Verizon.

8.3.5 Except as stated in this Section 8.3, subject to the requirements of Applicable Law, the manner in which, and the frequency with which, Great Works Usage Information will be provided to Great Works shall be determined by Verizon.

8.4 Access to and Use of Verizon OSS Facilities.

8.4.1 Verizon OSS Facilities may be accessed and used by Great Works only to the extent necessary for Great Works's access to and use of Verizon OSS Services pursuant to this Agreement.

8.4.2 Verizon OSS Facilities may be accessed and used by Great Works only to provide Telecommunications Services to Great Works Customers.

8.4.3 Great Works shall restrict access to and use of Verizon OSS Facilities to Great Works. This Section 8 does not grant to Great Works any right or license to grant sublicenses to other persons, or permission to other persons (except Great Works's employees, agents and contractors, in accordance with Section 8.4.7 below), to access or use Verizon OSS Facilities.

8.4.4 Great Works shall not (a) alter, modify or damage the Verizon OSS Facilities (including, but not limited to, Verizon software), (b) copy, remove, derive, reverse engineer, or decompile, software from the Verizon OSS Facilities, or (c) obtain access through Verizon OSS Facilities to Verizon databases, facilities, equipment, software, or systems, which are not offered for Great Works's use under this Section 8.

8.4.5 Great Works shall comply with all practices and procedures established by Verizon for access to and use of Verizon OSS Facilities (including, but not limited to, Verizon practices and procedures with regard to security and use of access and user identification codes).

8.4.6 All practices and procedures for access to and use of Verizon OSS Facilities, and all access and user identification codes for Verizon OSS Facilities: (a) shall remain the property of Verizon; (b) shall be used by Great Works only in connection with Great Works's use of Verizon OSS Facilities permitted by this Section 8; (c) shall be treated by Great Works as Confidential Information of Verizon pursuant to Section 10 of the General Terms and Conditions; and, (d) shall be destroyed or returned by Great Works to Verizon upon the earlier of request by Verizon or the expiration or termination of this Agreement.

8.4.7 Great Works's employees, agents and contractors may access and use Verizon OSS Facilities only to the extent necessary for Great Works's access to and use of the Verizon OSS Facilities permitted by this Agreement. Any access to or use of Verizon OSS Facilities by Great Works's employees, agents, or contractors, shall be subject to the provisions of this Agreement, including, but not limited to, Section 10 of the General Terms and Conditions and Section 8.5.2.3 of this Attachment.

8.5 Verizon OSS Information.

8.5.1 Subject to the provisions of this Section 8, in accordance with, but only to the extent required by, Applicable Law, Verizon grants to Great Works a non-exclusive license to use Verizon OSS Information.

8.5.2 All Verizon OSS Information shall at all times remain the property of Verizon. Except as expressly stated in this Section 8, Great Works shall acquire no rights in or to any Verizon OSS Information.

8.5.2.1 The provisions of this Section 8.5.2 shall apply to all Verizon OSS Information, except (a) Great Works Usage Information, (b) CPNI of Great Works, and (c) CPNI of a Verizon Customer or a Great Works Customer, to the extent the Customer has authorized Great Works to use the CPNI.

8.5.2.2 Verizon OSS Information may be accessed and used by Great Works only to provide Telecommunications Services to Great Works Customers.

8.5.2.3 Great Works shall treat Verizon OSS Information that is designated by Verizon, through written or electronic notice (including, but not limited to, through the Verizon OSS Services), as "Confidential" or "Proprietary" as Confidential Information of Verizon pursuant to Section 10 of the General Terms and Conditions.

8.5.2.4 Except as expressly stated in this Section 8, this Agreement does not grant to Great Works any right or license to grant sublicenses to other persons, or permission to other persons (except Great Works's employees, agents or contractors, in accordance with Section 8.5.2.5 below), to access, use or disclose Verizon OSS Information.

8.5.2.5 Great Works's employees, agents and contractors may access, use and disclose Verizon OSS Information only to the extent necessary for Great Works's access to, and use and disclosure of, Verizon OSS Information permitted by this Section 8. Any access to, or use or disclosure of, Verizon OSS Information by Great Works's employees, agents or contractors, shall be subject to the provisions of this Agreement, including, but not limited to, Section 10 of the General Terms and Conditions and Section 8.5.2.3 above.

8.5.2.6 Great Works's license to use Verizon OSS Information shall expire upon the earliest of: (a) the time when the Verizon OSS Information is no longer needed by Great Works to provide Telecommunications Services to Great Works Customers; (b) termination of the license in accordance with this Section 8; or (c) expiration or termination of this Agreement.

8.5.2.7 All Verizon OSS Information received by Great Works shall be destroyed or returned by Great Works to Verizon, upon expiration, suspension or termination of the license to use such Verizon OSS Information.

8.5.3 Unless sooner terminated or suspended in accordance with this Agreement or this Section 8 (including, but not limited to, Section 2.2 of the General Terms and Conditions and Section 8.6.1 below), Great Works's access to Verizon OSS Information through Verizon OSS Services shall terminate upon the expiration or termination of this Agreement.

8.5.4 Audits.

8.5.4.1  Verizon shall have the right (but not the obligation) to audit Great Works to ascertain whether Great Works is complying with the requirements of Applicable Law and this Agreement with regard to Great Works 's access to, and use and disclosure of, Verizon OSS Information.

8.5.4.2  Without in any way limiting any other rights Verizon may have under this Agreement or Applicable Law, Verizon shall have the right (but not the obligation) to monitor Great Works 's access to and use of Verizon OSS Information which is made available by Verizon to Great Works pursuant to this Agreement, to ascertain whether Great Works is complying with the requirements of Applicable Law and this Agreement, with regard to Great Works 's access to, and use and disclosure of, such Verizon OSS Information.  The foregoing right shall include, but not be limited to, the right (but not the obligation) to electronically monitor Great Works 's access to and use of Verizon OSS Information which is made available by Verizon to Great Works through Verizon OSS Facilities.

8.5.4.3  Information obtained by Verizon pursuant to this Section 8.5.4 shall be treated by Verizon as Confidential Information of Great Works pursuant to Section 10 of the General Terms and Conditions; provided that, Verizon shall have the right (but not the obligation) to use and disclose information obtained by Verizon pursuant to this Section 8.5.4 to enforce Verizon's rights under this Agreement or Applicable Law.

8.5.5  Great Works acknowledges that the Verizon OSS Information, by its nature, is updated and corrected on a continuous basis by Verizon, and therefore that Verizon OSS Information is subject to change from time to time.

8.6  Liabilities and Remedies.

8.6.1  Any breach by Great Works, or Great Works's employees, agents or contractors, of the provisions of Sections 8.4 or 8.5 above shall be deemed a material breach of this Agreement.  In addition, if Great Works or an employee, agent or contractor of Great Works at any time breaches a provision of Sections 8.4 or 8.5 above and such breach continues for more than ten (10) days after written notice thereof from Verizon, then, except as otherwise required by Applicable Law, Verizon shall have the right, upon notice to Great Works, to suspend the license to use Verizon OSS Information granted by Section 8.5.1 above and/or the provision of Verizon OSS Services, in whole or in part.

8.6.2  Great Works agrees that Verizon would be irreparably injured by a breach of Sections 8.4 or 8.5 above by Great Works or the employees, agents or contractors of Great Works, and that Verizon shall be entitled to seek equitable relief, including injunctive relief and specific performance, in the event of any such breach.  Such remedies shall not be deemed to be the exclusive remedies for any such breach, but shall be in addition to any other remedies available under this Agreement or at law or in equity.

8.7 <u>Relation to Applicable Law.</u>

The provisions of Sections 8.4, 8.5 and 8.6 above with regard to the confidentiality of information shall be in addition to and not in derogation of any provisions of Applicable Law with regard to the confidentiality of information, including, but not limited to, 47 U.S.C. § 222, and are not intended to constitute a waiver by Verizon of any right with regard to protection of the confidentiality of the information of Verizon or Verizon Customers provided by Applicable Law.

8.8 <u>Cooperation.</u>

Great Works, at Great Works's expense, shall reasonably cooperate with Verizon in using Verizon OSS Services. Such cooperation shall include, but not be limited to, the following:

8.8.1 Upon request by Verizon, Great Works shall by no later than the fifteenth (15th) day of the last month of each Calendar Quarter submit to Verizon reasonable, good faith estimates of the volume of each type of OSS transaction that Great Works anticipates submitting in each week of the next Calendar Quarter.

8.8.2 Great Works shall reasonably cooperate with Verizon in submitting orders for Verizon Services and otherwise using the Verizon OSS Services, in order to avoid exceeding the capacity or capabilities of such Verizon OSS Services.

8.8.3 Great Works shall participate in cooperative testing of Verizon OSS Services and shall provide assistance to Verizon in identifying and correcting mistakes, omissions, interruptions, delays, errors, defects, faults, failures, or other deficiencies, in Verizon OSS Services.

8.9 <u>Verizon Access to Information Related to Great Works Customers.</u>

8.9.1 Verizon shall have the right to access, use and disclose information related to Great Works Customers that is in Verizon's possession (including, but not limited to, in Verizon OSS Facilities) to the extent such access, use and/or disclosure has been authorized by the Great Works Customer in the manner required by Applicable Law.

8.9.2 Upon request by Verizon, Great Works shall negotiate in good faith and enter into a contract with Verizon, pursuant to which Verizon may obtain access to Great Works's operations support systems (including, systems for pre-ordering, ordering, provisioning, maintenance and repair, and billing) and information contained in such systems, to permit Verizon to obtain information related to Great Works Customers (as authorized by the applicable Great Works Customer), to permit Customers to transfer service from one Telecommunications Carrier to another, and for such other purposes as may be permitted by Applicable Law.

8.10 <u>Verizon Pre-OSS Services.</u>

8.10.1 As used in this Section 8, "Verizon Pre-OSS Service" means a service which allows the performance of an activity which is comparable to an activity to be performed through a Verizon OSS Service and which Verizon offers to provide to Great Works prior to, or in lieu of, Verizon's provision of the Verizon OSS Service to Great Works. The term

"Verizon Pre-OSS Service" includes, but is not limited to, the activity of placing orders for Verizon Services through a telephone facsimile communication.

8.10.2 Subject to the requirements of Applicable Law, the Verizon Pre-OSS Services that will be offered by Verizon shall be as determined by Verizon and Verizon shall have the right to change Verizon Pre-OSS Services, from time-to-time, without the consent of Great Works.

8.10.3 Subject to the requirements of Applicable Law, the prices for Verizon Pre-OSS Services shall be as determined by Verizon and shall be subject to change by Verizon from time-to-time.

8.10.4 The provisions of Sections 8.4 through 8.8 above shall also apply to Verizon Pre-OSS Services. For the purposes of this Section 8.10: (a) references in Sections 8.4 through 8.8 above to Verizon OSS Services shall be deemed to include Verizon Pre-OSS Services; and, (b) references in Sections 8.4 through 8.8 above to Verizon OSS Information shall be deemed to include information made available to Great Works through Verizon Pre-OSS Services.

8.11 Cancellations.

Verizon may cancel orders for service which have had no activity within thirty-one (31) consecutive calendar days after the original service due date.

9. **Poles, Ducts, Conduits and Rights-of-Way**

9.1 Verizon shall afford Great Works non-discriminatory access to poles, ducts, conduits and rights-of-way owned or controlled by Verizon. Such access shall be provided in accordance with, but only to the extent required by, Applicable Law, pursuant to Verizon's applicable Tariffs, or, in the absence of an applicable Verizon Tariff, Verizon's generally offered form of license agreement, or, in the absence of such a Tariff and license agreement, a mutually acceptable agreement to be negotiated by the Parties.

9.2 Great Works shall afford Verizon non-discriminatory access to poles, ducts, conduits and rights-of-way owned or controlled by Great Works. Such access shall be provided pursuant to Great Works's applicable Tariffs, or, in the absence of an applicable Great Works Tariff, Great Works's generally offered form of license agreement, or, in the absence of such a Tariff and license agreement, a mutually acceptable agreement to be negotiated by the Parties. The terms, conditions and prices offered to Verizon by Great Works for such access shall be no less favorable than the terms, conditions and prices offered to Great Works by Verizon for access to poles, ducts, conduits and rights of way owned or controlled by Verizon.

10. **Telephone Numbers**

10.1 This Section applies in connection with Great Works Customers served by Telecommunications Services provided by Verizon to Great Works for resale or a Local Switching Network Element provided by Verizon to Great Works.

10.2 Great Works's use of telephone numbers shall be subject to Applicable Law the rules of the North American Numbering Council and the North American Numbering Plan Administrator, the applicable provisions of this Agreement (including, but not limited to, this Section 10), and Verizon's practices and

procedures for use and assignment of telephone numbers, as amended from time-to-time.

10.3 Subject to Sections 10.2 and 10.4, if a Customer of either Verizon or Great Works who is served by a Verizon Telecommunications Service ("VTS") or a Verizon Local Switching Network Element ("VLSNE") changes the LEC that serves the Customer using such VTS or VLSNE (including a change from Verizon to Great Works, from Great Works to Verizon, or from Great Works to a LEC other than Verizon), after such change, the Customer may continue to use with such VTS or VLSNE the telephone numbers that were assigned to the VTS or VLSNE for the use of such Customer by Verizon immediately prior to the change.

10.4 Verizon shall have the right to change the telephone numbers used by a Customer if at any time: (a) the Customer requests service at a new location, that is not served by the Verizon switch and the Verizon rate center from which the Customer previously had service; (b) continued use of the telephone numbers is not technically feasible; or, (c) in the case of Telecommunications Service provided by Verizon to Great Works for resale, the type or class of service subscribed to by the Customer changes.

10.5 If service on a VTS or VLSNE provided by Verizon to Great Works under this Agreement is terminated and the telephone numbers associated with such VTS or VLSNE have not been ported to a Great Works switch, the telephone numbers shall be available for reassignment by Verizon to any person to whom Verizon elects to assign the telephone numbers, including, but not limited to, Verizon, Verizon Customers, Great Works, or Telecommunications Carriers other than Verizon and Great Works.

10.6 Great Works may reserve telephone numbers only to the extent Verizon's Customers may reserve telephone numbers.

11. **Routing for Operator Services and Directory Assistance Traffic**

For a Verizon Telecommunications Service dial tone line purchased by Great Works for resale pursuant to the Resale Attachment, upon request by Great Works, Verizon will establish an arrangement that will permit Great Works to route the Great Works Customer's calls for operator and directory assistance services to a provider of operator and directory assistance services selected by Great Works. Verizon will provide this routing arrangement in accordance with, but only to the extent required by, Applicable Law. Verizon will provide this routing arrangement pursuant to an appropriate written request submitted by Great Works and a mutually agreed-upon schedule. This routing arrangement will be implemented at Great Works's expense, with charges determined on an individual case basis. In addition to charges for initially establishing the routing arrangement, Great Works will be responsible for ongoing monthly and/or usage charges for the routing arrangement. Great Works shall arrange, at its own expense, the trunking and other facilities required to transport traffic to Great Works's selected provider of operator and directory assistance services.

# INTERCONNECTION ATTACHMENT

**1.    General**

Each Party ("Providing Party") shall provide to the other Party, in accordance with this Agreement, the Providing Party's applicable Tariffs, and Applicable Law, interconnection with the Providing Party's network for the transmission and routing of Telephone Exchange Service and Exchange Access.

**2.    Methods for Interconnection and Trunk Types**

2.1    Methods for Interconnection.

    2.1.1   In accordance with, but only to the extent required by, Applicable Law, the Parties shall provide interconnection of their networks at any technically feasible point as specified in this Agreement.

    2.1.2   Each Party ("Originating Party"), at its own expense, shall provide for delivery to the relevant IP of the other Party ("Receiving Party") Reciprocal Compensation Traffic and Measured Internet Traffic that the Originating Party wishes to deliver to the Receiving Party.

    2.1.3   Great Works may use any of the following methods for interconnection with Verizon:

        2.1.3.1   a Collocation arrangement Great Works has established at the Verizon-IP pursuant to the Collocation Attachment; and/or

        2.1.3.2   a Collocation arrangement that has been established separately at the Verizon-IP by a third party and that is used by Great Works to interconnect with Verizon; and/or

        2.1.3.3   an Entrance Facility and transport obtained from Verizon (and any necessary multiplexing) pursuant to the applicable Verizon access Tariff, from the Great Works network to the Verizon-IP.

    2.1.4   Great Works may order from Verizon, in accordance with the rates, terms and conditions set forth in this Agreement and applicable Verizon Tariff(s) (or in the absence of applicable rates, terms and conditions set forth in this Agreement and Verizon Tariff(s), in accordance with rates, terms and conditions to be negotiated by the Parties), any of the methods for interconnection specified in Section 2.1.3 above.

    2.1.5   Verizon may use any of the following methods for interconnection with Great Works:

        2.1.5.1   a Collocation arrangement Verizon has established at the Great Works-IP pursuant to the Collocation Attachment, or an interconnection arrangement Verizon has established at the Great Works-IP that is operationally equivalent to a Collocation arrangement (including, but not limited to, a Verizon provided Entrance Facility); and/or

2.1.5.2    a Collocation arrangement that has been established separately at the Great Works-IP by a third party and that is used by Verizon to interconnect with Great Works; and/or

2.1.5.3    a non-distance sensitive Entrance Facility obtained from Great Works (and any necessary multiplexing), from the Verizon network to the Great Works-IP (including, but not limited to, at Verizon's election, an Entrance Facility accessed by Verizon through interconnection at a Collocation arrangement that Great Works has established at a Verizon Wire Center pursuant to the Collocation Attachment, or through interconnection at a Collocation arrangement that has been established separately at a Verizon Wire Center by a third party and that is used by Great Works), or an Entrance Facility obtained from a third party that has established an interconnection arrangement with Great Works.

2.1.6   Verizon may order from Great Works, in accordance with the rates, terms and conditions set forth in this Agreement and applicable Great Works Tariff(s) (or in the absence of applicable rates, terms and conditions set forth in this Agreement and Great Works Tariff(s), in accordance with rates, terms and conditions to be negotiated by the Parties), any of the methods for interconnection specified in Section 2.1.5 above.

2.2    <u>Trunk Types.</u>

2.2.1   In interconnecting their networks pursuant to this Attachment, the Parties will use, as appropriate, the following separate and distinct trunk groups:

2.2.1.1    Interconnection Trunks for the transmission and routing of Reciprocal Compensation Traffic, translated LEC IntraLATA toll free service access code (e.g., 800/888/877) traffic, and IntraLATA Toll Traffic, between their respective Telephone Exchange Service Customers, Tandem Transit Traffic, and, Measured Internet Traffic, all in accordance with Sections 5 through 8 of this Attachment;

2.2.1.2    Access Toll Connecting Trunks for the transmission and routing of Exchange Access traffic, including translated InterLATA toll free service access code (e.g., 800/888/877) traffic, between Great Works Telephone Exchange Service Customers and purchasers of Switched Exchange Access Service via a Verizon access Tandem in accordance with Sections 9 through 11 of this Attachment; and

2.2.1.3    Miscellaneous Trunk Groups as mutually agreed to by the Parties, including, but not limited to: (a) choke trunks for traffic congestion and testing; and, (b) untranslated IntraLATA/InterLATA toll free service access code (e.g. 800/888/877) traffic.

2.2.2   Other types of trunk groups may be used by the Parties as provided in other Attachments to this Agreement (e.g., 911/E911 Trunks; Information Services Trunks) or in other separate agreements between